# 20-3894-cv

## United States Court of Appeals
### *for the*
## Second Circuit

MISTY BLANCHETTE PORTER, M.D.,

*Plaintiff-Appellant,*

– v. –

DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, DARTMOUTH-HITCHCOCK HEALTH,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT
### (FILED UNDER SEAL)

GEOFFREY J. VITT
VITT & ASSOCIATES
Eight Beaver Meadow Road
P.O. Box 1229
Norwich, Vermont 05055
(802) 649-5700

KATHERINE B. KRAMER
DGW KRAMER LLP
One Rockefeller Plaza, Suite 1060
New York, New York 10020
(917) 688-2585

*Attorneys for Plaintiff-Appellant*

**Table of Contents**

TABLE OF AUTHORITIES .................................................................. iii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .......................2

STATEMENT OF THE CASE ...........................................................4

  I.  Introduction and Procedural History .................................4

  II.  Dr. Porter's Employment at D-H.....................................8

  III.  Dr. Porter's Whistleblowing Complaints Regarding Drs. Seifer and Hsu ...9

    A.  *General Patient Safety Concerns* ................................9

    B.  *Specific Whistleblowing Incidents*.............................13

  IV.  Dr. Porter's Disability ...............................................15

  V.  Decision to Close REI Division and Decision to Terminate Dr. Porter's Employment..................................................................18

  VI.  Evidence of D-H's Unlawful and Discriminatory Motivation ..................21

SUMMARY OF ARGUMENT .........................................................26

ARGUMENT .............................................................................28

  I.  Standard of Review ..................................................28

    A.  *Summary Judgment* ...............................................28

    B.  *McDonnell Douglas Framework*.................................29

    C.  *"But For" Causation*..............................................30

  II.  The District Court erred in awarding summary judgment to Defendants when it misapplied the legal standard applicable to Plaintiff's whistleblower claims. ..................................................................32

    A.  *Whistleblower Retaliation* ........................................32

    B.  *Temporal Proximity*...............................................33

    C.  *Awareness of Whistleblowing Activities*.......................36

    D.  *Wrongful Termination* .............................................39

  III.  The District Court erred in awarding summary judgment to Defendants because it misapplied the legal standard applicable to Plaintiff's disability claims. ..................................................................41

   A.  *Disability Discrimination* ...........................................................41

   B.  *Failure to Accommodate* ...........................................................45

   C.  *Retaliation - Disability* .............................................................46

   D.  *Vermont Fair Employment Practices Act - Disability* ...............48

   E.  *N.H. Law Against Discrimination - Disability*...........................49

IV.  The District Court erred in awarding summary judgment to Defendants where it improperly usurped the jury's role by deciding disputed facts and consequently and erroneously concluded that Defendants purported "legitimate business reasons" for closing the REI Division and not retaining Dr. Porter were not pretextual. ...................................51

**CONCLUSION**....................................................................................56

**CERTIFICATE OF COMPLIANCE** ................................................57

## TABLE OF AUTHORITIES

**Cases**

*Abrams v. Dep't of Pub. Safety*, 764 F.3d 244 (2d Cir. 2014)..................................55

*Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128 (1st Cir. 2012)........ 36, 52

*Appeal of Bosselait*, 547 A.2d 682 (N.H. 1988) .....................................................51

*Appeal of Seacoast Fire Equip. Co.*, 777 A.2d 869 (N.H. 2001) ...........................32

*Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020)....................................31

*Burns v. Johnson*, 829 F.3d 1 (1st Cir. 2016) .................................................. 43, 55

*Cincinnati Ins. Co. v. S. Vermont Sprinkler Servs., Inc.*,
No. 5:l 7-CV-254, 2019 WL 5698930 (D. Vt. July 10, 2019) ............................52

*Cloutier v. Great Atl. & Pac. Tea Co.*, 436 A.2d 1140 (N.H. 1981)............... 39, 40

*Cooper v. Thomson Newspapers, Inc.*, 6 F. Supp. 2d 109 (D.N.H. 1998) .............44

*Garayalde-Rijos v. Mun. of Carolina*, 747 F.3d 15 (1st Cir. 2014) ................. 34, 36

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93 (2d Cir. 2010)...........................31

*Hidalgo-Semlek v. Hansa Med., Inc.*, No. 1:19-CV-00436-JL,
2020 WL 6383237 (D.N.H. Oct. 30, 2020).........................................................33

*Hodgdon v. Mt. Mansfield Co.*, 624 A.2d 1122 (Vt. 1992) ....................................48

*Hubbard v. Tyco Integrated Cable Sys., Inc.,* 985 F. Supp. 2d 207
(D.N.H. 2013) .....................................................................................................51

*In re Dunlap*, 604 A.2d 945 (N.H. 1991) .................................................. 43, 50, 51

*Kaytor v. Elec. Boat Corp.*, 609 F.3d 537 (2d Cir. 2010)......................... 29, 35, 52

*Knapp v. State*, 168 Vt. 590 (1998) .......................................................................48

*Kopchik v. Town of E. Fishkill, New York*, 759 F. App'x 31
(2d Cir. 2018).............................................................................................. 35, 36

*Kwan v. Andalex Grp. LLC*, 737 F.3d 834 (2d Cir. 2013)................................ 30, 35

*Kwon v. Univ. of Vt. & State Agric. Coll.,* 912 F. Supp. 2d 135
   (D. Vt. 2012).............................................................................................55

*Lareau v. Nw. Med. Ctr.*, No. 2:17-CV-81, 2019 WL 4963057
   (D. Vt. Oct. 8, 2019) ...............................................................................47

*Lenzi v. Systemax, Inc.*, 944 F.3d 97 (2d Cir. 2019).........................................28, 36

*Massaquoi v. Genesis HealthCare, LLC*, No. 18-CV-00296-LM,
   2019 WL 6841949 (D.N.H. Dec. 16, 2019) .........................................47

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .............................29, 41

*McMillan v. City of New York*, 711 F.3d 120 (2d Cir. 2013) ...............................42

*Mesnick v. Gen. Elec. Co.*, 950 F.2d 816 (1st Cir. 1991) ......................................47

*Natofsky v. City of New York*, 921 F.3d 337 (2d Cir. 2019),
   *cert denied*, 140 S. Ct. 2668 (2020)............................................ 42, 47, 48, 49, 50

*Payne v. U.S. Airways, Inc.*, 987 A.2d 944 (Vt. 2009).........................................49

*Porter v. Dartmouth-Hitchcock Med. Ctr.*, No. 5:17-CV-194,
   2020 WL 6789564 (D. Vt. Nov. 3, 2020)..............................................4

*Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379 (2d Cir. 2020) .............................29, 34

*Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113
   (2d Cir. 2004)..........................................................................................45

*Smith v. Cty. of Suffolk*, 776 F.3d 114 (2d Cir. 2015)...........................................38

*Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19
   (1st Cir. 2015) ....................................................................................44, 55

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011).........................................................37

*Summa v. Hofstra Univ.*, 708 F.3d 115 (2d Cir. 2013)...........................................38

*Todd v. Aggregate Indus.-Ne. Region, Inc.*, No. 14-CV-393-JL,
2015 WL 6473434 (D.N.H. Oct. 27, 2015) ..........................................40

*Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33 (1st Cir. 2011) ...........................39

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)....................................30

*Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267 (2d Cir. 2016) .............38

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72 (2d Cir. 2015) ................52

*Walsh v. New York City Hous. Auth.*, 828 F.3d 70 (2d Cir. 2016) .........................29

*Witherbee v. Town of Brattleboro*, No. 2:18-CV-00113,
2019 WL 2476722 (D. Vt. June 13, 2019) ........................................48

*Wood v. City of Barre*, No. 369-6-14 WNCV, 2016 WL 8078133
(Vt. Super. Feb. 09, 2016) ............................................................. 45, 47

*Yang v. Navigators Grp., Inc.*, 674 F. App'x 13 (2d Cir. 2016)............................35

*Zangri v. Unit4 Bus. Software, Inc.*, No. 19-CV-408-SM,
2020 WL 3960919 (D.N.H. July 13, 2020) ........................................34

**Statutes**

21 Vt. Stat. Ann. § 495 ...................................................................................8

21 Vt. Stat. Ann. § 495(a)(1) ........................................................................48

21 Vt. Stat. Ann. § 495(a)(8) ........................................................................46

28 U.S.C. § 1291 .............................................................................................1

28 U.S.C. § 1331 .............................................................................................1

28 U.S.C. § 1332 .............................................................................................1

28 U.S.C. § 1367 .............................................................................................1

29 U.S.C. § 794 ........................................................................... 7, 8, 42, 47

29 U.S.C. § 794(a) .........................................................................................46

42 U.S.C. § 12101 ........................................................................... 7, 42, 47

42 U.S.C. § 12112(a) ................................................................49

42 U.S.C. § 12203(a) ................................................................46

N.H. Rev. Stat. Ann. § 275-E:2(I)(a) ...................................7, 32

N.H. Rev. Stat. Ann. § 354-A:19 .........................................7, 46

N.H. Rev. Stat. Ann. § 354-A:2, IV ..........................................44

N.H. Rev. Stat. Ann. § 354-A:7, I ................................... 7, 49, 50

N.H. Rev. Stat. Ann. § 354-A:7, VII .............................. 7, 49, 50

**Other Authorities**

*Merrill v. Fall Mountain Reg'l Sch. Dist. – SAU 60*,
   EA 0313-06, 16D-2006-10091 (Sept. 2010),
   https://www.nh.gov/hrc/decisions/documents/merrill-v-sau60-gross.pdf ...........50

# JURISDICTIONAL STATEMENT

The court below had subject matter jurisdiction based on diversity pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of Vermont and all Defendants are citizens of New Hampshire and the amount in controversy exceeds $75,000.

The court below also had subject matter jurisdiction based on federal question pursuant to 28 U.S.C. § 1331, with respect to the claims under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367, with respect to the state law claims.

This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291. Final judgment was entered in the court below on November 4, 2020. Plaintiff filed a timely notice of appeal on November 17, 2020. This appeal is from a final judgment that disposes of all Plaintiff's claims in this action against the Defendants.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the District Court misapplied the applicable legal standard and therefore erred in awarding summary judgment to Defendants.

2. Whether the District Court improperly weighed temporal proximity as the most important indicator of causation and erred in assessing temporal proximity with respect to the whistleblower claims.

3. Whether the District Court erred when it concluded that Defendants' purported "business reasons" for closing the REI division and not re-deploying Dr. Porter were genuine and not mere pretext where evidence demonstrated that the reasons were false and motivated by discriminatory animus.

4. Whether the District Court erred in awarding summary judgment to Defendants where it improperly usurped the jury's role by deciding disputed facts, further failed to view facts in the light most favorable to the plaintiff as required, and decided disputed facts in contravention of the evidence.

5. Whether the District Court erred when it found, as an undisputed fact, that decisionmakers were unaware of Dr. Porter's whistleblowing activities and complaints of discrimination at the time she was terminated, despite sufficient evidence for a reasonable jury to determine that decisionmakers were well aware of this information and that this information motivated their decision-making.

6. Whether the District Court erred in concluding that the evidence did not include sufficient indicia of causation such that a reasonable jury could find in favor of Dr. Porter and therefore erred in granting summary judgment.

# STATEMENT OF THE CASE

## I.   Introduction and Procedural History

This appeal follows from the final judgment in *Porter v. Dartmouth-Hitchcock Med. Ctr.*, No. 5:17-CV-194, 2020 WL 6789564 (D. Vt. Nov. 3, 2020) (Crawford, C.J.), (SPA-1 to SPA-30),[1] in which the lower court erroneously granted summary judgment for Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (together, "D-H" or "Defendants") in an action for employment discrimination arising from D-H's unlawful decision to terminate the employment of Misty Blanchette Porter, M.D. ("Dr. Porter" or "Plaintiff") after twenty-one years in the OB/GYN Department.

In March 2017, D-H decided to close the indisputably profitable[2] Reproductive Endocrinology and Infertility ("REI")[3] Division—located within the OB/GYN Department—in which Dr. Porter provided services. (JA-83.) The stated reason was a nursing staff shortage. (SPA-5.)

---

[1] Citations to "SPA-xx" refer to Plaintiff's Special Appendix (an addendum to this Brief). Citations to "JA-xx" refer to the separately-bound Joint Appendix.

[2] (JA-310 [133:15–134:7]; JA-228, JA-258 [13:18, 16:8–11, 133].)

[3] REI medicine involves consultation and care for women and their partners with complex problems related to the reproductive system, including fertility treatments.

Separately, at the end of April 2017, D-H made the decision to terminate Dr. Porter's employment. (JA-89.) This decision was not an inevitable consequence of D-H's decision to close the REI Division. Dr. Porter had unique talents that were in demand in the understaffed OB/GYN Department, and it was widely expected that she would continue working at D-H after the REI Division closed. (JA-648, JA-659.) The entire OB/GYN Department relied on Dr. Porter for help reading difficult ultrasounds, and she could perform complicated gynecological surgeries that no other D-H doctor could perform. (JA-581.) After Dr. Porter was terminated, patients needing these surgeries had to be referred to other hospitals. (*Id.*) Dr. Ed Merrens, Chief Clinical Officer, claims responsibility for terminating Dr. Porter and closing the REI Division but admits that he relied heavily on information from Dr. Leslie DeMars, Chair of the OB/GYN Department.[4] (JA-281 [19:8–19:10]; JA-291 [60:17–60:19]; JA-540 [129:10–129:15].)

Termination of Dr. Porter's employment resulted from unlawful employment discrimination based on Dr. Porter's disability and her whistleblowing activities. Dr. DeMars resented the need to accommodate Dr. Porter's disability[5]

---

[4] D-H asserts that Dr. Merrens also relied on Daniel Herrick's opinion; however, Mr. Herrick, a senior VP in charge of OB/GYN and other departments testified that he had no direct knowledge of Dr. Porter's behavior or skills. (JA-253 [115:23–116:4]; JA-255 [123:3–123:22] (admitting he would rely on Dr. DeMars for that).)

[5] Dr. Porter, as a long-time D-H employee and skilled medical provider, was a resource to the REI Division and the entire OB/GYN Department. When she was

and further resented Dr. Porter's on-going objections to unsafe and unlawful conduct by two other REI Division physicians, Dr. David Seifer and Dr. Albert Hsu. Dr. DeMars understood, due to her role hiring Dr. Seifer, that she would be held personally responsible for his professional failures. Indeed, she was asked to step down as Chair soon after the REI Division closed. (JA-544 [151:1–152:25].) Seeking to shift blame from herself (and Drs. Seifer and Hsu), Dr. DeMars concealed relevant information from Dr. Merrens about the REI Division and deliberately steered him into believing that Dr. Porter was a divisive troublemaker whose time at D-H needed to end with the closure of the REI Division. Dr. Merrens relied on this misleading information in deciding to terminate Dr. Porter's employment, as can be seen from his May 12, 2017 email to Dr. DeMars. He wrote:

> I am getting inundated with heartfelt and long emails wondering why Misty can't stay on to do her ultrasound complex operative and teaching role even if we end REI. I suspect that you considered this in the evaluation [of] the program and your knowledge of Misty. I just need to know how better to answer this question.

(JA-646.) Thus, even after the termination decisions had been announced, Dr. Merrens couldn't answer the "why" question without guidance from Dr. DeMars.

---

temporarily unable to carry the entire Division due to her disability, it made the failures of the other physicians and Dr. DeMars that much more obvious. (JA-644.)

All told, there was more than enough in the record to show, for purposes of summary judgment, that but for Dr. Porter's whistleblowing and disability, Dr. Porter would not have been terminated. Moreover, D-H's decision was irrational and short-sighted, thus further indicating discrimination. If all facts alleged by Dr. Porter had been taken as true, as required on a motion for summary judgment, the lower court would have concluded that a reasonable jury could deduce that the genuine reason behind Dr. Porter's termination was discrimination and retaliation. Instead, in granting summary judgment for D-H, the lower court engaged in repeated fact-finding on key disputed issues of fact and improperly usurped the role of the jury.

On October 11, 2017, Dr. Porter brought a complaint in the U.S. District Court for the District of Vermont alleging discrimination and retaliation based on disability (42 U.S.C. § 12101 *et seq.*; N.H. Rev. Stat. Ann. § 354-A:7, I; N.H. Rev. Stat. Ann. § 354-A:7, VII; and N.H. Rev. Stat. Ann. § 354-A:19); whistleblowing (N.H. Rev. Stat. Ann. § 275-E:2); and wrongful termination in violation of public policy. Plaintiff's motion to amend her complaint was granted on July 30, 2018, and the First Amended Complaint was filed on August 1, 2018. The First Amended Complaint added, among other things, a claim alleging disability discrimination under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §

794 *et seq.*) and disability discrimination and retaliation under Vermont's Fair Employment Practices Act (21 Vt. Stat. Ann. § 495 *et seq.*).

Defendants moved for summary judgment on January 29, 2020. (JA-80 to JA-82.) On November 3, 2020, the lower court granted summary judgment in favor of D-H. (SPA-1 to SPA-30.) Judgment was entered on November 4, 2020, (SPA-31), and Dr. Porter timely proceeded with this appeal (JA-711 to JA-712).

II.    <u>Dr. Porter's Employment at D-H</u>

Dr. Porter is a respected and highly-competent physician. She started at D-H in 1996, (SPA-3), and was part of the small group of doctors who built the REI Division within the OB/GYN Department. While Dr. Porter was particularly skilled at in vitro fertilization ("IVF"), her unique set of skills extended well beyond IVF, and she was heavily relied on by her OB/GYN colleagues. For example, a long-time REI nurse, Sharon Parent, stated in her affidavit that "[t]here were times when there would literally be a line of OB/GYN doctors waiting to see Dr. Porter." (JA-592.) Dr. Michelle Russell, a maternal-fetal medicine specialist at D-H since 2007, stated that everyone in the Department regularly relied on Dr. Porter's expertise. (JA-586.)

Not only did much of her work cross over into general OB/GYN, but Dr. Porter had skills that were not duplicated by any other physician at D-H. Dr.

Porter had an international reputation in the interpretation of gynecologic ultrasound. (*See* JA-583 (Dr. Julia MacCallum, who completed her OB/GYN residency at D-H, stated that Dr. Porter was "the only physician in the department formally reading gynecologic ultrasounds and had been recognized for this skill at international level" and was "frequently asked to re-read and interpret ultrasounds" by her colleagues.).) Dr. Maria Padin, Chief Medical Officer, described Dr. Porter as "a talented surgeon." (JA-642.) Dr. Porter was the only doctor at D-H who had training to perform certain minimally-invasive, advanced laparoscopic and ultrasound-guided procedures, myomectomies, complex hysteroscopic procedures, and more. (*See* JA-583 (Dr. MacCallum recalled that "[t]here was…no one who could replace Dr. Porter's surgical skills" after her termination and patients had to be referred out to other hospitals.); JA-586; JA-346 to JA-352.) Dr. Porter was an important resource to the OB/GYN Department, and her loss was keenly felt. (JA-586 (noting that Dr. Porter's termination was a "big loss," Dr. Russell represented that "[n]o one else in the OB/GYN Department has been able to replace her ultrasound skills").)

III.    Dr. Porter's Whistleblowing Complaints Regarding Drs. Seifer and Hsu

    A.    *General Patient Safety Concerns*

Dr. Hsu joined the REI Division in 2014. (JA-83.) He arrived with substantially less training and experience than expected for a post-fellowship REI

physician. Dr. Porter personally went above and beyond in her efforts to help him rise to the requisite skill level. (JA-592; JA-625.) She voluntarily took call with him and provided intensive mentoring on a nearly daily basis for six months. (JA-625.)

From shortly after Dr. Hsu started until the time of her termination, Dr. Porter reported concerns to Dr. DeMars, REI Division practice manager Heather Gunnell, and later Dr. Seifer (as Director of the REI Division), about Dr. Hsu's inadequate skills and unsafe practices, which on more than one occasion led to unnecessary or failed treatment, patient complaints of pain or bleeding, and excess costs. (JA-144 to JA-145 [30:18–31:20]; JA-598; JA-625 to JA-629.) In June 2016, Dr. Porter prepared a 10-page report for Dr. Seifer and Dr. DeMars that explained that ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ (JA-623 to JA-635.)

Dr. Porter's concerns were corroborated by others in the OB/GYN Department. Indeed, Dr. Porter was frequently approached by others with concerns about Dr. Hsu. She passed on their complaints while reminding them to raise their concerns with Dr. DeMars and Department management. (JA-599.) Dr. Judith McBean, a contracted provider in the REI Division, wrote to Dr. DeMars,

expressing concern that Dr. Hsu ████████████████████████████████

████████████████████████████████████████████████████████

███████████████ (JA-637.)  Dr. MacCallum told Dr. DeMars "about the danger

that Dr. Hsu posed to patients when he operated."  (JA-581 to JA-582.)  Describing

one case in which she assisted Dr. Hsu, she attested that his "unrefined and

unskilled surgical approach … unnecessarily increased the patient's surgical

bleeding and increased her risk for uterine scarring and weakening of the uterus."

(JA-582.)  Some reported incidents were even more shocking—with devastating

consequences for the patient involved.  Dr. Russell recalled one incident where Dr.

Hsu failed to take an adequate medical history before starting fertility treatments

and, consequently, missed an underlying medical condition that increased the risk

to the pregnancy, eventually resulting in a pre-term delivery at 26 weeks that the

baby did not survive.  (JA-588.)  These incidents do not reflect a simple difference

of opinion over best practices or preferred technique, as Dr. DeMars claimed.  The

record further shows that, regardless of who reported concerns, Dr. DeMars

blamed it on Dr. Porter.  (*See, e.g.,* JA-605 [70:17–24; 71:3–11] (stating her belief

that the numerous negative comments received about Dr. Hsu "were all based on

conversations that Dr. Porter had with individuals" and "the opinions were

influenced by Dr. Porter's opinions").)

In 2016, Dr. DeMars recruited Dr. Seifer to join the REI Division; however, a number of red flags in his record, including "the suggestions that he had … been asked to cease providing services in some areas," raised serious doubts among the members of the credentials committee at D-H. (JA-295 [74:3–75:22]; JA-640.) Dr. Merrens demanded that Dr. DeMars accept personal responsibility for Dr. Seifer's success or failure if he was hired, and Dr. DeMars accepted that liability. (JA-296 [77:11–77:13].)

Dr. DeMars started receiving complaints about Dr. Seifer almost immediately. As with Dr. Hsu, colleagues frequently approached Dr. Porter with their concerns about Dr. Seifer, and she directed them to Dr. DeMars. (JA-148 [34:7–34:22]; JA-150 [36:5–36:18]; JA-353 to JA-355.) Again, regardless of the individual making the complaint, Dr. DeMars blamed it on Dr. Porter. (JA-599.) For example, experienced REI nurse Sharon Parent reported concerns to Dr. DeMars about Dr. Seifer's retrieval techniques and excessive pain levels experienced by his patients. (JA-593 to JA-594.) Dr. DeMars dismissed her concerns, assuming that they were prompted by Dr. Porter and claiming later that Dr. Porter was a "biased source" of information. (JA-640.) According to Ms. Parent, however, Dr. Hsu's retrievals were "the most bloody and painful that [she] had] ever witnessed" and she had told Dr. DeMars that "the pain and discomfort

caused by Dr. Hsu and Dr. Seifer was sending [her] moral compass off the charts."
(JA-593 to JA-594.)

B.     *Specific Whistleblowing Incidents*

In addition to general concerns about patient safety and the professional skills of Drs. Seifer and Hsu, Dr. Porter raised concerns about numerous other incidents of unlawful behavior in the REI Division to Dr. DeMars and Ms. Gunnell.  The following examples were identified in the lower court proceedings:

- During the spring of 2017, Dr. Porter forwarded concerns reported to her by an ultrasound technician who had observed Dr. Hsu performing, in the presence of Dr. Seifer, tubal patency studies on a patient who had not given appropriate consent for—and who did not need—such a procedure. (JA-166 to JA-170 [52:13–56:3]; JA-353 to JA-357.)  Dr. Porter believed this conduct violated laws requiring informed consent.

- Dr. Porter observed that Drs. Seifer and Hsu frequently ordered lab tests during initial infertility exams that exceeded the relevant professional guidelines and that she believed constituted billing fraud.  (JA-152 to JA-158 [38:12–44:16].)  Drs. Seifer and Hsu also began routinely ordering mock embryo transfers on all new infertility patients, which was not part of the applicable professional guidelines; not a practice that any other REI provider at D-H had followed; and that led to insurance issues,

patient complaints, and exposure to fraudulent billing investigation. (JA-357 to JA-359.) Dr. Porter reported these fraudulent billing concerns to Dr. DeMars and the REI practice manager, as well as at REI team meetings and Value Institute retreats. (JA-152 [38:1–38:11].)

- In April of 2017, less than a month before the decision was made to terminate Dr. Porter's employment, Dr. Porter raised concerns about Dr. Hsu's practice of providing outpatient services in a space designated as inpatient space, which she understood to be unlawful billing fraud. (JA-159 to JA-166 [45:8–52:5]; JA-359 to JA-360.)

- In February of 2017, Dr. Porter approached Risk Management after she was asked by the head of the embryology lab to review Drs. Seifer and Hsu's plan to transfer an embryo created using sperm that potentially had been exposed to the Zika virus, in possible violation of applicable standards. (JA-172 to JA-177; JA-362 to JA-364.)

Dr. Porter continued, on a regular basis, to report these and other concerns to Dr. DeMars and Ms. Gunnell until her termination. (JA-144 to JA-147 [30:18–31:5, 32:10–33:9]; JA-459 to JA-462 [91:5–94:3]; JA-599.) Dr. DeMars avoided telling Dr. Merrens about the numerous complaints received about Dr. Hsu and Dr. Seifer's subpar performance, risk to patients, and poor leadership skills because of Dr. Merrens' "this is on you" comment. (JA-607 [127:2–127:9].) Dr. DeMars

went so far as to assert that Dr. Seifer's "failure" was due to "a masterful takedown by Misty Porter," claiming that if Dr. Porter "had wanted to support him, she would have made the division successful." (JA-656.)

IV.  Dr. Porter's Disability

Dr. Porter developed a cerebral spinal fluid leak[6] in November 2015 and needed periodic leave for treatment and recovery. (JA-84 to JA-85; JA-99; JA-340 to JA-342.) She was expected to make a full recovery, although gradual and not without small setbacks.[7]

By April 2017, when the decision was made to close the REI Division, Dr. Porter was working approximately 20 hours per week and performing nearly her full range of duties, including surgery. (JA-85; JA-340 to JA-342.) Dr. Padin observed Dr. Porter perform surgery on April 11, 2017, writing afterwards, "you are a talented surgeon."[8] (JA-642.) By that point, Dr. Porter's most serious

---

[6] The symptoms included double vision, headaches, fatigue, vertigo, tinnitus, slowed cognitive processing. (JA-340 to JA-342.)

[7] A final surgery in September 2017 resolved the underlying condition, (JA-340 to JA-342; JA-377 [9:20–9:22]), and Dr. Porter went from per-diem to full-time work at the University of Vermont in May of 2018, (JA-214 to JA-215 [100:13–101:1]; JA-220 [106:9–106:14]).

[8] When a surgeon returns to the operating room after extended hiatus, the initial surgeries are typically proctored. (JA-342 to JA-343.)

symptoms had abated, but she remained partially disabled and still required accommodations.

D-H did not dispute that Dr. Porter was disabled, and when Dr. Porter returned to work, D-H agreed to provide a set of reasonable accommodations. (JA-84 to JA-85.) These accommodations included limited work hours, not taking call or working after hours, not multi-tasking, and quiet, uninterrupted workspace. (JA-84 to JA-85; JA-342 to JA-343; JA-527.)

Dr. DeMars and Ms. Gunnell were familiar with Dr. Porter's accommodations, but failed to ensure that they were provided as agreed. (JA-342 to JA-343; JA-411 [43:2–43:6]; JA-413 [45:6].) Dr. Seifer, as REI Division Director, was also aware, but failed on a regular basis to respect them or to ensure that Dr. Hsu respected them. (JA-413 to JA-415 [45:2–47:6].) He and Dr. Hsu complained about Dr. Porter being disabled. (JA-188 to JA-189 [74:7–75:6].) Dr. Seifer repeatedly asked Dr. Porter to work beyond her scheduled hours, badgered her to resume taking call before she was cleared to do so, and he and Dr. Hsu unreasonably interrupted her work and refused to leave her workspace when asked. (JA-344 to JA-346.) On one occasion, Dr. Porter was forced to provide full weekend coverage to patients in addition to her regular hours. (JA-344 to JA-346.) She repeatedly asked Dr. DeMars and Ms. Gunnell for their help in enforcing the accommodations, but they refused. (JA-344 to JA-346; JA-599 to JA-600.) By

failing to ensure reliable access to her approved accommodations, D-H failed to reasonably accommodate Dr. Porter's disability.

Dr. DeMars demonstrated increasing frustration with Dr. Porter's disability. In an email communication shortly before Dr. Porter's termination, Dr. DeMars bitterly recalled the pre-disability Dr. Porter: "Everyone also is remembering Misty as a full-time employee wearing three hats, and not the one who has been out for almost 18 months. What she has done in these 18 months is help several members of the department have babies." (JA-644.)

At times, Dr. DeMars couched this frustration in a patronizing attitude towards Dr. Porter. Referencing their prior friendship, Dr. DeMars claimed to be advocating for what was "best" for Dr. Porter in light of her disability. (*See id.* at JA-644 to JA-645 (asserting that it would be "best" for Dr. Porter to be terminated and to "land [at another hospital] on a part time basis and … able to do REI and ultrasound the amount that she wants, stress free"). Dr. Merrens adopted a similar patronizing tone. (JA-344 (repeatedly suggesting to Dr. Porter, in a meeting with her and a representative from employee relations, that it was fine to be terminated because she could stay on disability).) Shortly after the termination decision was announced and while Dr. Porter was still employed at D-H, Dr. DeMars wrote to Dr. Merrens:

Misty's medical disability has been devastating, and I'm not sure that she should or will really ever to able to do the complex hysteroscopy or laparoscopy that she once did… *I think that the best outcome of this termination is the chance for Misty to actually be out on leave with no intervening responsibilities*, so that she can assess how much improvement she might gain.

(JA-645 (emphasis added).) Dr. Merrens agreed, concluding that after the dust had settled, "[w]e will be in a better position with all this, including Misty." (JA-644.)

## V.  Decision to Close REI Division and Decision to Terminate Dr. Porter's Employment

By March 20, 2017, following a late February review of Dr. Seifer's performance, D-H leadership had decided that Drs. Seifer and Hsu had to go. (JA-360 to JA-362 (Dr. DeMars told Dr. Porter that Dr. Seifer was leaving.).) By that date, D-H leadership had also decided that the REI Division would be closed. Over the next month, Ms. Gunnell was responsible for planning the closure. She created a spreadsheet that reflected the ten "Current Staff" members, the "Future Staff with Complete REI Shutdown," and "Future Staff – Rebuild." (JA-659 to JA-664.) Ms. Gunnell's April 19, 2017 cover email to Dr. DeMars and Mr. Herrick reads: "I added a brief staffing plan for both a complete shutdown and a rebuild. My assumption is that MBP [Dr. Porter] will be refocused to Gyn U/S."[9] (*Id.*)

---

[9] Gyn U/S refers to a subset of the OB/GYN Department.

The April 17 spreadsheet reflects a logical conclusion by D-H that Dr. Porter would be "refocused" to OB/GYN, an understandable decision in view of her widely-recognized clinical and surgical expertise and her broad-based job duties. (*See id.*; *see also* JA-195 [81:15-81:19] (testifying that Dr. DeMars told her [Dr. Porter] that the plan, until a week before the closure was announced, was for Dr. Porter to stay).) Within two weeks of that date, however, Dr. Porter went from the keep to the eliminate category.[10] On April 25, 2017, Dr. DeMars communicated her thoughts about Dr. Porter, blaming "a masterful takedown by Misty Porter" for Dr. Seifer's failure and advising how to rebuild the REI Division without involving Dr. Porter. (JA-656 to JA-657.) Based on the record before the Court, it is reasonable to conclude that Dr. Merrens did not independently evaluate the evidence to decide that Dr. Porter should be terminated; instead, he relied on Dr. DeMars' assessment. This can be seen in his May 12, 2017 email to Dr. DeMars on May 12, 2017, wondering why: "Misty can't stay on to do her ultrasound complex operative and teaching role even if we end REI. I suspect that you considered this in the evaluation the program and your knowledge of Misty. I just need to know how better to answer this question." (JA-646.)

---

[10] Notably, a long-time nurse practitioner in the REI Division was redeployed to a role in general OB/GYN after the REI closure. (JA-710.)

Dr. DeMars promptly responded to Dr. Merrens' inquiry about why Dr. Porter had been terminated and not reassigned. Much of her response focused on her complaints about Dr. Porter's "devastating" disability and her perception that Dr. Porter was still disabled. Dr. DeMars opined, for example, that she was "not sure that she [Dr. Porter] should or will really every [*sic*] to be able to do the complex hysteroscopy or laparoscopy that she once did." (JA-645.)[11] Dr. DeMars told Dr. Merrens that the "best outcome of this termination is the chance for Misty to actually be out on leave with no intervening responsibilities, so that she can assess how much improvement she might gain." (*Id.*)

Dr. Merrens' response is telling. He ratifies Dr. DeMars' statements and compliments the "comprehensive, thoughtful and appropriate insight." (JA-644.) He concludes with his wish that "once the dust settles, will [*sic*] be in a better position with all this, including Misty." (*Id.*)

Dr. Porter was notified on May 4, 2017—the same date that the REI closure decision was publicly announced—that her employment would terminate on June 3, 2017. (JA-89.) The D-H community of patients and staff responded in shock to the news that Dr. Porter's employment would terminate. (JA-646 (D-H was

---

[11] Had she made a simple inquiry, she would have learned that D-H's Chief Medical Officer had already concluded that Dr. Porter was still "a talented surgeon." (JA-642.)

"inundated" with "heartfelt" calls and emails supporting Dr. Porter.).) This was in

stark contrast to the picture Dr. DeMars painted of Dr. Porter as a "splitting" force

or a behavior problem. Nurse Coordinator Vicki Maxfield described working with

Dr. Porter as "an honor" and urged Dr. Merrens to reconsider. (JA-648.) Dr.

MacCallum, recalling her time under Dr. Porter, describes her as "consistently

calm and focused, highly technically skilled, held resident physicians to an

appropriately high standard while fostering their surgical and clinical skill

development, and if a problem arose in clinical or surgical realms, she was able to

quickly resolve the issue." (JA-580 to JA-581.) Dr. MacCallum's description is of

someone who is the antithesis of a team splitter. Dr. DeMars' emails frankly state

her rationale for recommending Dr. Porter's termination: her disability makes her

less useful to OB/GYN ("[e]veryone also is remembering Misty as a full time

employee wearing 3 hats"), her "past behavior" (her whistleblowing complaints),

and "we would not have been able to terminate the other two without cause"

(reference to the pretext that all the REI providers were terminated simply because

the REI Division was closed). (JA-644.)

VI.  Evidence of D-H's Unlawful and Discriminatory Motivation

D-H concocted a "nursing shortage" cover story to explain its decision to

close the REI Division. Acknowledging the need for a cover story, Dr. DeMars

wrote to Mr. Herrick that "staffing issues" would be an "ideal message." (JA-657.)

This reason is demonstrably pretextual, as acknowledged by the lower court and admitted by Dr. Merrens in a candid email intended only for a small group of upper-level administrators, in which he acknowledged that the nursing shortage story was a "thin" pretext. (JA-653; SPA-5.)

To the lower court, D-H argued that the true reason for the closure was "dysfunction" in the REI Division. (*See, e.g.,* SPA-4, SPA-5, SPA-16, SPA-18 (citing email from Dr. Merrens blaming physician dysfunction and Dr. DeMars and deposition testimony from Mr. Herrick).) "Dysfunction" in this context is simply a code word for Dr. Porter's continual whistleblowing regarding the dangerous and unlawful activities of her colleagues and her need to take time to recover from and be accommodated for her disability.

Dr. Merrens admitted that he relied heavily on Dr. DeMars in reaching the decision to close the REI Division and whether to re-allocate or terminate its staff. (JA-648.) The record shows that Dr. DeMars argued against retaining Dr. Porter.[12] Dr. DeMars advised Dr. Merrens that Dr. Porter's "past behavior and her inability to be just a worker bee" were reasons to terminate her. (JA-644 to JA-645; *see*

---

[12] Dr. DeMars represented herself, at times, as an advocate on Dr. Porter's behalf, but her actions tell a different story. (*See* JA-195 [81:3–81:19]; JA-198 [84:15– 84:20]. *See also* JA-201 to JA-202 [87:11–88:17] (recalling that shortly before the announcement, Dr. DeMars' behavior towards her deteriorated and she stopped listening to Dr. Porter's concerns).) Because Dr. DeMars' story changes with her audience, any dispute over her true intent or motivation is best left to the jury.

*also* JA-254 [118:5–119:13] (discussing Dr. Porter's future at D-H, Mr. Herrick testified that "Leslie continued to explain the challenges of working with Misty and that Misty was a disruptive behavior").) Dr. DeMars was compromised by her personal liability for the problematic Dr. Seifer, and therefore needed to find another source of blame for his problems. In context, a jury could reasonably view Dr. DeMars' reference to "behavior" and being a "worker bee" as based on Dr. Porter's refusal to stay silent about Drs. Hsu and Seifer. (*See, e.g.,* JA-254 [120:6–120:9] (Herrick acknowledged that "disruptive" behavior might include someone "hav[ing] really demanding standards and insist[ing] that people meet those."); JA-657 (Dr. DeMars' hostility towards Dr. Porter was further demonstrated by her musing that it would be "much easier" for her if Dr. Porter lost her medical license).)

Second, there is enough evidence for a reasonable jury to find that D-H discriminated against Dr. Porter for her disability. Dr. DeMars made frequent comments about the impact of Dr. Porter's disability on the REI Division and OB/GYN Department and her perception that Dr. Porter would no longer be the doctor who could do everything and wear three hats. (*See* JA-645; JA-297 [81:14–81:16] ("[Dr. DeMars] clearly stat[ed] she's concerned, concerned about the division, its leadership, and Misty being on medical leave.").) Both Dr. DeMars and Dr. Merrens opined that termination would be "best" for Dr. Porter, given her

disability. Further, at a later meeting of the entire professional staff of the OB/GYN Department, Dr. Russell asked Dr. Merrens: "I can understand why the other two needed to leave, but why Misty?" His response was shocking: She was "on disability." (JA-586 to JA-587. *See also* JA-352 to JA-353.)

This patronizing and discriminatory attitude towards a disabled employee is further demonstrated in other communications by Dr. Merrens. When Ms. Maxfield asked why Dr. Porter's employment would be terminated as OB/GYN was already understaffed and Dr. Porter could provide value and "greatly needed" skills, Dr. Merrens answered, incorrectly, that Dr. Porter was only working at 20% of her former schedule—although she was actually working at around 50%. (JA-648.) He then added, "I'm not sure of her interest in staying on if the infertility part were to cease." (*Id.*) Only a small part of Dr. Porter's REI work during that period involved infertility work,[13] and neither Dr. Merrens nor Dr. DeMars had asked Dr. Porter about her "interest in staying on." A jury might reasonably conclude that Dr. Merrens' saw no need to ask Dr. Porter about her preferences

---

[13] During this time, the majority of her work was applicable to general OB/GYN. *See* JA-345 (explaining that Dr. DeMars and Ms. Gunnell concentrated Dr. Porter's time in 2016 on gynecologic ultrasound clinics, outpatient clinic visits for patients with complex gynecologic needs, and care for a select group of IVF couples.); JA-272 [148:7–148:12] (recalling that in 2017, most of Dr. Porter's time was devoted to GYN ultrasound and some of portion of that was not REI-specific).)

because she was disabled.  Similarly, Dr. Merrens told another OB/GYN physician that Dr. Porter's termination was in connection with her "part-time status," which was one of her disability accommodations.  (JA-360 to JA-362.)

Third, there is more than enough evidence for a reasonable jury to conclude that, but for unlawful and discriminatory motivation, D-H would not have terminated Dr. Porter because the decision made no sense.  D-H needed more physicians in the OB/GYN Department, as shown by an urgent hiring request for a generalist OB/GYN physician submitted immediately following closure of the REI Division.  (JA-666; s*ee also* JA-648.)  Dr. Porter was qualified to do that work and more, and her colleagues relied on her expertise.

Both to protect herself and out of animus towards Dr. Porter, Dr. DeMars portrayed Dr. Porter to Dr. Merrens as a troublemaker, a poor leader, and a complainer unwilling to do her part to save the REI Division.  In addition, she withheld details from Dr. Merrens about the full extent of Drs. Seifer and Hsu's performance issues.  (JA-298 to JA-299 [88:1–90:5] (Dr. Merrens, expressing surprise that Dr. DeMars had concerns about Dr. Seifer's clinical competence soon after he was hired but failed to raise the issue for discussion); JA-301 [97:4–98:15] (Dr. Merrens, confirming he had seen Dr. DeMars' summary of Dr. Seifer's reviews, but not the underlying reviews from colleagues warning of his significant

deficits and unsafe practices.).)  Dr. Merrens relied wholesale on this tainted and discriminatory information in making D-H's decision to terminate Dr. Porter.

## SUMMARY OF ARGUMENT

In 2017, D-H wrongfully terminated Dr. Porter's employment in contravention of multiple state and federal laws.  The lower court erroneously granted summary judgment for D-H, and that decision should be reversed.  Dr. Porter alleged facts sufficient to support a finding that D-H would not have terminated her employment had she not needed leave or accommodations for her disability or if she had remained silent in the face of her concerns about Drs. Seifer and Hsu.  The lower court erroneously ignored the summary judgment standard by failing to take the facts in the light most favorable to Dr. Porter and by making factual findings on key disputed issues.  This case is replete with factual issues to be decided by a jury, and the evidence submitted by Dr. Porter is more than sufficient to support a reasonable jury in finding in her favor.

D-H made two separate decisions in the spring of 2017: (1) What do to with the REI Division; and then, separately, (2) What to do with Dr. Porter?  D-H asked the court to conclude that the facts, as alleged by Dr. Porter, could not reasonably support a jury finding that either Dr. Porter's reputation as a whistleblower or her disability was a deciding factor in D-H's decision to close REI and terminate Dr. Porter's employment.  The evidence presented by Dr. Porter shows that D-H was

motivated by unlawful and discriminatory reasons, and that D-H would not have terminated her employment but-for those illegal motives.

Like so many employment-discrimination cases, the heart of the case is what motivated the defendants to terminate the plaintiff's employment. This issue requires careful fact-finding and credibility assessments, which is the province of the jury. Dr. Porter provided the court with evidence that the decision to terminate her employment was highly influenced by Dr. DeMars. Dr. DeMars had a strong motive to retaliate against Dr. Porter for whistleblowing about the conduct of Drs. Seifer and Hsu because Dr. DeMars' future at D-H depended on Dr. Seifer's success. Dr. Porter introduced evidence that her concerns about Drs. Seifer and Hsu were shared by many of her colleagues in the OB/GYN Department, but Dr. DeMars blamed Dr. Porter regardless of who made the report. Similarly, she resented Dr. Porter because of her disability which only highlighted the problems in the REI Division. Dr. DeMars withheld information tending to show that Drs. Seifer and Hsu were the cause of any "dysfunction" and misled Dr. Merrens into believing, inaccurately, that Dr. Porter was a troublemaker who would be better off nursing her disability at home. The evidence shows that, had the court below applied the proper standards—including taking all of Dr. Porter's alleged facts as true and refraining from weighing the evidence or resolving disputed factual issues—it would have determined that a jury could reasonably infer that Dr.

Porter's termination would not have occurred but for Dr. Porter's disability and whistleblowing. This is all that was required for the court to deny D-H's motion for summary judgment and permit Dr. Porter to take her case to the jury.

## **ARGUMENT**

Dr. Porter's First Amended Complaint includes six counts. Count 1 (wrongful discharge) and Count 2 (violation of New Hampshire Whistleblower's Protection Act) both derive from her wrongful termination as a result of concerns she reported about the unsafe and illegal practices of Drs. Seifer and Hsu. Count 3 (violation of the Americans with Disabilities Act), Count 4 (violation of Section 504 of the Rehabilitation Act), Count 5 (violation of New Hampshire anti-discrimination, failure to accommodate, and retaliation statutes), and Count 6 (violation of Vermont anti-discrimination, failure to accommodate, and retaliation statutes) are based on D-H's refusal to protect her exercise of disability-related accommodations that it had approved and its decision to terminate her because of her disability and in retaliation for exercising her rights under disability law.

I.      Standard of Review

A.      *Summary Judgment*

The standard of review in this appeal is *de novo*. *Lenzi v. Systemax, Inc.*, 944 F.3d 97 (2d Cir. 2019). Evidence must be viewed in context, with all reasonable inferences drawn in Dr. Porter's favor, "even though contrary

inferences might reasonably be drawn." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). *See also Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 386 (2d Cir. 2020) (warning not to consider evidence piecemeal or "trust[] innocent explanations for individual strands of evidence"). Summary judgment is often inappropriate in employment discrimination cases because state of mind, intent, and credibility are key. *Walsh v. New York City Hous. Auth.,* 828 F.3d 70, 75 (2d Cir. 2016).

B.    *McDonnell Douglas Framework*

The District Court analyzed Dr. Porter's claims under the three-step, burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). To survive summary judgment, Dr. Porter had to allege facts which, if proven, would be sufficient to support a jury finding that the reasons offered by D-H for its decision to terminate Dr. Porter were a pretext for discrimination. As with many such cases, the outcome below turned on the employer's intent behind the termination, which is an issue that should have been left to the jury.

The initial reason given for terminating Dr. Porter—namely, elimination of her position following closure of the REI Division due to a lack of nursing staff—was not the true reason. (*See* SPA-5 (acknowledging sufficient evidence that D-H created a "cover story … which was not entirely true").) Dr. Porter argued that her

termination was the product of discrimination and retaliation. D-H argued, and the District Court accepted, that her termination was a valid business decision, based on staffing, lack of profitability, and general "dysfunction" within the division. (SPA-4.) In doing so, the District Court misapplied the legal standard with respect to causation. (SPA-7.) In addition, the lower court erroneously resolved key factual disputes in Defendants' favor, glossing over statements from the decisionmaker and key influencers which indicate that Dr. Porter's whistleblowing and disability were but-for factors in the decision-making process and ignoring or downplaying the importance of other evidence suggesting that the decision to terminate Dr. Porter was inconsistent with reasonable business judgment and therefore would not have been made but for unlawful and discriminatory motivations.

C.     *"But For" Causation*

The lower court analyzed each of Dr. Porter's claims using a "but for" causation standard. This requires something more than "substantial" or "motivating" factor, *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), but it is not necessary to show that discrimination or retaliation was the *only* motive for the adverse action, merely that it would not have occurred in the absence of the improper motive, *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). As the Supreme Court has recently confirmed, an event may have

multiple but-for causes. *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1739 (2020). *See also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (stating that "where two bases of discrimination exist, the two grounds cannot be neatly reduced to distinct components"). Dr. Porter alleges, and the record supports, that her termination was unlawfully motivated by both whistleblower retaliation and disability discrimination.

This standard "directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Bostock*, 140 S. Ct. at 1739. Dr. Merrens told at least one physician that Dr. Porter had been terminated and not reassigned to a role in OB/GYN because she was "on disability," (JA-586 to JA-587), and further concurred with Dr. DeMars that, in light of Dr. Porter's disability, termination would be "best" for Dr. Porter, (JA-644 to JA-645). These two statements imply that if Dr. Porter were not disabled, D-H would not have terminated her employment. Taken at his word, changing Dr. Porter's disability would have changed the outcome. Similarly, while recognizing the OB/GYN Department would benefit from continued access to her skills, Dr. DeMars recommended *against* retaining Dr. Porter because of unspecified "behaviors" and her inability to just be a "worker bee." When such comments are viewed in context with Dr. Porter's on-going whistleblowing activities, a jury could find that if Dr. Porter had kept silent, put her head down, and not rocked the

boat when she saw unlawful or unsafe conduct in the workplace, she would have kept her job. For purposes of summary judgment, this is sufficient to show that Dr. Porter's termination was motivated by and would not have occurred but for her disability and her whistleblowing activities.

II.  The District Court erred in awarding summary judgment to Defendants when it misapplied the legal standard applicable to Plaintiff's whistleblower claims.

A.  *Whistleblower Retaliation*

New Hampshire's Whistleblower Protection Act prohibits an employer from discharging or otherwise discriminating against an employee "because … [t]he employee, in good faith, reports or causes to be reported, verbally or in writing, what the employee has reasonable cause to believe is a violation of any law or rule adopted under the laws of this state, a political subdivision of this state, or the United States." N.H. Rev. Stat. Ann. 275-E:2(I)(a). A whistleblower plaintiff must show that she (1) engaged in a protected act; (2) suffered an adverse action; and (3) there was a causal link between the protected act and the adverse action. *Appeal of Seacoast Fire Equip. Co.*, 777 A.2d 869, 872 (N.H. 2001).

Dr. Porter reported incidents that she believed unlawful, dangerous, or in violation of professional standards, including: (1) procedures performed without consent; (2) procedures that were not medically necessary; (3) improper or fraudulent medical billing; (4) physical injury to patients due to poor technique or

lack of adequate skill; and (5) other risks to patient safety. (JA-599; JA-693 to JA-698.)  The lower court accepted that Dr. Porter had engaged in protected conduct and suffered an adverse action.  (SPA-10, SPA-12.)  *See also Hidalgo-Semlek v. Hansa Med., Inc.*, No. 1:19-CV-00436-JL, 2020 WL 6383237, at *16 (D.N.H. Oct. 30, 2020) (A whistleblower need not prove the truth of her accusations—only her reasonable belief.).  The only remaining issue was whether Dr. Porter's whistleblowing was the cause of her termination, and that is where the lower court erred.  (SPA-13.)

The lower court erroneously adopted D-H's two objections to Dr. Porter's evidence supporting a causal connection: an absence of temporal proximity and a lack of evidence that Dr. Merrens, who made the ultimate decision to close the REI Division and terminate Dr. Porter's employment, was aware of Dr. Porter's whistleblowing.  (SPA-13.)  Each of these issues is discussed below.

B.  *Temporal Proximity*

The District Court erred in its analysis of temporal proximity and placed too much emphasis on its conclusion that there was no temporal proximity between Dr. Porter's protected conduct and the decision to terminate her employment.  In the first instance, the lower court erroneously assumed that Dr. Porter's protected whistleblowing conduct ended February 2017, two months before the decision was

made to terminate her employment. (SPA-14.) In doing so, the court ignored evidence that protected conduct continued at least until April 2017.

The lower court considered only the February 2017 whistleblowing event, but Dr. Porter's whistleblowing was not a one-time event—she raised multiple concerns, multiple times, over multiple years. By viewing one event in isolation, the lower court ignored the cumulative effect of repeated conduct. *See Garayalde-Rijos v. Mun. of Carolina*, 747 F.3d 15, 25–26 (1st Cir. 2014) (stating the court's temporal analysis was "flawed" because it failed to read the complaint "holistically and ignored relevant context"); *Rasmy*, 952 F.3d at 386 (Court must not consider the evidence piecemeal or "trust[] innocent explanations for individual strands of evidence."). *See also Zangri v. Unit4 Bus. Software, Inc.*, No. 19-CV-408-SM, 2020 WL 3960919, at *4 (D.N.H. July 13, 2020) (finding a causal connection where employee's protected conduct/complaints began months before her termination and employee continued to raise concerns until within a week of her termination).

Dr. Porter asserts that she reported concerns to Dr. DeMars from 2014 until at least the end of April 2017 and, further, identified specific concerns that she raised about Dr. Seifer and Dr. Hsu in the four months or so before a decision was made to terminate her employment. (JA-599.) Precise dates are not required, and, for purposes of summary judgment, the lower court should have taken her

testimony as true.  *See, e.g., Yang v. Navigators Grp., Inc.*, 674 F. App'x 13, 14–15 (2d Cir. 2016) (stating plaintiff's testimony is admissible evidence and should be considered in reviewing defendants' summary judgment motion and viewed in the light most favorable to the plaintiff); *Kaytor*, 609 F.3d at 550 (noting employee's testimony would be admissible at trial despite the fact that she couldn't recall dates or details of some of the incidents and it was error for court to question her credibility).  Assuming reported concerns in April and a decision to terminate at the beginning of May 2017, the time between Dr. Porter's protected conduct and D-H's adverse action is negligible.

In the second instance, even assuming the time between Dr. Porter's last whistleblowing event and her termination was two months, the District Court erroneously usurped the jury's role when it summarily concluded that two months was too long to create a viable inference of causation.  (SPA-15 ("Dr. Porter has not identified a particular complaint on a date close in time to the decision to close the REI Division that can serve as a basis for an inference of causation.").)  The First and Second Circuits have sustained inferences of causation arising from time periods of up to nine months.  *See Kwan*, 737 F.3d at 845 (acknowledging that this Circuit has found a 5-month delay sufficient); *Kopchik v. Town of E. Fishkill, New York*, 759 F. App'x 31, 35–38 (2d Cir. 2018) (finding 9 months was not inherently too distant to support a causal inference and noting there is no bright-line

definition); *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 144 (1st Cir. 2012) (Decisionmaker's age-related remarks made within 6 months of termination could be temporally and causally related to employee's discharge.)  Two months is well within the bounds of plausibility, and the question should have been decided by the jury.

In addition, the lower court placed too much emphasis on its perception of limited temporal proximity given that temporal proximity is only one possible pathway to an inference of causation.  *Garayalde-Rijos*, 747 F.3d at 25 (finding error where court deemed causation implausible based "solely" on 5-month gap between protected conduct and adverse action).  Causal connection in retaliation can be shown by evidence of temporal proximity, but also through statistical differences in the treatment of different groups, stray remarks, other circumstantial evidence, or through direct evidence.  *Kopchik*, 759 F. App'x at 35; *Lenzi*, 944 F.3d at 111–12.

## C.  *Awareness of Whistleblowing Activities*

Defendants argued and the District Court accepted that Dr. Merrens (and therefore D-H) was not aware of Dr. Porter's whistleblowing activities at the time the decision was made to terminate her employment.  (SPA-16.)  The evidence in the record, however, is sufficient to show that he was aware (either directly or

through implication) and that but for these whistleblowing activities, Dr. Porter would still have a position at D-H.

Dr. Merrens relied on Dr. DeMars for information about Dr. Porter and the REI Division. (JA-281 [19:8–19:10], JA-291 [60:17–60:19]; JA-540, [129:10–129:15].) Even if Dr. Merrens had no direct knowledge[14] and harbored no bias or discriminatory animus, Dr. Porter would still be able to impute knowledge and animus to Dr. Merrens (and therefore to D-H) under a "cat's paw" theory, which holds the employer/decisionmaker liable for the discriminatory animus of a supervisor where the supervisor performs acts intended to cause an adverse employment action. *See, e.g., Staub v. Proctor Hosp.*, 562 U.S. 411, 422–23 (2011) ("We therefore hold that if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse

---

[14] Out of concern for her own career, Dr. DeMars sanitized the worst about Drs. Seifer and Hsu and exaggerated the worst about Dr. Porter before sharing it with Dr. Merrens and other senior leadership. There is record evidence, however, that Dr. Merrens was not completely without knowledge and, given the months of discussion leading up to the crucial decisions, Dr. Merrens' role on the credentialing committee, and how vocal Dr. Porter and others in the OB/GYN had been about their concerns, it is disingenuous to assert that he had no knowledge. For example, by May 2, 2017, at the latest, Dr. Merrens was aware that the "failure to recruit nurses" story was pretext and that there was underlying "dysfunction" at the physician level in the REI Division. (*See* JA-653 (In Dr. Merrens' email, the "physician who worked in this area for years" is Dr. Porter and "recent hires" would be Dr. Seifer and Dr. Hsu.).)

employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA.") (emphasis in original); *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271–73 (2d Cir. 2016) (adopting the cat's paw theory in the Second Circuit and stating that by "merely effectuating or rubber-stamping a discriminatory employee's unlawful design, the employer plays the credulous cat to the malevolent monkey and, in so doing, allows itself to get burned") (internal quotations and citations omitted); *Summa v. Hofstra Univ.*, 708 F.3d 115, 122, 130–31 (2d Cir. 2013) (demonstrating that decisionmaker ignorant of plaintiff's protected activity acted on recommendation of supervisor with knowledge is sufficient to show decisionmaker knowledge).

There is sufficient record evidence that Dr. DeMars had the requisite discriminatory animus. A jury could reasonably find, for example, that Dr. DeMars' May email to Dr. Merrens, (JA-644 to JA-646), was full of retaliatory animus towards Dr. Porter for her whistleblowing activities. In that email, Dr. DeMars argued against retaining Dr. Porter to work in OB/GYN or in a future REI Division because of Dr. Porter's "past behavior and her inability to just be a worker bee," and because she "would undermine any efforts to have someone new come in and restart a program." (JA-644 to JA-646) *See, e.g., Smith v. Cty. of Suffolk*, 776 F.3d 114, 121–22 (2d Cir. 2015) (finding error where court ignored "direct evidence of retaliatory intent" in the form of statements made in

disciplinary charges and internal memos criticizing employee for unflattering statements made about department policy).

Dr. DeMars intentionally fed Dr. Merrens information or withheld information in a manner intended to bring about Dr. Porter's termination. The record also indicates that Dr. Merrens relied upon Dr. DeMars' recommendations. These facts, if proven, would support attributing Dr. DeMars' animus to Dr. Merrens and, consequently, D-H. The ultimate factfinding on the cause of Dr. Porter's termination is a question for the jury. *See Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 42 (1st Cir. 2011) ("It was for the jury to decide whether the committee was misled by Day in a way that altered the outcome.").[15]

D.     *Wrongful Termination*

Wrongful termination in violation of public policy occurs where "the defendant was motivated by bad faith, malice, or retaliation in terminating the plaintiff's employment," and evidence indicates that the plaintiff was "discharged because [s]he performed an act that public policy would encourage, or refused to do something that public policy would condemn." *Cloutier v. Great Atl. & Pac. Tea Co.*, 436 A. 2d 1140, 1144 (N.H. 1981). Dr. Porter refused to tolerate

---

[15] In the alternative, even if Dr. Merrens did not have the full picture at the time he made the termination decision, it is certain that he did afterwards and yet took no steps to retract his decision.

substandard and dangerous patient care and vocally informed leadership of perceived deficiencies. The lower court recognized that this would satisfy the public policy requirement, (SPA-30), but had there been any doubt, the question should have been resolved by the jury, *see Cloutier*, 436 A. 2d at 1144 (determining existence of a public policy "calls for the type of multifaceted balancing process that is properly left to the jury").

The lower court erroneously determined that "[t]he record evidence does not support a conclusion by a jury that Dr. DeMars' anger towards Dr. Porter for criticizing Dr. Hsu and Dr. Seifer led to either the closure of the REI Division or the decision not to retain Dr. Porter in an alternative capacity." (SPA-29.) Bad faith, malice, or retaliation can be found where the stated reason for discharge is not supported by the record. *See Todd v. Aggregate Indus.-Ne. Region, Inc.*, No. 14-CV-393-JL, 2015 WL 6473434, at *4 (D.N.H. Oct. 27, 2015) (finding reason for termination pretextual where there was close temporal proximity between plaintiff's protected activity and discharge, the extent of plaintiff's impairment was disputed, and evidence could support a finding that the true reason was avoiding a workers' compensation claim).

Dr. DeMars' concealment of relevant facts from Dr. Merrens, combined with the shifting rationales provided for terminating Dr. Porter, indicates malice or bad-faith attributable to D-H. Dr. DeMars knew that she would be held personally

responsible if Dr. Seifer failed, and she resented Dr. Porter for publicizing Dr. Seifer's deficiencies. (*See, e.g.,* JA-644 to JA-646.) She had a vested interest in painting Dr. Porter as the root cause of any "dysfunction" in the REI Division because it would shift the blame from Dr. Seifer (and consequently, herself). In addition, Dr. Porter has submitted ample evidence showing that her termination simply did not make sense absent a wrongful motivation, given the loss of much-needed clinical capacity and the negative impact on resident and fellow training, as a result of her termination.

III.    The District Court erred in awarding summary judgment to Defendants because it misapplied the legal standard applicable to Plaintiff's disability claims.

Dr. Porter brought disability discrimination, failure to accommodate, and retaliation claims under federal, Vermont, and New Hampshire law. The analysis under each is similar. As it was with the whistleblower and wrongful termination claims, it is the third *McDonnell Douglas* step, i.e., pretext, that is disputed in the disability discrimination and retaliation claims.

A.      *Disability Discrimination*

To establish a prima facie case of disability discrimination, Dr. Porter must show (1) that D-H is an employer subject to statute; (2) that Dr. Porter suffered from a disability; (3) that despite the disability, she can perform the essential duties of her job, without or without reasonable accommodations; (4) and that she was

fired because of her disability. *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). In the present case, the deciding issue is whether Dr. Porter presented sufficient evidence to permit a jury to find she was terminated because of her disability. With respect to the federal claims—the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*—she must prove that "but for" her disability, she would not have been terminated. *Natofsky v. City of New York*, 921 F.3d 337 (2d Cir. 2019), *cert denied*, 140 S. Ct. 2668 (2020). It is less clear, however, that the Vermont and New Hampshire claims are subject to the same "but for" standard.[16]

The record evidence shows that Dr. Merrens was aware of Dr. Porter's disability, (JA-288 to JA-289 [45:9–51:24]), and found it a compelling reason not to retain her as part of OB/GYN, as did Dr. DeMars. Rather than construing the evidence in Dr. Porter's favor as required and refraining from deciding between competing explanations, the lower court construed the statements by Dr. Merrens and Dr. DeMars as benign expressions of friendly concern rather than evidence of discrimination based on Dr. Porter's actual or perceived disability. This was error.

Disability discrimination occurs when an employer treats an employee differently or denies the employee opportunities because of an actual or perceived

---

[16] See discussion below.

disability.  It does not require evil intent or "conscious animosity."  *Burns v. Johnson*, 829 F.3d 1, 13 (1st Cir. 2016).  It can be sufficient if unconscious bias and stereotypes caused the employee to be treated differently.  *See id.* (concluding that a reasonable jury could find that a sex-based stereotype, namely that men are better suited for positions of importance in the national security/defense arena, was the root of employer removing female employee from leadership role and giving it instead to a group of male employees).  Thus, even "well intentioned" employers can run afoul of the disability discrimination laws.  *In re Dunlap*, 604 A.2d 945, 952 (N.H. 1991) (stating that disability-related "employment discrimination stems not only from the conviction that all those who presently suffer from the substantial impairment of a major life activity are unable to make a meaningful contribution in the workplace, but also from the belief that previously-incapacitated individuals can never again be entrusted with responsible employment.").

Here, Dr. Merrens and Dr. DeMars, a decisionmaker and a key influencer, stated that decisions about Dr. Porter's continued employment have been made based on her disability or their perception of Dr. Porter as someone who is disabled.  (JA-644 to JA-646.)  Dr. DeMars talked about how the pre-disability Dr. Porter—who wore "three hats" and performed intricate, complex surgeries—was no more.  Dr. DeMars questioned whether Dr. Porter would ever again be able to

perform surgeries like she used to, stating "I'm not sure that she should or will really ever be able to do the complex hysteroscopy or laparoscopy that she once did"—when in fact Dr. Padin had recently observed Dr. Porter perform a major surgery with consummate skill. (*Id.*; JA-642.) Even if Dr. Merrens and Dr. DeMars were acting out of a misguided belief that terminating Dr. Porter was in her best interest, this type of patronizing and discriminatory attitude towards a disabled employee is unlawful. *See, e.g.,* N.H. Rev. Stat. Ann. § 354-A:2, IV (defining disability for purposes of the law against employment discrimination as a person with a "physical or mental impairment which substantially limits one or more of such person's major life activities" or "[a] record of having such an impairment" or "[b]eing regarded as having such an impairment"); *Cooper v. Thomson Newspapers, Inc.*, 6 F. Supp. 2d 109, 113 (D.N.H. 1998) (employer perceived terminated employee as disabled).

At the summary judgment stage, the court's role is only to decide whether a reasonable jury might conclude, based on Dr. Porter's allegations, that D-H would not have terminated her employment if she had not been disabled. *Cf. Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19, 29–30, 33 (1st Cir. 2015) (weighing evidence of discriminatory motive against evidence of legitimate motive not permitted). The record evidence shows that a reasonable jury could find that Dr. Porter would not have been terminated but for her disability.

To the extent this Court concludes that Dr. Porter could meet a mixed-motive standard and not a but-for standard, however, Dr. Porter requests certification of the state law claims to the New Hampshire and Vermont Supreme Courts, for determination of whether the state law claims apply a mixed-motive standard or a but-for standard for causation.

B.    *Failure to Accommodate*

At the time that Dr. Porter's employment was terminated, and for approximately eighteen months prior, she was suffering from the debilitating effects of a cerebral spinal fluid leak. She took several periods of leave for treatment and recovery and in between those periods slowly increased the hours she was able to work and the range of duties she could once again perform. Her requests for accommodation were approved, but not enforced in practice.

Failure to accommodate requires showing that D-H knew about Dr. Porter's disability; that she could perform the essential duties of her job; and that D-H failed to provide reasonable accommodations. *See, e.g., Wood v. City of Barre*, No. 369-6-14 WNCV, 2016 WL 8078133, at *4 (Vt. Super. Feb. 09, 2016) (*citing Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)).

Dr. Porter's supervisors and colleagues were aware of her disability and knew that she was working on a limited basis. Dr. Seifer and Dr. Hsu regularly

failed to respect her accommodations by complaining about her being on disability, pushing her to extend her hours and resume taking call before she was medical cleared to do so, and unreasonably interrupting her protected workspace and refusing to leave when asked.   (JA-188 to JA-189 [74:7–75:6]; JA-342 to JA-346; JA-411 [43:2–43:6]; JA-413 to JA-415 [45:2–47:6].)  On one occasion, Dr. Porter was forced to provide full weekend coverage to patients in addition to her regular hours and in contravention of her agreed accommodations.  (JA-344 to JA-346.) She repeatedly went to Dr. DeMars and Ms. Gunnell to ask for their help in enforcing the accommodations, but they refused.  (JA-599 to JA-600; JA-344 to JA-346.)  It is not sufficient to promise an accommodation—to be effective, it must actually be delivered.  For these reasons, D-H failed to provide reasonable accommodations for Dr. Porter in violation of federal and state law.

## C.    *Retaliation - Disability*

It is unlawful to retaliate against an employee because that employee has exercised her right to complain about discriminatory conduct in the workplace. N.H. Rev. Stat. Ann. § 354-A:19; 21 Vt. Stat. Ann. § 495(a)(8); 42 U.S.C. § 12203(a); 29 U.S.C. § 794(a).  To prove retaliation based on an employee's disability, the employee must show, by a preponderance of the evidence, (1) that she was engaged in a protected activity; (2) her employer was aware of the activity; (3) she suffered an adverse employment action; and (4) there was a causal

connection between the protected activity and the adverse action.  *See, e.g., Wood,* 2016 WL 8078133, at *4 (finding disabled employee's claim sufficient to avoid summary judgment, where employer's failure to engage in interactive process "could permit the inference that it was looking for a reason to terminate him because of his prior support of a female firefighter").

Disability retaliation claims are decided using the "but for" causation standard.  *See, e.g., Natofsky*, 921 F.3d at 346–48 (ADA and Section 504); *Massaquoi v. Genesis HealthCare, LLC*, No. 18-CV-00296-LM, 2019 WL 6841949, at *2-3, 7 (D.N.H. Dec. 16, 2019) (retaliation claims under NH law); *Lareau v. Nw. Med. Ctr.*, No. 2:17-CV-81, 2019 WL 4963057, at *2-3 (D. Vt. Oct. 8, 2019) (retaliation claims under ADA and VFEPA).

Sources of evidence that can show retaliation include, for example, statistical evidence of differential treatment, temporal proximity, and "comments by the employer which intimate a retaliatory mindset." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991).  Dr. Porter repeatedly complained to Dr. DeMars and Ms. Gunnell that she was not receiving the accommodations that D-H had agreed to provide when she returned to work.  Dr. Seifer, Dr. DeMars, and Dr. Merrens each made a series of negative comments about Dr. Porter's disability.  This evidence is suggestive of discriminatory retaliation and sufficient to support bringing Dr. Porter's disability retaliation claims to the jury.

D.    *Vermont Fair Employment Practices Act - Disability*

Dr. Porter brought claims under Vermont's Fair Employment Practices Act (VFEPA), alleging discrimination based on disability.  Under Vermont law, it is unlawful for an employer "to discriminate against any individual *because of* race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age *or against a qualified individual with a disability*."  21 Vt. Stat. Ann. § 495(a)(1) (emphasis added).  "[The standards and burdens of proof under [V]FEPA are identical to those under Title VII." *Witherbee v. Town of Brattleboro*, No. 2:18-CV-00113, 2019 WL 2476722, at *9 (D. Vt. June 13, 2019) (*quoting Hodgdon v. Mt. Mansfield Co.*, 624 A.2d 1122, 1128 (Vt. 1992)).  With respect to disability discrimination, the Vermont courts apply Title VII's "motivating factor" standard, under which a plaintiff need only show that disability was one factor motivating the adverse employment action. *See, e.g., Knapp v. State*, 168 Vt. 590, 591 (1998) (affirming jury instruction that stated "plaintiff must prove that defendants intentionally discriminated against her; in other words, that her hearing impairment was a *motivating factor* in defendants' decision to terminate plaintiff") (emphasis in original).

Prior to 2019, federal disability discrimination claims were also decided under the motivating factor standard.  In 2019, this Circuit revised the causation standard for such claims.  *Natofsky*, 921 F.3d at 341.  Noting that the ADA

prohibits discrimination "*on the basis of* disability" but lacks Title VII's "motivating factor" language, *Natofsky*, 921 F.3d at 345 (*quoting* 42 U.S.C. § 12112(a)) (emphasis added), this Circuit concluded that "the ADA requires a plaintiff alleging employment discrimination to prove that discrimination was the but-for cause of any adverse employment action," *id.* at 348.

The lower court assumed—without analysis—that *Natofsky* modified VFEPA's causation standard. But Vermont courts have readily deviated from federal case law when appropriate. *See, e.g., Payne v. U.S. Airways, Inc.*, 987 A.2d 944, 948 (Vt. 2009) (noting that [V]FEPA's standards are identical to Title VII but also noting that federal decisions are not binding and not always persuasive). Plaintiff is not aware of any Vermont Supreme Court, published trial court order, or published administrative agency decision construing the impact of *Natofsky* on state-law disability discrimination claims. Because the lower court failed to analyze the issue, this Court may either remand for assessment by the District Court under the motivating-factor standard—as the Vermont standard was not changed by *Natofsky*—or certify the question to the Vermont Supreme Court.

E.     *N.H. Law Against Discrimination - Disability*

New Hampshire law prohibits discrimination "because of" disability and requires employers to make reasonable accommodations to enable employees with disabilities to perform their jobs. N.H. Rev. Stat. Ann. § 354-A:7, I, VII(a)-(b).

While New Hampshire generally looks to equivalent federal anti-discrimination laws for guidance, the New Hampshire Supreme Court has not yet addressed whether it will adopt *Natofsky*'s "but for" causation standard for disability claims.[17] *See, e.g., Merrill v. Fall Mountain Reg'l Sch. Dist. – SAU 60*, EA 0313-06, 16D-2006-10091 (Sept. 2010), https://www.nh.gov/hrc/decisions/documents/merrill-v-sau60-gross.pdf (NH Commission for Human Rights decided, on state law policy grounds, that the "but for" standard did not apply to age discrimination claims under RSA 354-A:7, I, but rather the Title VII mixed-motive standard).

The lower court concluded, citing *In re Dunlap*, 604 A.2d 945 (N.H. 1991),[18] that New Hampshire applies the "sole reason" standard from the Rehabilitation Act, (SPA-23), which *Natofsky* found equivalent to the "but for" standard, *Natofsky*, 921 F.3d at 345.[19] Causation was not in dispute in *Dunlap*, however, and there was no discussion about whether the statement "he must establish that his handicap was the sole reason for his nonrenewal" referred to both

---

[17] Unlike Vermont, New Hampshire is not in the Second Circuit.

[18] Note, *Dunlap* and Chief Judge Crawford's decision cites to RSA 354-A:8, but the correct cite is RSA 354-A:7.

[19] Justice Chin dissented, agreeing that "but for" was appropriate for retaliation claims, but arguing that discrimination and failure-to-accommodate claims under the Rehabilitation Act are governed by the "motivating factor" standard. *Natofsky*, 921 F.3d at 354 (Chin, J., *dissenting*).

his Rehabilitation Act and state law claims or just the Rehabilitation Act. *See Dunlap*, 604 A.2d at 951 (finding error in Boards' reliance on past record of impairment). Similarly, the relevant language in *Dunlap* is based on *Appeal of Bosselait*, 547 A.2d 682 (N.H. 1988), which does not concern claims under New Hampshire's law against discrimination. Given the age of *Dunlap* and the number of newer, precedent-changing cases, its use is questionable.

Because the lower court erred in applying the incorrect legal standard under New Hampshire law, the claims may be remanded for further analysis or certified to the New Hampshire Supreme Court for clarification.

IV.  The District Court erred in awarding summary judgment to Defendants where it improperly usurped the jury's role by deciding disputed facts and consequently and erroneously concluded that Defendants purported "legitimate business reasons" for closing the REI Division and not retaining Dr. Porter were not pretextual.

To survive summary judgment, Dr. Porter needed to allege facts, which, if taken as true, would support a jury finding that the legitimate reasons offered by D-H for its decisions to close the REI Division and terminate Dr. Porter were not its true reasons, but were a pretext for discrimination. A plaintiff can demonstrate pretext by showing that the employer's actions were "more likely motivated by discrimination than by the explanation proffered by the defendant." *Hubbard v. Tyco Integrated Cable Sys., Inc.,* 985 F. Supp. 2d 207, 227 (D.N.H. 2013).

"[C]lever men may easily conceal their motivations." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).  It is the jury's role—not the court's—to weigh evidence, make credibility assessments, and choose between conflicting versions of events.  *Cincinnati Ins. Co. v.* S. *Vermont Sprinkler Servs., Inc.,* No. 5:l 7-CV-254, 2019 WL 5698930, at *2-3 (D. Vt. July 10, 2019) (Crawford, J.); *Kaytor*, 609 F.3d at 550.  Because Dr. Porter's claims all depend on questions of intent and motivation, and because it is the jury's province to decide between competing interpretations of the relevant facts, the lower court erred when it failed to view the facts in a light most favorable to Dr. Porter and decided disputed facts.  *See Acevedo-Parrilla*, 696 F. 3d at 140–43 (The heart of the pretext analysis is whether the employer believes its own reasons for the adverse employment actions.)

D-H and Dr. Porter could not be more at odds in their arguments about what motivated Defendants to terminate Dr. Porter's employment after more than 20 years of impeccable job performance.  D-H insists that it was strictly business—there was a division with modest (at best) profitability, there were problems recruiting and keeping nurses, and there was "dysfunction" among the doctors.  All things considered, according to D-H, the easiest, cleanest business decision was to shut the division, thereby ending the employment of three doctors.  Although

unfortunate, this decision was not unlawful in D-H's view because it was motivated solely by dollars and cents business reasons.

Dr. Porter has a different view about what happened. The nursing problem was a problem of their own making. If D-H had made even a modest effort, it could have recruited all the nurses that it needed, just like the University of Vermont did in Burlington, where Dr. Porter now works. Saying that there was "dysfunction" among the doctors tells us little about what caused the dysfunction and what would have been reasonable to resolve it. (*See, e.g.,* JA-254, [120:6– 120:9] (Herrick acknowledges that "disruptive" behavior might include someone "hav[ing] really demanding standards and insist[ing] that people meet those.").) In this case, there were understandable tensions among the doctors because one of them was making regular reports to management (i.e., Dr. Porter to Dr. DeMars), about how the other doctors' performance in the operating room regularly presented a risk to patient safety and that their behavior also violated the law because of improper billing and lack of patient consent. Since Dr. DeMars was compromised because of her promise to the credentialling committee, she would not act. She intentionally omitted or downplayed any negative reviews relating to Drs. Seifer and Hsu when reporting to Dr. Merrens and other senior leadership. Instead, she chose to blame Dr. Porter for not supporting her lack of action regarding Drs. Seifer and Hsu. As an excuse for terminating Dr. Porter, she relied

upon Dr. Porter's supposed disability and told upper management that Dr. Porter was no longer the rock star surgeon and clinician she used to be. (*See* SPA-7 (reviewing letter from Dr. DeMars to Dr. Merrens dated one week after the announcement to close REI and terminate Dr. Porter, in which Dr. DeMars shares thoughts on the reasons behind the termination decision.)

The lower court focused on points that it concluded would support D-H's argument, i.e., Dr. DeMars' assertion that Dr. Porter was a "divisive" employee and her statements about "tensions within the OB/GYN Department concerning Dr. Porter's intimidating manner." (SPA-7.) Conversely, it glossed over Dr. DeMars' comments evidencing discriminatory and retaliatory intent, such as those explaining why Dr. Porter should not continue working for D-H. (*Id.*) The lower court erroneously rendered judgment on Dr. DeMars' intentions and concluded that Dr. DeMars "discussed Dr. Porter's disability" and proposed a "bland explanation for the decision." (*Id.*) By dismissing this email as providing "little or no evidence relevant to the claims of discrimination and retaliation," the lower court erroneously ignores the tone of the email and the repeated references to Dr. Porter's disability and refusal to be a "worker bee." The lower court also failed to consider the context of Dr. DeMars' statements, which would affect a jury's determination of credibility and motivation. A jury could reasonably see those references as evidence of discriminatory and retaliatory animus, such that by

whistleblowing, Dr. Porter was creating "dysfunction," and being "divisive" and "splitting" and not a good little "worker bee." *See, e.g., Burns*, 829 F.3d at 12–13 (noting that the jury, considering use of the otherwise neutral word "she" in context, including emphasis and condescending tone, could find discriminatory animus towards female employee); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 253-54 (2d Cir. 2014) ("[T]he phrasing 'better fit' or 'fitting in' *just might* have been about race; and when construing the facts in a light most favorable to the non-moving party, those phrases, even when isolated, could be enough to create a reasonable question of fact for a jury.").

The court's obligation, at the summary judgment stage, is to assume plaintiff's alleged facts are true. When it chose D-H's explanation for events over Dr. Porter's, it usurped the role of the jury and committed reversible error. *See Soto-Feliciano*, 779 F.3d at 25 (warning that courts must be "particularly cautious" before granting a motion for summary judgment where the issue is "whether the employer's stated nondiscriminatory reason is a pretext for discrimination"); *Kwon v. Univ. of Vt. & State Agric. Coll.,* 912 F. Supp. 2d 135, 141 (D. Vt. 2012) (noting that summary judgment is "generally inappropriate" where the employer's state of mind is at issue).

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court vacate the lower court's judgment and remand for trial.

Respectfully submitted,

Dated:  March 1, 2021

/s/ *Geoffrey J. Vitt*
Geoffrey J. Vitt

Geoffrey J. Vitt
Vitt & Associates, PLC
PO Box 1229
8 Beaver Meadow Rd.
Norwich, VT  05055
(802) 649-5700
gvitt@vittandassociates.com

Katherine B. Kramer
DGW Kramer LLP
One Rockefeller Plaza
Suite 1060
New York, NY  10020
(917) 688-2585
kkramer@dgwllp.com

*Attorneys for Appellant*

<u>**CERTIFICATE OF COMPLIANCE**</u>

This Brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) and L.R. 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,566 words.

This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Word for Microsoft 365 in Times New Roman, 14-point font.

Dated: March 1, 2021

/s/ *Geoffrey J. Vitt*
Geoffrey J. Vitt

*Attorney for Appellant*

**SPECIAL APPENDIX**

**TABLE OF CONTENTS**

                                                                    <u>Page</u>

*Porter v. Dartmouth-Hitchcock Med. Ctr.*, No. 5:17-CV-194,
2020 WL 6789564 (D. Vt. Nov. 3, 2020) (Dkt. 152)………………    SPA-1

Judgment in a Civil Action (Nov. 4, 2020) (Dkt. 153)…..………….    SPA-31

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2020 NOV -3  PM 3: 41

CLERK

BY___*EH*___
DEPUTY CLERK

MISTY BLANCHETTE PORTER,          )
                                  )
        Plaintiff,                )
                                  )
    v.                            )          Case No. 5:17-cv-194
                                  )
DARTMOUTH-HITCHCOCK MEDICAL       )
CENTER, DARTMOUTH-HITCHCOCK       )
CLINIC, MARY HITCHCOCK            )
MEMORIAL HOSPITAL, and            )
DARTMOUTH-HITCHCOCK HEALTH,       )
                                  )
        Defendants.               )

**DECISION ON MOTION FOR SUMMARY JUDGMENT**
**(Doc. 139)**

This case concerns the termination of employment of Plaintiff Misty B. Porter, M.D.

from her position as a physician within the Reproductive Medicine and Infertility Division

("REI") of Dartmouth-Hitchcock Medical Center ("DHMC"). DHMC has filed a motion for

summary judgment. (Doc. 139.) It contends that Dr. Porter cannot establish the element of

causation for each of her claims. Dr. Porter responds that a reasonable jury could draw an

inference that her termination was the result of unlawful retaliation or discrimination by DHMC.

(Doc. 140.)

**Summary Judgment Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). At this stage, the court does not weigh evidence or determine the truth of the matter.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court "resolve[s] all

ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the

party opposing summary judgment." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006)). The court will not grant summary judgment "where there are genuine issues of material fact 'that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Davis-Garett*, 921 F.3d at 45 (quoting *Anderson*, 477 U.S. at 250).

In ruling on the motion for summary judgment, the court considers the facts in the light most favorable to Dr. Porter and draws all reasonable inferences in her favor. The court examines the factual record to determine whether there is record evidence which, if believed by a jury, could support a jury verdict in favor of Dr. Porter. In examining each claim, the court follows the *McDonnell Douglas* procedure of considering the evidence offered by Dr. Porter in support of her prima facie case, the explanation offered in response by DHMC, and Dr. Porter's evidence that DHMC's explanation is no more than pretextual. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The court makes no judgment about the credibility of the witnesses or the truth of the parties' contentions. Rather, in the context of summary judgment, the court's task is to determine whether there is record evidence to support each step of the *McDonnell Douglas* analysis.

## **Facts**

The record evidence provided by Plaintiff establishes the following facts for purposes of summary judgment. Because Plaintiff is the non-moving party, the court considers the affidavits and declarations she submits to be true.

In 1996, Dr. Porter began working as a staff physician at DHMC. (Doc. 50 ¶ 18.) She specialized in the treatment of women and their partners who were experiencing difficulties with fertility. The REI division functioned within the OB/GYN Department at DHMC.

In 2014, Albert Hsu, M.D. joined the REI Division after completing his fellowship training in reproductive medicine. Plaintiff developed a poor opinion of Dr. Hsu's expertise. She was not alone in this view. Plaintiff's counsel has supplied affidavits from two physicians employed at DHMC describing their misgivings about Dr. Hsu's professional abilities.  (Doc. 140-4, 104-5).

In 2016, David Seifer, M.D. joined the REI Division as its director. He replaced Plaintiff who had previously served as interim director. After working with him, Plaintiff developed concerns about Dr. Seifer's expertise as well. These concerns were shared by one of the DMHC physicians who supplied an affidavit in this case. (Doc. 140-5.) ("My overall impression was that [Dr. Seifer] was not a strong clinician.")

Dr. Porter complained frequently to Leslie DeMars, M.D., chair of the OB/GYN Department, about Dr. Hsu and Dr. Seifer. Dr. Porter expressed these concerns through the end of April 2017. (Doc. 140-7). Dr. Porter and Dr. DeMars worked together for over 20 years within the OB/GYN Department and were long-time friends and colleagues.

Dr. Porter was not the only physician to complain about Dr. Seifer. In February 2017, another physician provided a detailed confidential review expressing concerns about Dr. Seifer's clinical skills and his management abilities, particularly as these concerned Dr. Hsu whom she also described as deficient. (Doc. 140-13.)

In December 2015, Plaintiff took a medical leave of absence due to a serious neurological condition which caused her to experience dizziness, headaches and fatigue. (Doc. 140-24 at 2–5.)

She received short-term disability benefits until her return to work in April 2016 on a limited

basis (5–7 hours per week). In June 2016, Plaintiff qualified for long-term disability benefits.

She increased her work schedule to 12 hours per week with limitations on the scope of her

activities. (Doc. 140-24 at 5.) In July 2016, Plaintiff submitted a list of requested

accommodations which she had developed with her physician. These included private office

space and restricted work duties not to exceed 12 hours per week. Leslie DeMars, M.D., chair of

the OB/GYN Department, accepted these accommodations. (Doc. 139-11 ¶¶ 12, 15.)

In August 2016, Plaintiff commenced a medical leave of absence which lasted until

November 2016 when she returned to part-time work. (Doc. 140-24 at 3.) During this leave, she

received surgery for a suspected spinal fluid leak. After returning to work, Plaintiff gradually

increased her work hours. In March 2017, she began working 20 hours per week. She received

long-term disability benefits for the time she was unable to work. (Doc. 140 at 3–4.)

During the spring months of 2017, leadership at DHMC evaluated reorganizing the REI

division. The initial discussions concerned closing the invitro fertilization service ("IVF") and

keeping the REI division open for the evaluation of women with reproductive endocrinologic

disorders. (Doc. 140-8 at 109-111.) By May 2017, DHMC reached a decision to close the REI

division entirely. In his deposition testimony, Daniel Herrick, an executive within the human

resources department, described the reasons he recommended that DMHC close the division:

> [The decision to close] was pretty straightforward. It was marginally profitable. It
> was at that time totally dysfunctional. We were unable to sustain staff to run the
> operation. Patients were not getting the care they deserved, and we were not able
> to provide care that was [consistent with] the reputation of Dartmouth-Hitchcock.

(Doc. 140-9 at 13.)

The REI Division closed in June 2017. The closure resulted in the termination of the

employment of Dr. Porter, Dr. Hsu and Dr. Seifer. Plaintiff asserts that she could have remained

4

within the OB/GYN Department at DHMC due to her skills in interpreting and working with gynecologic ultrasounds.

In recounting these undisputed facts, the court does not seek to over-simplify the events surrounding the closure of the REI Division. The discharge of three physicians and the closure of an entire division serving many women and families was a major decision by DHMC. Plaintiff's counsel has worked tirelessly to investigate the decision through the discovery process. Some of this information casts an unflattering light on the hospital administration. The court is not blind to the harm Dr. Porter—a physician of long standing with DHMC and by all accounts a skilled clinician—experienced when she was unceremoniously ushered out of the institution where she had served for more than 20 years. But much of Defendants' conduct about which Plaintiff complains is not relevant to her claims of retaliation and discrimination. The court addresses this conduct here to make clear that it was not overlooked in the course of reaching a ruling on the summary judgment issues.

## A.      Claims of Deceitful Conduct

Considered in the light most favorable to the Plaintiff, Plaintiff's counsel has produced evidence that hospital administrators created a "cover story" for the closure of the REI Division which was not entirely true. In announcing the closure, DHMC attributed the decision to a lack of nursing staff within the division. Dr. Porter contends that the closure was the result of conflict and a lack of leadership among the physicians within the REI Division. She points to an email from Dr. Merrens, Chief Clinical Officer, in which he states:

> While on the surface we are pinning the dissolution of our reproductive endocrinology program on our failure to maintain and recruit nurses for this work, it is ultimately the dysfunction of the physicians who worked in this area for years (as well as recent hires) and ultimately a failure of leadership, for which I hold Leslie [DeMars] fully accountable.

(Doc. 140-19.)

5

**B.      Dr. DeMars's Role in Hiring Dr. Seifer and Its Price**

The decision to hire Dr. Seifer as the director of the REI Division in 2016 was

controversial. Before he was hired, faculty at his previous employment expressed concerns about

his clinical skills to the credential committee at DHMC. (Doc. 140-10, Tr. at 75.) Dr. DeMars

supported his hiring and took responsibility for ensuring that he would be a success.

(Doc. 140-10, Tr. at 77.) In January 2017, after Dr. Seifer received some criticism in the course

of a review by the credentials committee, Dr. DeMars proposed a proctoring plan directed at

retaining Dr. Seifer. (Doc. 140-14.) Dr. DeMars's advocacy and Dr. Seifer's disappointing

performance were factors in the decision of chief medical officer Dr. Merrens to remove her as

chair of the OB/GYN Department. (Doc. 140-10, Tr. at 83.)

**C.      Dr. DeMars's Efforts to Find a Role for Dr. Porter at DMHC After the
           Closure of the REI Division**

In the course of negotiating the closure of the REI Division, Dr. DeMars shared her views

of Dr. Porter in emails to hospital administrators. Two emails in particular illustrate the

frustration she experienced due to conflict among the three physicians. In April 2017, before the

decision to close the Division, she identified Dr. Porter as a person with substantial responsibility

for the problems within the Division.

> While David [Seifer] is not a good leader, his failure is also the result of a masterful
> takedown by Misty Porter. If she had wanted to support him, she would have made
> the division successful. Misty is counting on her longevity and my friendship to
> come in as the savior of the division.

(Doc. 140-20 at 2) The email addresses Dr. Porter's close ties to UVM Medical Center (where

she now works) and the difficulties in rebuilding an REI practice at DHMC without her

involvement.

6

In a detailed and revealing email from Dr. DeMars to Dr. Merrens dated May 12, 2017, Dr. DeMars evaluated the response within the OB/GYN Department to the closure and the dismissal of the three physicians. (Doc. 140-16.) She described "an enormous backlash, mostly heartfelt based on [Dr. Porter's] longevity, and with only a token nod to the elephant in the room of her disruptive/splitting behavior that everyone has seen." (Doc. 140-16 at 2.) She proposed a bland explanation for the decision that omitted reference to the fear and anger other employees experienced. She stated that the most desirable option would be a line position for Dr. Porter at DHMC focused on ultrasound work or, alternatively, a position at the University of Vermont Medical Center "on a part time basis [where Dr. Porter] is able to do REI and ultrasound the amount that she wants, stress free." (*Id.* at 3.) The email discussed Dr. Porter's disability and reduced ability to work and tensions within the OB/GYN Department concerning Dr. Porter's intimidating manner. (*Id.*)

The response to Dr. Porter's termination also included very positive statements from patients and other practitioners. Members of the OB/GYN Department wrote to Dr. Merrens to express their dismay at losing a talented colleague. (Doc. 140-17.)

All three of these issues provide little or no evidence relevant to the claims of discrimination and retaliation. The public relations effort to shield the embarrassing truth that conflict among the physicians played a substantial role in the decision to close the REI Division does not make it more likely that Dr. Porter was terminated for whistleblowing or because she was working a reduced schedule on disability. Similarly, the conflict Dr. DeMars faced between loyalty to Dr. Porter and to Dr. Seifer and her concerns for the OB/GYN Department is a common problem for leaders within small organizations. It provides no evidence of retaliatory intent by Dr. DeMars. Finally, Dr. DeMars's consideration of the benefits and costs of retaining

7

Dr. Porter, including her own assessment of what might be best for her colleague, at most indicates that she was very aware of Dr. Porter's disability and limited return to work. Nothing in Dr. DeMars' emails reasonably supports an inference that she sought to retaliate against Dr. Porter or that she was motivated by discriminatory intentions.

## Analysis

### I.       Whistleblower Claims

Dr. Porter asserts that DHMC terminated her employment because she had complained to hospital management about "a) the transfer and implantation of an embryo where transmission of Zika virus to the conception was a known risk; b) performing procedures on patients without obtaining the patients' consent; c) fraudulent billing practices; and d) failure to retain necessary personnel to validate Federally-required data reports." (Doc. 50 ¶ 99 (First Amended Complaint).) She seeks back pay and reinstatement under the terms of the New Hampshire Whistleblowers' Protection Act, N.H. R.S.A. § 275-E:2.

In its motion for summary judgment, DHMC asserts that Dr. Porter cannot establish a causal connection between her complaints about hospital practices and her termination. DHMC argues that the complaints and the termination did not occur close in time and that the hospital executives who made the decision to close the REI Division knew nothing about Dr. Porter's complaints. (Doc. 139-19.) DHMC identifies business reasons for closing the Division and terminating all employees.

In response, Dr. Porter argues that the business reasons DHMC identifies are pretextual. Dr. Porter describes multiple complaints about Dr. Hsu and Dr. Seifer which she addressed to Dr. DeMars as chair of the OB/GYN Department. She argues that Dr. DeMars "had a strong motive to blame Dr. Porter for the problems with Dr. Seifer and Dr. Hsu, namely an interest in

protecting herself from scrutiny and potential job loss herself." (Doc. 140 at 16.) In Dr. Porter's

view, Dr. DeMars retaliated against her by terminating her employment because she was

"continually vocal about the problems with Dr. Seifer." (*Id.*) Dr. Porter points to DHMC's

decision not to retain her after closing the REI Division as further evidence that her termination

constituted retaliation for her alleged whistleblowing activity. (Doc. 140 at 22.)

### A. New Hampshire Whistleblowers' Protection Act and *McDonnell Douglas* Burden-Shifting Analysis

The New Hampshire Whistleblowers' Protection Act ("NHWPA") appears at NH RSA §

275-E:2. It provides in relevant part:

> No employer shall harass, abuse, intimidate, discharge, threaten, or otherwise discriminate against any employee regarding . . . employment because:
>
> (a) The employee, in good faith, reports or causes to be reported, verbally or in writing, what the employee has reasonable cause to believe is a violation of any rule of law adopted under the laws of this state, a political subdivision of this state, or the United States.

The cause of action has three elements. A plaintiff must show (1) that she engaged in an act

protected by the NHWPA; (2) she suffered an employment action such as termination and (3)

there was a causal connection between the protected conduct and the proscribed employment

action. *Cluff-Landry v. Roman Catholic Bishop of Manchester*, 169 N.H. 670, 156 A.3d 147, 151

(2017).

In *In re Seacoast Fire Equipment Co.*, 146 N.H. 605, 777 A.2d 869 (2001), the New

Hampshire Supreme Court adopted the *McDonnell Douglas* burden-shifting analysis for

NHWPA cases. Under this framework, a plaintiff "bears the initial burden of establishing

a *prima facie* case of unlawful conduct" under the NHWPA. *In re Seacoast Fire*, 146 N.H.

at 872. After the plaintiff establishes a prima facie case, "the burden 'shift[s] to the employer to

articulate some legitimate, nondiscriminatory reason for the [adverse employment action].'" *Id.*

9

(alterations in original) (quoting *Scarborough v. Arnold*, 117 N.H. 803, 379 A.2d 790 (1977)). If the defendant meets this burden, the plaintiff must then demonstrate that the employer's explanation was pretextual. *Id.*

The court first examines whether the record evidence proffered by Plaintiff suffices to establish a prima facie case under the NHWPA, and then evaluates the parties' arguments under the *McDonnell Douglas* framework.

**B.     Plaintiff's Prima Facie Case**

**1.     Record Evidence of NHWPA-Protected Activity**

For purposes of Defendants' summary judgment motion, Plaintiff has provided evidence that she made whistleblowing complaints about practices within the REI Division sufficient to satisfy the first element of the NHWPA. In her responses to DHMC's interrogatories, Plaintiff provided the following details about her complaints:

- **Potential Zika transmission**

In February 2017, Navid Esfandiari, head of the DHMC embryology laboratory, asked Dr. Porter to review the care for a patient couple under the care of Dr. Seifer and Dr. Hsu. The couple had traveled to Brazil on vacation shortly before the husband provided a sperm sample. In Dr. Porter's view, the potential exposure to the Zika virus required the husband to wait six months before providing sperm for use in fertilization. Alternatively, Dr. Seifer or Dr. Hsu could have requested the husband to provide sperm *before* the trip. Dr. Porter complained to the Risk Management department at DHMC about what she saw as unethical and unsafe medical practice. (Doc. 140-24 ¶ 16).

- **Performing procedures without obtaining consent**

10

At a time not stated, a DHMC employee advised Dr. Porter that Dr. Hsu was performing tubal patency studies without verbal or written consent. He was conducting these studies with Dr. Seifer. The employee believed that the procedures were medically inappropriate because the patients were receiving treatment for gynecologic concerns and not for difficulties with fertility. Dr. Porter spoke with Dr. DeMars and others within the OB/GYN Department about her concerns. Dr. DeMars told her she would speak with Dr. Hsu and Dr. Seifer. (Doc. 140-24 ¶ 11.)

- **Fraudulent billing practices**

At a time or times not stated, Dr. Porter advised Dr. Hsu and Dr. Seifer that she did not agree with their practice of ordering what she believed to be unnecessary lab tests at initial new infertility evaluations as well as certain radiology scans. She also took issue with their practice of ordering "trial embryo transfers" on all new infertility patients. She concludes that this practice "caused an issue with excess billing and the potential to have the initial infertility work up denied, and it caused chaos in ultrasound regarding the work schedule." In her interrogatory response, she states that she brought these issues up with Dr. Seifer and Dr. Hsu and "explained why it was unnecessary, time consuming, risked unnecessary charges and the risks of additional unwarranted procedures." (Doc. 140-24 ¶ 12).

In her interrogatory answers, Dr. Porter also described her dispute with Dr. Hsu over his practice of taking couples who were not admitted to the hospital (outpatients) to inpatient space and billing for "full outpatient services within the inpatient space." In effect, Dr. Hsu was using the wrong exam rooms to see outpatients. Dr. Porter raised the issue with Dr. Seifer who ignored her as well as Heather Gunnell and Dr. DeMars. Dr. DeMars later brought the practice to an end. (Doc. 140-24 ¶ 13.)

- **Failure to retain necessary personnel**

11

In her interrogatory answers, Dr. Porter states that DHMC "violated the law by failing to retain necessary personnel to validate federally-required data reports upon closing the REI Division." She states that "[d]ue to the lack of an IVF Medical Director to validate the data, the [Society for Assisted Reproductive Technologies] removed the [DHMC] program registry and declined to allow submission of the data. Thus, [DHMC] did not report to SART and the CDC for the entire year of 2016, nor the portion of 2017 that the REI Division was open." She states that she reported these issues to SART in the summer of 2017 and that "[i]f D-H had retained me in my position I could have validated the data and allowed for the proper submission of the required data." (Doc. 140-24 ¶ 16.)

Plaintiff describes these four episodes as violations of the Health Care Fraud Act, the False Claims Act, the Civil Monetary Penalties Law, the Social Security Act, HIPAA, the New Hampshire False Claims Act, and the New Hampshire Unfair Business Practices Act as well as multiple standards and guidelines promulgated by medical associations and federal agencies. (Doc. 140-24 ¶ 15.) The parties do not directly address the question of whether these four episodes qualify as whistleblower incidents. DHMC accepts for purposes of summary judgment the claim that they qualify. (*See* Doc. 139 at 5 ("Even assuming Dr. Porter is able to satisfy the first two prongs of her prima facie case for retaliation under the NHWPA, Dr. Porter cannot show any causal connection between her alleged whistleblower activities and her termination.").) The court will take the same course and assume for purposes of discussion that the four episodes qualify as protected conduct.

## 2.      Adverse Employment Action

The parties do not dispute, and there can be no doubt, that termination is an adverse employment action for purposes of the NHWPA.

### 3.      Record Evidence of Causation

The central issue on which the parties disagree is whether there is sufficient record evidence of a causal connection between the protected act and the proscribed employment action. Plaintiff argues that "Dr. DeMars made the decision to terminate Dr. Porter, separate and apart from the decision to close the REI Division, and presented that recommendation to Dr. Merrens, who adopted it." (Doc. 140 at 19–20.) Plaintiff theorizes that Dr. DeMars's assumption of responsibility for the success of Dr. Seifer (Doc. 140–10 at 5–6) created "an incentive [for Dr. DeMars] to blame Dr. Porter for any problems with Dr. Seifer rather than address them." (*Id.*)

To establish causation, Plaintiff points to record evidence that members of the DHMC hiring committee expressed doubt about Dr. Seifer's credentials, which caused Dr. DeMars to assume personal responsibility for his success at DHMC. (Doc. 140–10 at 5–6.) Subsequent to Dr. Seifer's hiring, Plaintiff identified deficiencies arising from Dr. Seifer's behavior to Dr. DeMars. (Doc. 140-24 at 17–22.) The record contains emails in which Dr. DeMars discusses Plaintiff's complaints about Dr. Seifer (Doc. 140-20 at 2) and which document Dr. DeMars's frustration with the situation (*see id.*; Doc. 140-16 at 2–3). Plaintiff contends that this evidence establishes that her whistleblowing activities motivated Dr. DeMars to recommend Dr. Porter's termination.

DHMC raises two related objections to Plaintiff's proof of causation: the absence of temporal proximity between her complaints and her termination and the lack of evidence that these complaints were known to Dr. Ed Merrens, DHMC's Chief Clinical Officer, when he made the decision to close the REI Division and terminate the employment of Dr. Porter and the other two physicians.

13

### a.      Temporal proximity

Because employers who retaliate against whistleblowers rarely admit to their actions and motives, case law recognizes that a close temporal relationship between the protected conduct and the termination of employment or other adverse action may provide the basis for an inference of causation by the factfinder. Temporal proximity is one factor that courts in New Hampshire have considered as evidence of causation. *See In re Seacoast Fire Equipment Co.*, 146 N.H. at 610 ("We need not address Seacoast's contention that temporal proximity alone is not enough to establish causation because the evidence in this case went well beyond temporal proximity."). But when temporal proximity is the only evidence of causation, courts have been reluctant to accept it as prima facie evidence of the causation element. *See Bellerose v. SAU No. 39*, No. 13-cv-404-PB, 2014 WL 7384105 (D.N.H. Dec. 29, 2014) ("[Chronological proximity does not by itself establish causality, particularly if the larger picture undercuts any claim of causation . . ." (quoting *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) (construing the Americans with Disabilities Act))).

Here, even the evidence of temporal proximity is weak. The only whistleblowing episode for which Dr. Porter can supply a date is the Zika incident which occurred in February 2017—approximately two months before the decision in April 2017 to close the REI Division and four months before the announcement that the three physicians were terminated. Considered in the light most favorable to the plaintiff, the Zika incident was a dispute over safety measures in the care of a single patient who may have been exposed to a virus. Dr. Porter complained to the Risk Management department which disagreed with her position and expressed the view that the patients had provided informed consent to the risk of contamination of the sperm. (Doc. 140-24 at 26.) Even setting aside the disproportion between this dispute over patient care and the much

14

larger decision to close the entire REI Division, the passage of several months greatly reduces the basis on which a jury could infer that the Zika dispute played any role in motivating Dr. Porter's termination.

The temporal connection between Dr. Porter's termination and the three other complaints she identifies as whistleblower incidents is much looser because no particular date is identified. These disputes over the use of the wrong exam rooms and the unnecessary tests and procedures appear to have been long-running. In her Statement of Material Facts, plaintiff states only:

> Many of the whistleblowing instances occurred near in time to the closure of REI, and Dr. Porter continued to present concerns until the announcement of the closure.

(Doc. 140-1 ¶ 20.) What is clear is that Dr. Porter has not identified a particular complaint on a date close in time to the decision to close the REI Division that can serve as a basis for an inference of causation. She states only that she (and other doctors and nurses) complained frequently about Dr. Hsu's and Dr. Seifer's conduct and that she "engaged in ongoing, years-long reporting to Dr. DeMars of incidents involving Dr. Hsu, Dr. Seifer, or both, that she had reasonable cause to believe were violations of law or rules." (Doc. 140-1 ¶ 19.) The most striking example of her reporting appears in a long email she sent to Dr. DeMars and Dr. Seifer in June 2016 outlining her specific concerns about Dr. Hsu's abilities. (Doc. 140-12.)

Complaints over a period of years are different from two events that occur close in time. When one event follows another closely in time a factfinder may infer a causal connection because, in our experience, things that happen close to the same time are frequently connected. When something occurs for years—as in the case of Dr. Porter's complaints about her two colleagues—there is far less reason to infer a causal link. It may be present, but the temporal connection is loose in comparison with two events which occur in sequence. The gap of months or years between the whistleblowing complaints and the decision to close the REI Division

provides very little basis on which a factfinder could draw an inference that these complaints

motivated any administrator at DHMC to seek the termination of her employment.

**b.      Decisionmaker knowledge of complaints**

The second problem presented by Plaintiff's claim that her termination was caused by her

whistleblowing complaints is the absence of record evidence that the decision-maker at DHMC

had any knowledge of the Zika dispute, the charges of unnecessary tests and procedures, or the

billing disputes. DHMC describes the decision-making process in its Statement of Undisputed

Material Facts:

> In the March/April timeframe, OB/GYN Department management and DHMC
> leadership had multiple discussions regarding issues in the REI Division,
> including the general dysfunction [of the Division] as well as the nursing shortage
> predicament. Dr. DeMars, Chair of the OB/GYN Department, Daniel Herrick,
> Vice President of Perioperative and Surgical Services, and Dr. Ed Merrens, Chief
> Clinical Officer, participated in those meetings, along with others.

> Ultimately, Dr. Merrens made the decision to shut down the REI Division due to
> the fact that they did not have the necessary staffing to provide safe and effective
> care.

(Doc. 139-1 ¶¶ 10–11 (citations to deposition transcripts omitted).) Although Plaintiff disagrees

about whether the staffing was available, she identifies no dispute about who made the decision

to close the REI Division. On this issue, her Statement of Material Facts states only:

> The decision to close the REI Division was made in late April 2017, and the
> announcement was made—along with the announcement of the three terminations
> in early May 2017.

(Doc. 140-1 ¶ 26.) Despite wide-ranging discovery, including depositions of Dr. Merrens,

Plaintiff has produced no evidence that Dr. Merrens had any knowledge of the complaints by Dr.

Porter about Dr. Hsu and Dr. Seifer. The record evidence appears to be undisputed that Dr.

DeMars was the only person within the decision-making process who had received complaints

from Dr. Porter about the other two physicians.

16

C.   *McDonnell Douglas* **Analysis of Plaintiff's Prima Facie Case**

The court turns now to the *McDonnell Douglas* analysis itself. The first step is to determine whether plaintiff has identified evidence sufficient to support a prima facie case of retaliation. Plaintiff's claim is that Dr. DeMars felt personal responsibility for Dr. Seifer's lack of success at DHMC and blamed Dr. Porter as the person who led the criticism of Dr. Seifer. (*See* Doc. 140 at 19–20.)

Looking at the evidence in the light most favorable to the plaintiff, the court concludes that plaintiff has provided evidence sufficient to meet the first step of the *McDonnell Douglas*. The logical steps include the following. Before DHMC hired Dr. Seifer, Dr. DeMars championed his candidacy as director of the REI Division. After his arrival, Dr. Seifer turned out to be disappointing in that role. Dr. Porter was a prominent and vocal critic of Dr. Seifer. Her criticism of Dr. Seifer and Dr. Hsu continued through the spring of 2017. Some portion of this criticism likely qualifies as protected whistleblowing activity. Irritated by the criticism of her protégé, Dr. DeMars may have weighed in against retaining Dr. Porter at DHMC.

It is when the court turns to the second and third steps in the *McDonnell Douglas* analysis that the weakness of Dr. Porter's claim of retaliation becomes evident. At this stage, Defendants must identify a legitimate, nondiscriminatory motive for Plaintiff's termination to overcome her prima facie case. To defeat Defendants' motion for summary judgment, Plaintiff must identify record evidence indicating that Defendants' nondiscriminatory explanation for her termination is pretextual.

### 1.   **Plaintiff's termination as a consequence of closure**

To rebut Plaintiff's prima facie case, DHMC has provided substantial evidence that it made a business decision to close the REI Division in the spring of 2017. Unsurprisingly, the

decision was made at the highest level of hospital administration. It was not made by Dr.

DeMars, who was the Department chair. Instead, the decision was made by the Chief Clinical

Officer, Dr. Merrens, in consultation with Mr. Herrick, the principal human resource officer, as

well as Dr. DeMars and Heather Gunnell. Mr. Herrick made the initial recommendation to close

the division after discussions with an outside consultant. Dr. Merrens approved his

recommendation in April 2017. (Doc. 139-5 at 5.) In his deposition, Mr. Herrick described the

business reasons he recommended closing the division:

> [The decision to close the division] was pretty straightforward. It was marginally
> profitable. It was at that time totally dysfunctional. We were unable to sustain
> staff to run the operation. Patients were not getting the care that they deserved,
> and we were not able to provide care that was to the reputation of Dartmouth-
> Hitchcock.

(Doc. 139-5 at 5, Tr. 13.) He described the decision to terminate Dr. Porter's employment as part

of the closure of the division:

> Q. Why was [Dr. Porter] employment terminated?
>
> A. She was terminated along with the closure of the REI program.
>
> Q. So because she was in the program and because the program was closed,
> therefore her employment was terminated?
>
> A. That's correct.

(Doc. 139-5 at 5, Tr. 15.) DHMC has met its burden of producing record evidence of a

legitimate, non-retaliatory reason to close the REI Division.

The final step in the *McDonnell Douglas* analysis is determining whether Dr. Porter has

produced evidence which, if believed by the jury, would support a determination that the

business reasons for the closure were pretextual and that the true reason was retaliation for

whistleblowing activity. The court concludes that the evidence of pretext is entirely insufficient.

18

Dr. Porter does not contest that the principal decision-maker—Dr. Merrens—had no knowledge of her complaints about Dr. Seifer and Dr. Hsu. He expressly denies such knowledge. There is no evidence to the contrary. It is unsurprising that the chief clinical officer of a large hospital would not know about intra-departmental complaints about disputes over patient care and billing practices. The reasons DHMC offers to explain the closure of the REI Division are substantial. While the parties disagree about whether the closure was a good business decision, it followed months of deliberation over business concerns. No reasonable jury could find that the concerns of hospital leadership about staffing levels or physician conflict were excuses they concocted to deflect attention from their true motive of retaliating against Dr. Porter. The court is satisfied that the evidence of pretext is entirely insufficient to satisfy the third step of the *McDonnell Douglas* analysis.

## 2.    Non-Retention

The court turns now to Dr. Porter's alternative argument that her termination occurred in two stages: first, the closure of the REI Division and, second, DHMC's decision not to move Dr. Porter to alternative employment within the larger OB/GYN Department. The discussion so far establishes that there is no credible evidence that the REI Division was closed because of Dr. Porter's whistleblowing complaints. The remaining question is whether the decision not to retain her in another capacity was motivated by retaliation.

The evidence is undisputed that following the announcement of the closure of the REI Division, Dr. DeMars and Mr. Herrick considered retaining Dr. Porter to perform ultrasound work within the Gynecology Department. In Dr. DeMars's initial discussions with senior management about reorganizing the REI Division, she advocated for "keep[ing Dr. Porter] in an ultrasound role" despite her medical leave. (Doc. 139-12 at 5, Tr. 139.) Dr. DeMars testified that

19

"[i]t was unclear to me how long her recovery was going to take, and I wanted to be able to give her as much time as she needed to recover and to put her in an ultrasound-heavy role that would, we could then grow that role or grow her otherwise as her recovery allowed." (*Id.*)

Following the decision to close the division, Dr. DeMars continued to seek a way to keep Dr. Porter on staff at DHMC. She testified in her deposition that "I had a choice of could I keep her within the department or could I have her be a member of the Department of Radiology." (Doc. 139-12 at 8, Tr. 158.) The Radiology Department advised that they had no open position. DHMC has supplied an affidavit from the chair of the Radiology Department confirming that in 2017, "the Department of Radiology did not have any need to hire or move a physician into the Department to perform or read only gynecologic and/or early obstetric ultrasounds, or any other small sub-segment of ultrasounds." (Doc. 139-15 at 1.) Mr. Herrick determined that the existing patient need for ultrasound evaluation was already met by existing staff and that there was no business need for another physician to read ultrasounds. (Doc. 139-5 at 15, Tr. 54-64.) Dr. DeMars was never able to create a new position for Dr. Porter in the OB/GYN Department. All three physicians within the REI Division left DHMC.

Returning to the *McDonnell Douglas* framework, the "non-retention" decision places the court in the third step of the analysis. Focusing on Dr. DeMars's actions, Dr. Porter has satisfied step one by providing evidence that she made complaints about improper billing and other potential violations of law to Dr. DeMars. (Doc. 140 at 21–22.) DHMC has satisfied step two by providing evidence that Dr. DeMars considered creating a new position for Dr. Porter separate from the REI Division but that there was little support or need for another physician specializing in ultrasound. At step three, focusing only on Dr. DeMars's actions, Dr. Porter argues that the business reasons are insufficient to support Dr. DeMars's decision not to transfer Dr. Porter

within the OB/GYN Department. Instead, Plaintiff argues that Dr. DeMars's decision was
motivated by a desire to retaliate for the criticism Dr. Porter directed against Dr. Seifer.

Within the *McDonnell Douglas* framework, the evidence Plaintiff offers to demonstrate
that the business reasons provided by DHMC at step two are pretextual is inadequate to defeat
summary judgment. The record contains evidence of business reasons supporting both closure of
the REI Division and non-retention of Dr. Porter. Against these, Plaintiff offers the argument that
Dr. DeMars must have been sufficiently angered or embarrassed by Dr. Porter's complaints
against Dr. Seifer to retaliate by opposing her retention.

There is no evidence of this anger. It is a theory which is often stated in Plaintiff's papers
but remains unsupported by an email or deposition testimony. No reasonable jury could infer that
Dr. DeMars decided not to arrange for a new position within the OB/GYN Department because
Dr. Porter had criticized Dr. Seifer. At most, Dr. DeMars's involvement in hiring Dr. Seifer in
2016 gave her reason to be angry at his critics a year later and disappointed that his tenure at
DHMC did not go well. But it is a significant logical step to propose that these feelings,
whatever they were, motivated her to exclude Dr. Porter from further employment at DHMC.

There is also no evidence that Dr. DeMars sought to terminate Dr. Porter's employment
at DHMC. The deposition testimony is to the contrary. Both Mr. Herrick and Dr. DeMars
described multiple efforts by Dr. DeMars to create a new job for Dr. Porter at DHMC, originally
within a modified REI Division and, subsequently, within the larger OB/GYN or Radiology
Departments. The only evidence of why these efforts came up short comes from Mr. Herrick,
who determined that there was no business need for Dr. Porter in these roles.

The court is satisfied that Dr. Porter has not established that her whistleblowing
complaints about a variety of practices at DHMC caused her termination. The evidence is

21

strongly to the contrary. DHMC has produced sufficient evidence of business reasons to close

the REI Division and to make the decision not to create a new position elsewhere in the hospital

for Dr. Porter. These reasons are sufficient to rebut the claim that administrators at DHMC were

motivated by a desire to retaliate against Dr. Porter for her complaints and terminated her

employment (or the entire REI Division) for such reasons. Consequently, the court grants

Defendants motion for summary judgment on Plaintiff's whistleblowing claim.

## II.    Disability Retaliation Claim

Dr. Porter also claims that she was terminated because of her neurological disability. She

makes claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA")

(Count 3), the Rehabilitation Act, 29 U.S.C. § 794 (Count 4), and New Hampshire and Vermont

anti-discrimination and retaliation statutes (Counts 5 and 6).

### A.    Legal Standard for Disability Discrimination Claims

To establish a prima facie case of disability discrimination under the ADA, a plaintiff

must demonstrate that "(1) her employer is subject to the ADA; (2) she suffers from a disability

within the meaning of the ADA; (3) she could perform the essential functions of her job with or

without reasonable accommodation; and (4) she was fired because of her disability." *Ryan v.*

*Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir. 1998). In 2019, the Second Circuit

clarified that "a plaintiff alleging a claim of employment discrimination [must] prove that

discrimination was the but-for cause of any adverse employment action." *Natofsky v. City of*

*New York*, 921 F.3d 337, 348 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2668 (2020). *Natofsky*

aligned the ADA standard with the "solely by reason" standard of the Rehabilitation Act, which

requires a plaintiff to "demonstrate that disability was the sole cause of the adverse employment

action." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 337 (2d Cir. 2000).

22

The New Hampshire state remedy for employer discrimination on the basis of disability appears at N.H. R.S.A. § 354-A:8 follows the "sole reason" standard of the Rehabilitation Act. *In re Dunlap*, 134 N.H. 533 (1991) ("[Plaintiff] must establish that his handicap was the sole reason for his nonrenewal."). Similarly, the Vermont Fair Employment Act, 21 V.S.A. § 495, follows the language of the Rehabilitation Act. The Vermont Supreme Court follows federal case law regarding "the allocations of burdens and standards of proof." *State v. G.S. Blodgett Co.*, 163 Vt. 175, 180 (1995).

The parties agree that the *McDonnell Douglas* burden-shifting analysis apply similarly to all four counts. (Doc. 139-19 at 9; Doc. 140 at 24.) The parties also agree that, as in the case of Plaintiff's NHWPA claim, the primary issue is whether Dr. Porter can provide sufficient evidence to establish that DHMC terminated Plaintiff because of her disability. (Doc. 139-19 at 10; Doc. 140 at 24.)

### B.      Plaintiff's Claim of Disability Retaliation

The evidence that hospital executives terminated Dr. Porter because she was working part-time and suffering from a serious neurological condition is vaporous. It was obviously no secret that Dr. Porter took two medical leaves of absence starting in late 2015 and had returned to work on a part-time basis with restrictions. Dr. Merrens was generally aware of her status although he denies any detailed information. Dr. DeMars was very conscious of Dr. Porter's limitations and worked with her to develop accommodations. But there is a great difference between knowing about a disability and taking an adverse employment action because of it. The court evaluates the evidence proffered by Plaintiff to establish causation.

First, there is no evidence that DHMC decided to close the REI Division because one of the principal physicians was on disability and working half-time. That would be an absurd

23

argument and plaintiff does not make it. The evidence that Dr. Porter was not rehired or transferred to the larger OB/GYN Department due to her health problems is only a little stronger. In this regard, Plaintiff points to an email exchange between Dr. DeMars and Dr. Merrens in June 2017, one week after the announcement of the closure of DHMC's REI Division. Dr. DeMars wrote that "the best outcome of this termination is the chance for Misty [Dr. Porter] to actually be out on leave with no intervening responsibilities, so that she can assess how much improvement she might gain." (Doc. 140-16 at 3.) Dr. Merrens responded that "once the dust settles, [we] will be in a better position with all this, including Misty." (*Id.*) However, describing the potential benefit of time off for someone recovering from serious surgery is hardly the basis for inferring that the disability motivated her termination. That the email exchange occurred after the announcement of the closure of the REI Division further weakens any basis for this inference.

Second, Plaintiff relies on an affidavit submitted by Michelle Russell, M.D., as evidence of causation. Much of the affidavit describes Dr. Porter's strong positive qualities as a physician as well as Dr. Russell's concerns about the shortcomings of Dr. Hsu and Dr. Seifer. In paragraph 10 of her affidavit, Dr. Russell describes a meeting between Dr. Merrens and the members of the OB/GYN Department at which Dr. Merrens discussed the closure of the REI Division and the termination of three physicians:

> Dr. Merrens said that the REI Division was closed due to problems recruiting adequate nursing staff for the division. He then began discussing personnel and the termination of three physicians in conjunction with the closure. When he began discussing personnel, I raised my hand (I was seated towards the front) and asked Dr. Merrens why Dr. Porter had been terminated. I said something like, "I can understand why the other two needed to leave, but why Misty?" Dr. Merrens responded by saying that Misty was "on disability." I specifically recall him using the word "disability" in his response, because I was so shocked that he said that. I said something like, "but she was coming back," and Dr. Merrens moved on to a different subject.

(Doc. 140-5.) Standing alone, however, this exchange is inconclusive. It would not be reasonable to interpret the exchange as a confession by Dr. Merrens before the entire OB/GYN Department that he had terminated a long-time employee and colleague because she was partially disabled. That is the only interpretation which would directly support plaintiff's claim. There are other possible interpretations. These include the possibility that Dr. Merrens was assuring the group that Dr. Porter had access to income independent to her hospital salary. It is also possible that Dr. Merrens and Dr. Russell misunderstood one another entirely. None of these interpretations would support a claim of discrimination and the court will not speculate about what Dr. Merrens may have meant to say. The comment would play a role if it formed part of a pattern of discriminatory comments by Dr. Merrens or others within the hospital. By itself, it is insufficient to provide evidence of discriminatory intent.

Finally, Plaintiff includes an email from Dr. Merrens in which he responded to an inquiry from a nursing coordinator regarding Dr. Porter's impending termination by saying, "As you know Dr. Porter currently works at 20 % of her time currently and I'm not sure of her interest in staying on if the infertility part were to cease." (Doc. 140-17 at 2.) However, Dr. Merrens referred to Dr. Porter's disability status in explaining his decision to terminate all three physicians. His comment was inaccurate about the percentage of time Dr. Porter was working, and, like so many emails, probably unwise, but it is not reasonably possible to read it as evidence of animus or discriminatory intent.

The court applies these observations in the context of the *McDonnell Douglas* framework. At the first step, Dr. Porter has established that at the time of termination, she suffered from a medical disability. DHMC has supplied evidence of non-discriminatory reasons to justify her termination. These include the strategic decision to close the entire REI Division

and, subsequently, the decision not to retain Dr. Porter because other physicians within the OB/GYN and Radiology Departments were already able to meet demand for her ultrasound skills. DHMC has met the requirements of the second step by providing evidence of a business reason for the termination decision. In response, Plaintiff provides virtually no evidence that the proffered business reasons are simply a pretext that masks discriminatory intent. Dr. Merrens' remark that Dr. Porter was on disability was true. Mentioning her disability in front of a large group of colleagues or discussing it in an email with another staff member may have been insensitive, but standing alone without the context of more explicit statements of discrimination, these provide no basis on which a reasonable jury could infer that the hospital administration decided to terminate Dr. Porter because she was disabled. The court grants Defendants' motion for summary judgment on Plaintiff's disability-based retaliatory termination claim.

### III.     Failure to Accommodate Claim

In addition to arguing that DHMC violated the ADA by terminating Plaintiff because of her disability, Plaintiff also claims that DHMC violated the ADA and provisions of New Hampshire and Vermont employment law by failing to consistently provide reasonable accommodations for her disability. (Doc. 140 at 25.)

The prima facie case for a failure-to-accommodate claim under the ADA is similar to the prima facie case for a discriminatory termination claim. A plaintiff must establish that "(1) [the plaintiff] is a person with a disability under the meaning of [the ADA]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Natofsky*, 921 F.3d at 353 (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)). A plaintiff must also show the connection between an

employer's failure to accommodate, the employee's deficient performance, and any adverse
employment action. *Id.* A failure to accommodate claim becomes a discriminatory discharge
claim when an employee alleges that an employer's failure to make reasonable accommodations
causes the employee's termination. *Parker*, 204 F.3d at 332.

Both sides address Plaintiff's failure-to-accommodate claim separately from her
discriminatory discharge claim. (Doc. 139-19 at 11–12; Doc. 140 at 25.) Construing the record
in the light most favorable to Plaintiff, the court considers whether Plaintiff has presented
evidence sufficient to establish a prima facie case of failure to accommodate.

The record indicates that Dr. Porter remained employed from the onset of her illness in
November 2015 until her termination on a combination of full and partial disability. (Doc. 139-1
¶¶ 3-6.) In July 2016, Dr. DeMars accepted and ordered all of the accommodations that Dr.
Porter requested. (Doc. 139-11 ¶¶ 12, 15.) Plaintiff argues, however, that "[a]lthough
Defendants periodically provided the necessary accommodations to Dr. Porter—thus allowing
her to perform at her usual high standard . . .—Defendants failed to maintain these
accommodations" consistently. (Doc. 140 at 25.)

In particular, Plaintiff complains about the actions of Dr. Seifer, who "tried to contact
[Plaintiff] after work, and sometimes [] followed [her] out to the parking lot to continue asking
[her] questions after [her] shift ended." (Doc. 140-7 at 3.) Plaintiff refers to a weekend in March
2017 in which both Dr. Hsu and Dr. Seifer were unable to take call, which caused the on-call
REI Division nurse practitioner to contact Plaintiff "at home on the weekend to have [her] make
a treatment decision," even though Plaintiff "was not approved by [her] physicians to take call."
(Doc. 139-8 at 6-7.) Plaintiff also cites an occasion on which Dr. Seifer asked her "to call him
with [ultrasound] results that evening, after [she] had worked that afternoon," even though

27

Plaintiff "was not supposed to work after [she] was done with [her] scheduled hours for the day." (*Id.* at 8.) Plaintiff complains that Dr. DeMars and Heather Gunnell, the practice manager for the OB/GYN Department, failed to prevent these actions by Dr. Seifer. (*Id.* at 7–8; Doc. 140-7 at 3–4.) According to Plaintiff, these incidents were "very stressful" and occasionally "physically and psychologically taxing." (Doc. 140-7 at 6–7.)

However, even construing this evidence most favorably towards Plaintiff does not establish a prima facie case of failure to accommodate under the ADA. The Second Circuit has held that a "[r]easonable accommodation may take many forms . . . . [E]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee. All that is required is effectiveness." *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 95 (2d Cir. 2015) (internal citations omitted). Plaintiff fails to identify a connection between the alleged lapses in reasonable accommodation and any subsequent performance deficiencies or adverse employment actions. Instead, as Plaintiff herself alleges in the Amended Complaint, the accommodations in place at the time of her termination enabled her to "perform[] at her usual high standards and . . . meet all the essential job requirements." (Doc. 50 ¶ 6.) Furthermore, experiencing occasional stress is not itself an adverse employment action under the ADA, as such actions "must be more than just disruptive" for an employee. *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 72 (2d Cir. 2019).

In the absence of any evidence supporting a prima facie case of failure to accommodate, the court grants Defendants' motion for summary judgment on Plaintiff's failure-to-accommodate claim.

## IV.    Wrongful Discharge

Plaintiff makes a claim of wrongful discharge under New Hampshire common law. Neither party identifies a written contract. The court understands, therefore, that Dr. Porter was an employee at-will protected by the public policy exception first identified by the New Hampshire Supreme Court in *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974). *See id.* at 133 ("We hold that a termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not in the best interest of the economic system or the public good and constitutes a breach of the employment contract."). The cause of action for wrongful discharge has two elements: (1) the defendant's motivation by bad faith, malice or retaliation in terminating the plaintiff's employment and (2) the employment was terminated because the employee performed acts which public policy would encourage or refused to perform acts which public policy would condemn. *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 44 (1st Cir. 2001) (internal quotations omitted); *see Cloutier v. Great Atl. & Pac. Tea Co.*, 121 N.H. 915, 922, 436 A.2d 1140 (1981).

Plaintiff identifies bad faith by Dr. DeMars in blaming and retaliating against Plaintiff for her conflict with Dr. Hsu and Dr. Seifer. Plaintiff identifies her employer's violation of public policy as retaliation for her actions in speaking out about her colleague's incompetence.

The wrongful discharge claim fails for the same reason that the court granted summary judgment on the whistleblower claim. The record evidence does not support a conclusion by a jury that Dr. DeMars's anger towards Dr. Porter for criticizing Dr. Hsu and Dr. Seifer led to either the closure of the REI Division or the decision not to retain Dr. Porter in an alternative capacity at DHMC. There is evidence that conflict among the three physicians (Dr. Porter, Hsu, and Seifer) contributed to the closure of their division. The conflict was no secret and was one

29

of the factors Mr. Herrick considered in reaching his recommendation to close the division. But recognizing that the three physicians worked very poorly together and retaliating against Dr. Porter for bringing this information to light are very different matters. There is no evidence that Dr. DeMars caused the closure out of animus against her colleague.

The court does not reach the second element concerning the performance of acts encouraged by public policy. In *Grivois v. Wentworth-Douglass Hosp.*, No. 12-cv-131-JL, 2014 WL 309354 (D.N.H. Jan. 28, 2014), the District of New Hampshire determined that a hospital administrator who was discharged after repeatedly raising concerns about patient care satisfied the test for purposes of summary judgment. *See id.* at *8 ("Grivois says that she was fired for complaining about new Wentworth–Douglass 'policies which she believed had created the potential of harm to Hospital patients.'"). The present case is similar. Dr. Porter's complaints about the other physicians are communications that would satisfy the public policy exception. (For similar reasons, the court concluded that these concerns qualified for statutory protection under the N.H. whistleblower protection statute.) Where Plaintiff's wrongful discharge claim falls short is the lack of evidence that Plaintiff's complaints caused DHMC to retaliate against her.

## Conclusion

The court GRANTS the defendant's motion for summary judgment on all claims (Doc. 139).

Dated at Rutland, in the District of Vermont, this 3rd day of November, 2020.

Geoffrey W. Crawford, Chief Judge
United States District Court

30

# UNITED STATES DISTRICT COURT

for the
District of Vermont

Misty Blanchette Porter, M.D.

*Plaintiff(s)*

v.

Dartmouth-Hitchcock Medical Center, Dartmouth-
Hitchcock Clinic, Mary Hitchcock Memorial Hospital,
Dartmouth-Hitchcock Health

*Defendant(s)*

)
)
)
)
)
)
)
)

Civil Action No.   5:17-cv-194

## JUDGMENT IN A CIVIL ACTION

☐   **Jury Verdict.**

☑   **Decision by Court.**

**IT IS ORDERED AND ADJUDGED** that pursuant to the court's Decision (Document No.152) filed November 3, 2020, defendants' Motion for Summary Judgment On All Claims (Document No.139) is GRANTED.  JUDGMENT is entered in favor of Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, Dartmouth-Hitchcock Health and against Misty Blanchette Porter, M.D. on all claims pursuant to Fed. R. Civ. P. 56.

Date:   November 4, 2020

JUDGMENT ENTERED ON DOCKET
DATE ENTERED:   11/4/2020

*JEFFREY S. EATON*
*CLERK OF COURT*

*/s/ Elizabeth S. Britt*
*Signature of Clerk or Deputy Clerk*

| STATE OF NEW YORK | ) | | **AFFIDAVIT OF SERVICE** |
|---|---|---|---|
| | ) | ss.: | **BY OVERNIGHT FEDERAL** |
| COUNTY OF NEW YORK | ) | | **EXPRESS NEXT DAY AIR** |

   I, Tyrone Heath, 2179 Washington Avenue, Apt. 19, Bronx, New York 10457, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age and resides at the address shown above or at

   **On March 1, 2021**

deponent served the within: **Brief and Special Appendix for Plaintiff-Appellant (Filed Under Seal)**

   **upon:**


**Donald William Schroeder**
*Attorneys for Defendants-Appellees*
**Foley & Lardner LLP**
**111 Huntington Avenue**
**Boston MA 02199**
**(617) 342-4041**



the address(es) designated by said attorney(s) for that purpose by depositing **2** true copy(ies) of same, enclosed in a properly addressed wrapper in an Overnight Next Day Air Federal Express Official Depository, under the exclusive custody and care of Federal Express, within the State of New York.


**Sworn to before me on March 1, 2021**



**MARIA MAISONET**
Notary Public State of New York
No. 01MA6204360
Qualified in Queens County
Commission Expires Apr. 20, 2021          **Job#  302634**