# 20-3894-cv

## United States Court Of Appeals
### for the
## Second Circuit

———————————

MISTY BLANCHETTE PORTER, M.D.,

Plaintiff-Appellant,

v.

DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, DARTMOUTH-HITCHCOCK HEALTH,

Defendants-Appellees.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF VERMONT, Case No. 5:17-cv-194 (Crawford, G.)

---

**BRIEF OF DEFENDANTS-APPELLEES DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, AND DARTMOUTH-HITCHCOCK HEALTH**

---

Donald W. Schroeder
Jessica E. Joseph
Morgan McDonald

*Attorneys for Defendants-Appellees*

**FOLEY & LARDNER LLP**
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000

# CORPORATE DISCLOSURE STATEMENTS

## DISCLOSURE STATEMENT OF DARTMOUTH-HITCHCOCK MEDICAL CENTER

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Dartmouth-Hitchcock Medical Center states that it does not have a parent corporation, there is no publicly held corporation that owns ten percent or more of its stock, and it has no subsidiaries and no affiliate that has issued shares of ownership to the public.

## DISCLOSURE STATEMENT OF DARTMOUTH-HITCHCOCK CLINIC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Dartmouth-Hitchcock Clinic ("DHC") identifies Dartmouth-Hitchcock Health, a nongovernmental corporation, as its parent corporation. DHC further states that there is no publicly held corporation that owns ten percent or more of DHC's stock, and that DHC has no subsidiaries and no affiliate that has issued shares of ownership to the public.

## DISCLOSURE STATEMENT OF MARY HITCHCOCK MEMORIAL HOSPITAL

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Mary Hitchcock Memorial Hospital ("MHMH") identifies Dartmouth-Hitchcock Health, a nongovernmental corporation, as its parent corporation. MHMH further states that there is no publicly held corporation that owns ten percent or more of MHMH's stock, and MHMH has no subsidiaries and no affiliate that has issued shares of ownership to the public.

## DISCLOSURE STATEMENT OF DARTMOUTH-HITCHCOCK HEALTH

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Dartmouth-Hitchcock Health, a nongovernmental corporation, states that it has no parent corporation, there is no publicly held corporation that owns ten percent or more of its stock, and it has no subsidiaries (except wholly owned subsidiaries) and no affiliate that has issued shares of ownership to the public.

Dated:      June 1, 2021                          /s/ Donald W. Schroeder
                                                 Donald W. Schroeder
                                                 Jessica E. Joseph
                                                 Morgan McDonald

FOLEY & LARDNER LLP

111 Huntington Avenue

Boston, MA 02199

Tel: (617) 342-4000

Fax: (617) 342-4001

*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES ...................................................................1

STATEMENT OF THE CASE ....................................................................2

I.   Introduction and Procedural History ........................................2

II.  Factual Background ..........................................................................4

SUMMARY OF ARGUMENT .................................................................14

ARGUMENT .............................................................................................16

I.   Standard Of Review .......................................................................17

II.  Summary Judgment In D-H's Favor On Dr. Porter's Whistleblower Retaliation Claim Was Proper...........................................................18

A.  Temporal Proximity Is A Red Herring...................................19

B.  D-H Provided Substantial Evidence Of A Legitimate, Non-Retaliatory Reason For Terminating Dr. Porter. ......................23

C.  The District Court Also Correctly Held That Dr. Porter Failed To Demonstrate Pretext. ...............................................................26

1. The Decision-Maker Behind Dr. Porter's Termination Had No Knowledge Of Her Alleged Complaints.................................26

2. Questions Regarding D-H's Business Judgment Are Irrelevant......33

III.  Summary Judgment on Dr. Porter's Disability Claims Was Also Appropriate. ....................................................................................36

A.  Dr. Porter Failed To Establish Even A Prima Facie Case Of Failure To Accommodate. ...........................................................36

B.  Dr. Porter Could Not Show That She Was Terminated Because Of Her Disability. ...............................................................................39

IV.  The District Court Correctly Awarded Summary Judgment To D-H On Dr. Porter's Wrongful Discharge Claim.................................49

CONCLUSION ..........................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)......................................................................................17

*Austin v. Ford Models, Inc.,*
149 F.3d 148 (2d Cir. 1998) .......................................................................23

*Best v. Duane Reade, Inc.,*
715 Fed. Appx. 95 (2d Cir. 2018) .............................................................36

*Borzon v. Green*,
778 F. App'x 16 (2d Cir. 2019) .................................................................33

*Cameron v. Cmty. Aid For Retarded Children, Inc.,*
335 F.3d 60 (2d Cir. 2003) .........................................................................31

*Cloutier v. Great Atl. & Pac. Tea Co.,*
121 N.H. 915, 436 A.2d 1140 (1981) .......................................................49

*Cluff-Landry v. Roman Catholic Bishop of Manchester,*
169 N.H. 670, 156 A.3d 147 (2017) .........................................................19

*Connolly v. City of Rutland*,
No. 2:09-cv-183, 2011 WL 3739064 (D. Vt. Aug. 24, 2011)..................18

*Connors v. Dartmouth Hitchcock Med. Ctr.,*
12 F. Supp. 3d 688 (D. Vt. 2014) ...................................................... 37, 43

*DeMarco v. Holy Cross High Sch.,*
4 F.3d 166 (2d. Cir. 1993) ..........................................................................33

*Dister v. Continental Grp., Inc.,*
859 F.2d 1108 (2d Cir. 1988) .....................................................................33

*Faldetta v. Lockheed Martin Corp.*,
    98 Civ. 2614 (RCC), 2000 WL 1682759 (S.D.N.Y. Nov. 9, 2000)..................23

*Fink v. New York City Dep't of Pers.*,
    53 F.3d 565 (2d Cir. 1995) ................................................................38

*Gage v. Rymes Heating Oils, Inc.*,
    No. 14-cv-480-PB, 2016 WL 843262 (D.N.H. Mar. 1, 2016) ............................
    ....................................................................................... 37, 41, 43

*In re Seacoast Fire Equip. Co.*,
    146 N.H. 605, 777 A.2d 869 (2001) ......................................................19

*Jackson v. New York City Dep't of Educ.*,
    768 Fed. Appx. 16 (2d Cir. 2019) ........................................................42

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005) ..............................................................18

*Langlois v. Hartford Board of Educ.*,
    831 F. App'x 548 (2d Cir. 2020) ........................................................47

*McPherson v. New York City Dep't of Educ.*,
    457 F.3d 211 ..............................................................................29

*Moccio v. Cornell Univ.*,
    889 F. Supp. 2d 539 (S.D.N.Y. 2012) ..................................................24

*Mueller v. Rutland Mental Health Servs.*,
    File No. 1:05-cv-38, 2006 WL 2585101 (D. Vt. Aug. 17, 2006) ....................41

*Natofsky v. City of New York*,
    921 F.3d 337 (2d Cir. 2019) ................................................. 17, 40, 41

*Naumovski v. Norris*,
    934 F.3d 200 (2d Cir. 2019) ..............................................................47

*Noll v. Int'l Bus. Machines Corp.,*
  787 F.3d 89 (2d Cir. 2015) ............................................................ 38, 39

*Parker v. Columbia Pictures Indus.,*
  204 F.3d 326 (2d Cir. 2000) ...............................................................40

*Porter v. Dartmouth-Hitchcock Med. Ctr.,*
  No. 5:17-cv-194, 2020 WL 6789564 (D. Vt. Nov. 3, 2020)................................4

*Roberts v. Vt. Dep't of Corr.,*
  No. 2:16-cv-135-cr-jmc, 2017 WL 2189707 (D. Vt. Apr. 4, 2017) .................17

*Ryan v. Grae & Rybicki, P.C.,*
  135 F.3d 867 (2d Cir. 1998) ...............................................................40

*Sandler v. Montefiore Health Sys.,*
  No. 16-cv-2258 (JPO), 2018 WL 4636835, (S.D.N.Y. Sept. 27, 2018) ...........27

*Saji v. Nassau Univ. Med. Center,*
  724 Fed. Appx. 11 (2d Cir. 2018) .......................................................18

*Sharma v. Potter,*
  06 Civ. 4448 (GAY), 2008 WL 461377 (S.D.N.Y. Feb. 14, 2008)..................37

*Straughn v. Delta Air Lines, Inc.,*
  250 F.3d 23 (1st Cir. 2001) ...............................................................49

*St. Mary's Honor Ctr. v. Hicks,*
  509 U.S. 502 (1993)............................................................................35

*Summa v. Hofstra Univ.,*
  708 F.3d 115 (2d Cir. 2013) ...............................................................28

*Vasquez v. Empress Ambulance Serv., Inc.,*
  835 F.3d 267 (2d Cir. 2016) ...............................................................28

*Weinstock v. Columbia Univ.,*
  224 F.3d 33 (2d Cir. 2000) ...................................................... 14, 18, 43

*Witherbee v. Town of Brattleboro,*
   No. 2:18-cv-00113, 2019 WL 2476722 (D. Vt. June 13, 2019) ......................42

**Statutes**

29 U.S.C. § 794.............................................................................................3

42 U.S.C. § 2000e-2(m) .............................................................................41

42 U.S.C. § 12101.........................................................................................3

N.H. RSA § 275-E:2 .....................................................................................3

N.H. RSA § 354-A:7..................................................................................3, 42

N.H. RSA § 354-A:19..................................................................................3

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................17

**Other Authorities**

*Merrill v. Fall Mountain Reg'l Sch. Dist. – SAU* 60,
   EA 0313-06, 16D-2006-10091 (Sept. 2010),
   https://www.nh.gov/hrc/decisions/documents/merrill-v-sau60-gross.pdf
   ..............................................................................................................42

# <u>STATEMENT OF THE ISSUES</u>

1.      Did the District Court correctly find that Dr. Porter's speculation and conjecture were insufficient to constitute evidence of pretext, and therefore D-H was entitled to summary judgment on Dr. Porter's whistleblower and disability discrimination and retaliation claims under federal and state law?

2.      With respect to Dr. Porter's failure to accommodate claim, did the District Court properly conclude that where Dr. Porter herself admitted she was able to perform the essential functions of her position at the time of her termination, she failed to produce evidence that she suffered any adverse employment action?

3.      Did the District Court properly find that Dr. Porter's own opinion, without more, would not allow a reasonable jury to find D-H responsible for wrongful discharge?

## STATEMENT OF THE CASE

### I.    Introduction and Procedural History

Plaintiff-Appellant Misty Blanchette Porter ("Dr. Porter") was previously employed as a physician in the Reproductive Endocrinology and Infertility ("REI") Division within Dartmouth-Hitchcock's Department of Obstetrics and Gynecology ("OB/GYN").  Following longstanding, well-documented issues with recruitment and staffing shortages of skilled nurses in the REI Division, Dartmouth-Hitchcock made the decision to shut down the Division entirely, which resulted in the termination of all three physicians in the Division—including Dr. Porter.  Rather than accept that this was the sole reason for her termination, however, Dr. Porter asserts several unsubstantiated claims for retaliation and discrimination under state and federal law based on her alleged disability, multiple requests for accommodations, and numerous alleged whistleblower complaints she made about other providers in the REI Division over the course of several years.

On October 11, 2017, Dr. Porter filed her initial Complaint in the United States District Court for the District of Vermont (the "District

Court"), alleging disability discrimination and retaliation in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 ("ADA"), N.H. RSA § 354-A:7, and N.H. RSA § 354-A:19, whistleblower retaliation in violation of the New Hampshire Whistleblowers' Protection Act, N.H. RSA § 275-E:2, ("NHWPA"), and wrongful discharge in violation of New Hampshire common law. She subsequently filed her First Amended Complaint almost one year later on August 1, 2018, which added a claim for disability discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Section 504"), as well as disability discrimination and retaliation under the Vermont Fair Employment Practices Act ("VFEPA").

On January 29, 2020, Defendants-Appellees Dartmouth Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "D-H") filed a motion for summary judgment. (JA-80 to JA-82).[1] Given Dr. Porter's inability to prove her claims, the District Court granted summary judgment

---

[1] Citations to "JA-xx" refer to the separately-bound Joint Appendix. Citations to "SPA-xx" refer to Dr. Porter's Special Appendix, attached to Plaintiff-Appellant's Brief ("Pl. Br.").

in D-H's favor on all counts.  *Porter v. Dartmouth-Hitchcock Med. Ctr.*, No. 5:17-cv-194, 2020 WL 6789564 (D. Vt. Nov. 3, 2020); (SPA-1 to SPA-30). Judgment was entered for D-H on November 4, 2020 (SPA-31), and Dr. Porter filed her notice of appeal on November 17, 2020 (JA-711 to JA-712).

## II.    Factual Background

Plaintiff-Appellant Dr. Porter began working at Dartmouth-Hitchcock Clinic on July 15, 1996 as a staff physician.  (JA-97).  She was employed within Dartmouth-Hitchcock's OB/GYN Department, specifically in the REI Division.   (JA-140 to JA-141 at 26:17-27:2; JA-231 at 25:22-26:1).  The REI Division specialized in the treatment of women and their partners who were experiencing difficulties with fertility.

In 2014, Dr. Albert Hsu ("Dr. Hsu") joined the REI Division as a more junior physician, soon after completing his fellowship.  (JA-265 at 44:2-11; JA-290 at 54:19-55:4).  In 2016, Dr. David Seifer ("Dr. Seifer") joined the REI Division as the Division Director.  (JA-295 at 73:1-13).  Prior to that time, Dr. Porter had been the interim Division Director for a few years.  (JA-141 to JA-142 at 27:3-28:6).

In November 2015, Dr. Porter began suffering symptoms as the result of an injury that led her to take a leave of absence in December 2015. (JA-340 to JA-341). These symptoms included dizziness, headaches, and fatigue. (JA-395 at 27:9-14). She received short-term disability benefits during this time. (JA-388 at 20:8-12). In April 2016, at her own request, she returned to work in a very limited capacity, working approximately 5 to 7 hours a week. (JA-393 at 25:13-22).

In June 2016, Dr. Porter sought and received approval for long-term disability benefits. (JA-404 at 36:8-14). There was no gap between her receipt of short-term disability benefits and long-term disability benefits. (JA-403 at 35:17-20). In mid-June, she increased her work hours to about 12 hours per week, though she was limited to one task at a time, and was unable to handle complex cases or work in the OR. (JA-341). She still suffered from dizziness, headaches, fatigue, and other symptoms. *Id*.

In July 2016, Dr. Porter's physician, Dr. Deb Fournier, drafted a letter providing a list of approximately 11 recommended accommodations for Dr.

Porter to allow her to resume her work responsibilities in a limited capacity.

(JA-527). These recommendations included:

- protected, quiet, private office space;

- very well described, restricted duties:

    - limited clinical responsibilities of no more than 12 hours a week, inclusive of administrative time and program development, and limited to GYN ultrasound and IVF-related activity only,

    - no main operating room cases,

    - no outpatient new patient consults,

    - no call, and

    - no teaching responsibilities;

- paced activities;

- additional time to complete tasks (with breaks after 1.5 hours of work);

- ergonomic accommodations like alternative lighting or a screen dimmer; and

- no work-related emails from home.

*Id.* Dr. Porter provided this list of recommended accommodations to Dr. Leslie DeMars ("Dr. DeMars"), Chair of the OB/GYN Department. (JA-400 to JA-401 at 32:20-33:11). Dr. Porter admits that Dr. DeMars approved or authorized every accommodation she requested in July 2016. (JA-531 at ¶ 12).

In August 2016, Dr. Porter briefly returned to work part-time for a few days. (JA-449 at 81:11-19). She was approved for a leave of absence as of August 10, 2016 and remained out of work until November 2016 when, having had additional treatment and surgery, she voluntarily decided to return to work on a part-time basis while continuing to receive long-term disability benefits. (JA-341; JA-420 at 52:2-11). At first, Dr. Porter worked approximately 4 hours a week, and in December increased her time to approximately 7 hours a week. (JA-341). In March 2017, Dr. Porter began working about 20 hours per week, and continued to receive long-term disability benefits. (JA-342; JA-404 at 36:12-23). She maintained this reduced schedule until her termination. (JA-429 to JA-430 at 61:22-62:1).

From the period between late 2016 until its closure effective June 2017, the REI Division experienced a critical shortage of trained nurses. (JA-269 at 130:10-131:18; JA-273 at 169:16-170:2; JA-274 at 191:24-192:11). Though the Division was operating with a patchwork, skeleton crew already, in November 2016, one of the REI nurses, Casey Dodge, was terminated. (JA-474 at 106:8-24). Just a few weeks later, in December 2016, another REI nurse, Sharon Parent, retired. (JA-472 at 104:15-25). Dr. Porter acknowledges that the nursing situation within the REI Division was dire. (JA-488 at 120:5-23).

Indeed, in early December 2016, the REI Division began deferring start dates for new patients until February 2017, due to the "REI nursing crunch" created by Ms. Parent and Ms. Dodge's departures, in order to allow Marti Lewis and Marlene Grossman, the two remaining nurses, a chance to catch up on the already-scheduled patients. (JA-559). In mid-December 2016, D-H leadership determined the REI Division would not see any new patients during both January and February 2017. (JA-561).

In April 2017, however, Marlene Grossman, the last fully trained REI nurse, also left D-H. (JA-474 to JA-475 at 106:25-107:13; JA-270 at 134:8-17,

136:4-16).  REI nurses require much more specialized skills and training than the typical nurse, and the Division struggled to find any nurses with the necessary skills and experience to fill these openings.  (JA-271 at 143:3-144:5; JA-272 at 145:5-16; JA-274 at 192:4-11).  REI nurse staffing was important and more difficult given that the program routinely required 24/7 management of patient cycles and resulted in long hours.  (JA-281 at 18:20-19:7; JA-274 at 192:4-11).  The only remaining Registered Nurse, Ms. Lewis, was not fully trained to manage the workload of the REI Division, and even with her there, there was still insufficient nursing staff to safely care for patients.  (JA-270 at 134:8-17; JA-273 at 169:9-12, 169:16-170:2).  Equally troubling, there were multiple complaints about all of the physicians within the REI Division, including Dr. Porter herself.  (JA-266 to JA-267 at 68:24-69:10; JA-268 at 73:2-5).

In the March/April 2017 timeframe, OB/GYN Department management and DHMC leadership had multiple discussions regarding issues in the REI Division, including the general dysfunction as well as the nursing shortage predicament.  (JA-305 at 115:20-116:5; JA-307 to JA-308 at

123:21-125:10; JA-228 at 13:16-23).    Dr. DeMars, Chair of the OB/GYN

Department, Daniel Herrick ("Mr. Herrick"), Vice President of Perioperative

and Surgical Services, and Dr. Edward (Ed) Merrens ("Dr. Merrens"), Chief

Clinical Officer, participated in these meetings, along with others.  (JA-308

at 127:9-14, 128:6-20).

Ultimately, Dr. Merrens made the decision to shut down the REI

Division due to the fact that they did not have the necessary staffing to

provide safe and effective care.  (JA-281 at 18:20-19:19; JA-307 at 124:7-25)

("Q: Why was the REI division closed? A:. . . ultimately, it came down to the

simple fact that we didn't have the staffing in order to provide the safe and

effective care that we felt the group could. Q: What was your role in the

decision to close the REI division? A: Ultimately, it was my decision."); (JA-

540 at 129:10-15; JA-543 to JA-544 at 148:20-149:4) (Dr. DeMars' deposition

testimony) ("Q: . . . The way you describe it, Ed Merrens ran the meeting,

said what the decision was going to be and everybody else got in line.  Does

that sound right?  A:  Yes.  There was again, some push-back from Maria.

Daniel had said well, you know, we do have some alternative plans that we

could discuss, and none of it was entertained."). Dr. DeMars was unhappy with the decision to close the Division, and believed her counterpoints to its closure were given short shrift by Dr. Merrens. (JA-540 to JA-541 at 132:21-133:11). Indeed, she felt she had "absolutely no say." *Id.*

Due solely to the decision to close the entire REI Division, Dr. Porter and the other two REI physician providers, Dr. Hsu and Dr. Seifer, were terminated. (JA-281 at 19:20-20:9). Dr. Merrens was the ultimate decision-maker. *Id.* at 19:20-20:19.

Neither Dr. Merrens nor Mr. Herrick (who recommended the REI Division closure to Dr. Merrens) were aware of any complaints made by Dr. Porter at the time the decision to close the REI Division was made. (JA-546 at ¶ 4; JA-549 at ¶ 3). Dr. Merrens also did not know anything about Dr. Porter's "illness, the nature of the illness, the conduct or course of her care[.]" (JA-288 at 45:25-46:5). Dr. Merrens knew Dr. Porter was on a leave of absence, had returned working in a reduced capacity, and was receiving long-term disability benefits, but did not know the details about why she was on leave, exactly how much she was working, particulars about any

accommodations, or "the specific arrangement around her return[.]" (JA-288 to JA-289 at 46:6-47:21, 48:2-8, 48:20-49:17). During the conversations about closing the Division, there were no discussions about whether Dr. Porter could or should eventually return to full-time work. (JA-289 at 50:3-12). In short, Dr. Porter's alleged disability had no bearing on Dr. Merrens' decision to terminate her. (JA-330 to JA-331 at 216:15-217:20) ("[T]here was nothing about her disability that led to my decision about her termination[.] . . . [N]othing about her disability or her needing time off had any component to the decision that was made, and we were pretty clear about that."); (JA-546 to JA-547). Instead, Dr. Merrens was genuinely concerned about ensuring Dr. Porter would still be entitled to receive her long-term disability benefits following her termination. (JA-289 at 50:13-51:18).

Based on her close relationship with Dr. Porter, Dr. DeMars wanted to somehow maintain Dr. Porter's employment with D-H in a potential part-time role reading gynecologic ultrasounds through the Radiology Department. (JA-197 at 83:1-11; JA-542 at 138:20-139:10). In an attempt to keep Dr. Porter on at D-H, Dr. DeMars asked Dr. Jocelyn Chertoff ("Dr.

Chertoff"), Chair of D-H's Department of Radiology, whether Dr. Porter could work within the Department of Radiology doing ultrasounds. At the time, there was no business necessity for an additional physician in such a role. (JA-552 at ¶ 3; JA-545 at 158:5-20; JA-238 at 55:1-23). Indeed, to Dr. Chertoff's knowledge, the Department of Radiology has never hired anyone in such a limited capacity. (JA-553 at ¶ 4). There also was no need to retain Dr. Porter to read ultrasounds within the OB/GYN Department, as those needs were already met by the existing physicians. (JA-238 at 55:1-23).

On May 4, 2017, D-H announced that it would close the REI Division. (JA-492 at 124:18-22). Like Dr. Hsu and Dr. Seifer, Dr. Porter's termination was effective as of June 3, 2017. (JA-389 at 21:14-17). Dr. Porter continued to receive long-term disability benefits for over a year following her termination. (JA-404 at 36:15-23). Though Dr. Porter was offered a severance equivalent to nine months of her base salary, she declined to accept it. (JA-521 at 153:2-13).

## SUMMARY OF ARGUMENT

Much as she did in the District Court, Dr. Porter spends most of her opening brief rehashing immaterial facts and hypothesizing about cherry-picked statements taken out of context from a handful of documents. The fundamental flaw she finds with the District Court's opinion is that it did not accept her conjecture over the clear, undisputed evidence that warranted judgment in D-H's favor. Though the District Court repeatedly gave Dr. Porter the benefit of the doubt (as it was required to do), Dr. Porter now claims that the lower court failed to construe the evidence in her favor and "decided disputed facts." Pl. Br. at 52. She also argues that it should have been the "jury's province to decide between competing interpretations of the relevant facts." *Id*.

The District Court made no such choice between competing factual interpretations. Rather, it merely highlighted that the evidence upon which Dr. Porter relied did not actually support her claims. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 44-45 (2d Cir. 2000) (rejecting an employee's assertion that

certain statements by her employer evidenced pretext because employee's interpretation of the statements was "simply not objectively reasonable").

First, the lower court correctly awarded summary judgment to D-H on Dr. Porter's whistleblower claims, because even construing the evidence in Dr. Porter's favor and assuming she set forth her prima facie case, she could not show that the legitimate reasons D-H offered for her termination (the closure of the REI Division due to nurse staffing issues and internecine strife) were merely pretext.

The District Court properly found for D-H on Dr. Porter's disability discrimination/retaliation claims, given Dr. Porter's inability to provide any evidence of discriminatory animus or motive that would demonstrate that D-H's reasons for terminating her were pretext. Dr. Porter's failure to accommodate claim also failed as she could not show (and indeed, her own allegations contradicted) the third element of her prima facie case – that she suffered any adverse employment action as a result of any lapse in reasonable accommodation.

Finally, the District Court correctly determined that Dr. Porter's wrongful discharge claim failed for the same reason as her whistleblower retaliation claim—the record evidence did not permit a reasonable jury to conclude that any discriminatory or retaliatory animus by D-H led to Dr. Porter's termination. For these reasons, and as set forth in further detail below, this Court should affirm the District Court's decision in favor of D-H on all counts of Dr. Porter's First Amended Complaint.

## ARGUMENT

Dr. Porter's First Amended Complaint contains claims for wrongful discharge and violation of the NHWPA stemming from her alleged termination following complaints about Drs. Seifer and Hsu (Counts 1 and 2), as well as claims for violation of the ADA (Count 3), Section 504 (Count 4), New Hampshire state law (Count 5) and Vermont state law (Count 6) arising out of D-H's alleged decision to terminate her based on her disability and failure to adequately provide her with her disability-related accommodations. The District Court properly awarded summary judgment to D-H on all six counts.

## I.     Standard Of Review

The Court should "review *de novo* a grant of summary judgment, construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in [her] favor." *Natofsky v. City of New York*, 921 F.3d 337, 344 (2d Cir. 2019) (quotations and citation omitted). Dartmouth-Hitchcock is "entitled to summary judgment where the record reveals 'no genuine dispute as to any material fact and [Dartmouth-Hitchcock] is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

"If the moving party demonstrates that there are no genuine issues of material fact, the burden then shifts to the nonmoving party, who must present significantly probative supporting evidence of a disputed fact." *Roberts v. Vt. Dep't of Corr.*, No. 2:16-cv-135-cr-jmc, 2017 WL 2189707, at *2 (D. Vt. Apr. 4, 2017) (quotations and citation omitted).  A fact is only "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, Dr. Porter "must do more than simply show that there is some metaphysical

doubt as to the material facts." *Saji v. Nassau Univ. Med. Ctr.*, 724 Fed. Appx. 11, 15 (2d Cir. 2018) (summary order) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)). And even though the evidence should be construed in Dr. Porter's favor, this does not require the Court to draw improbable inferences or consider statements out of context. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 44-45 (2d Cir. 2000) (rejecting argument that employer's statements evidenced pretext because employee's interpretation of the statements was "simply not objectively reasonable"). "[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Connolly v. City of Rutland*, No. 2:09-cv-183, 2011 WL 3739064, at *5 (D. Vt. Aug. 24, 2011) (quotations and citation omitted).

## II.    Summary Judgment In D-H's Favor On Dr. Porter's Whistleblower Retaliation Claim Was Proper.

Dr. Porter alleged a claim for whistleblower retaliation under the NHWPA. As the District Court set forth, to support a prima facie case of retaliation under the NHWPA, a plaintiff must show "(1) that she engaged in an act protected by the NHWPA; (2) she suffered an employment action

such as termination and (3) there was a causal connection between the protected conduct and the proscribed employment action." (SPA-9) (citing *Cluff-Landry v. Roman Catholic Bishop of Manchester*, 169 N.H. 670, 156 A.3d 147, 151 (2017)).

The *McDonnell Douglas* burden-shifting analysis applies to NHWPA claims. *In re Seacoast Fire Equip. Co.*, 146 N.H. 605, 777 A.2d 869, 872 (2001). Under this framework, Dr. Porter first bears the initial burden of establishing her *prima facie* case. If she succeeds, the burden shifts to D-H to articulate a legitimate, non-retaliatory reason for terminating her. Once it has done so, Dr. Porter must then prove D-H's stated reason for terminating her was merely pretext. *Id.* The District Court correctly determined that the second and third steps in the *McDonnell Douglas* analysis demonstrate the flaws in Dr. Porter's retaliation claim. (SPA-17).

### A.   Temporal Proximity Is A Red Herring.

Dr. Porter engages in a buckshot approach, criticizing the District Court even on points where Judge Crawford agreed with her. As a threshold matter, Dr. Porter spends a significant portion of her opening brief arguing

that the "District Court erred in its analysis of temporal proximity and placed too much emphasis on its conclusion that there was no temporal proximity between Dr. Porter's protected conduct and the decision to terminate her employment." Pl. Br. at 33. First, Dr. Porter argues that the District Court "erroneously assumed that Dr. Porter's protected whistleblowing conduct ended February 2017, two months before the decision was made to terminate her employment." *Id.* at 33-34 (citing (SPA-14)). She also asserts that the District Court "erroneously usurped the jury's role when it summarily concluded that two months was too long to create a viable inference of causation." *Id.* at 35 (citing (SPA-15)).

Dr. Porter's misplaced focus on the District Court's analysis of temporal proximity ignores both the role of temporal proximity in relation to her claim and the result the District Court ultimately reached. First, the District Court only analyzed temporal proximity in the context of creating an inference of causation, the third element of Dr. Porter's prima facie case—that is, step <u>one</u> of the *McDonnell Douglas* analysis. Even though it recognized many significant weaknesses with respect to the temporal

proximity of any alleged whistleblower complaints to Dr. Porter's termination, the lower court ultimately concluded that Dr. Porter "*ha[d] provided evidence sufficient to meet the first step of the McDonnell Douglas [framework].*" (SPA-17) (emphasis added). Therefore, any fault Dr. Porter found with the lower court's temporal proximity analysis is wholly immaterial, as it had no bearing on the outcome in favor of D-H.

Indeed, construing all of the evidence in Dr. Porter's favor, the District Court specifically said that Dr. Porter's "criticism of Dr. Seifer and Dr. Hsu continued *through the spring of 2017*. Some portion of this criticism likely qualifies as protected whistleblowing activity." *Id.* (emphasis added). It is unclear why Dr. Porter asserts the lower court assumed that her whistleblowing activity ended in February 2017[2], Pl. Br. at 33-34, when it

_____

[2] Plaintiff also asserts that the lower court "considered only the February 2017 whistleblowing event" and that "[b]y viewing one event in isolation, the lower court ignored the cumulative effect of repeated conduct." Pl. Br. at 34. But this is also a misreading of the District Court's opinion, which expressly acknowledged that Dr. Porter alleged she "engaged in ongoing, years-long reporting to Dr. DeMars of incidents involving Dr. Hsu, Dr. Seifer, or both, that she had reasonable cause to believe were violations of law or rules." (SPA-15) (quoting (JA-567 at ¶ 19)). Though the District Court noted that there was "far less reason to infer a causal link" from

plainly did not do so.  Regarding the issue of whether Dr. Porter had

established a viable inference of causation, the District Court explicitly found

that, looking at the evidence in the light most favorable to Dr. Porter, Dr.

Porter had provided evidence sufficient to make a prima facie case (which

necessarily included the element of causation).  (SPA-17).  It was only when

the District Court reached steps two and three of the *McDonnell Douglas*

framework that it found in favor of D-H.  (SPA-17) ("It is when the court

turns to the second and third steps in the *McDonnell Douglas* analysis that

the weakness of Dr. Porter's claim of retaliation becomes evident.").  As

such, Dr. Porter's objection to this portion of the District Court's decision is

misguided, and at any rate, irrelevant to the ultimate conclusion that the

lower court reached.

---

complaints that occurred for years, it did ultimately refer to Dr. Porter's
complaints about Drs. Hsu and Seifer when finding that Dr. Porter had
satisfied her burden of making a prima facie case, including an inference of
causation.  *Id.*; (SPA-17).

**B.    D-H Provided Substantial Evidence Of A Legitimate, Non-Retaliatory Reason For Terminating Dr. Porter.**

According to the District Court, D-H "provided substantial evidence that it made a business decision to close the REI Division in the spring of 2017." (SPA-17).  Dr. Porter was terminated when D-H decided to close the Division—a decision that Dr. Merrens made following months of staffing issues that had already led the Division to defer start dates for new patients. (JA-85 to JA-87 at ¶¶ 7-11).  While Dr. Porter may disagree with whether D-H tried hard enough, in her own opinion, to find adequate staffing, D-H's burden to articulate a legitimate, non-retaliatory reason for her termination is merely one of production, not persuasion, and any legitimate non-discriminatory reason is sufficient.  *Austin v. Ford Models, Inc.*, 149 F.3d 148, 153 (2d Cir. 1998) (citation omitted).  Dr. Merrens' decision to close the REI Division and terminate all of the REI physicians, including Dr. Porter's two male colleagues, plainly satisfies this burden.  *See, e.g., Faldetta v. Lockheed Martin Corp.*, 98 Civ. 2614 (RCC), 2000 WL 1682759, at *8 (S.D.N.Y. Nov. 9, 2000) (where employer's stated reason for terminating an employee was the closing of that employee's facility and an accompanying reduction in force,

employer had met its burden of production); *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 591 (S.D.N.Y. 2012) (where employer asserted that employee was terminated as part of a broader workforce reduction, leading to the elimination of her entire group, employer had satisfied burden to provide a legitimate, non-retaliatory reason for her termination).

Attempting to salvage her retaliation claim, Dr. Porter asserts that the decision to close the REI Division and her termination were separate decisions by D-H—yet in its 30-page opinion, the District Court humored Dr. Porter's contorted allegations and found that D-H had still articulated a valid, non-retaliatory business reason for terminating Dr. Porter. (SPA-19 to SPA-20). The undisputed evidence shows that following the decision to close the REI Division, Dr. DeMars went out of her way to try to retain Dr. Porter at D-H. In her initial discussions with senior management about reorganizing the REI Division, Dr. DeMars advocated for "keep[ing Dr. Porter] in an ultrasound role" despite her medical leave. (JA-542 at 139:2-10) ("It was unclear to me how long her recovery was going to take, and I wanted to be able to give her as much time as she needed to recover and to

put her in an ultrasound-heavy role that would, we could then grow that role or grow her otherwise as her recovery allowed.").  And even after Dr. Merrens decided to close the REI Division, Dr. DeMars continued to try to find a place within D-H for Dr. Porter.  Indeed, she consulted with Dr. Chertoff, the Chair of the Radiology Department, about whether there was a way for Dr. Porter to work in that department reading gynecologic ultrasounds, but Dr. Chertoff advised that they did not need any additional physicians in that role.  Moreover, to Dr. Chertoff's knowledge, the Department of Radiology had never hired anyone in such a limited capacity. (JA-88 at ¶ 15).  Mr. Herrick also determined that there was no business need for another physician to read ultrasounds, as the existing volume of ultrasounds was already met by existing staff.  (JA-238 at 55:1-23).  In light of all of this undisputed evidence, the District Court correctly determined that D-H had met its burden of production for step two of the *McDonnell Douglas* framework.  (SPA-20).

**C. The District Court Also Correctly Held That Dr. Porter Failed To Demonstrate Pretext.**

Dr. Porter failed to produce evidence sufficient to support a finding that the business reasons D-H articulated for closing the REI Division and terminating her were pretextual. (SPA-18; SPA-21).

### 1. The Decision-Maker Behind Dr. Porter's Termination Had No Knowledge Of Her Alleged Complaints.

It is undisputed that the principal decision-maker behind the closure of the Division and Dr. Porter's termination had no knowledge of her complaints.[3] (JA-87 to JA-88). Indeed, the District Court noted that "[t]here is no evidence to the contrary. . . [and i]t is unsurprising that the chief clinical officer of a large hospital would not know about intra-departmental complaints about disputes over patient care and billing practices." (SPA-19). Where a decision maker is unaware of an alleged protected activity, it undercuts any argument that retaliatory intent was behind the termination

---

[3] Dr. Porter cannot argue that "it is disingenuous to assert that [Dr. Merrens] had no knowledge" of her complaints and then also claim that determinations of credibility should be reserved for the jury. (Pl. Br. at 27, 37 n.14). Nor does Dr. Porter's unfounded claim controvert the undisputed evidence that Dr. Merrens was unaware of her complaints.

decision.  *See Sandler v. Montefiore Health Sys.*, No. 16-CV-2258 (JPO), 2018 WL 4636835, at *12 (S.D.N.Y. Sept. 27, 2018) ("the decision-makers' lack of notice [regarding plaintiff's complaint] essentially eviscerates the causation element of the claim that the November 16 decision was retaliatory") (citations and italics omitted).

Dr. Porter asserts that "Dr. Merrens relied on Dr. DeMars for information about Dr. Porter and the REI Division" in an attempt to argue that Dr. Merrens was being fed unflattering information about Dr. Porter as a result of discriminatory animus by Dr. DeMars. Pl. Br. at 37.  Dr. Porter claims that under a "cat's paw" theory (which she raises for the first time on appeal), Dr. DeMars possessed the requisite discriminatory animus against Dr. Porter and "intentionally fed Dr. Merrens information or withheld information in a manner intended to bring about Dr. Porter's termination." *Id.* at 38-39.  However, Dr. Porter ignores that under the cat's paw theory, "[o]nly when an employer in effect adopts an employee's unlawful animus by acting *negligently* with respect to the information provided . . . and thereby affords that biased employee an outsize role in its own employment

decision, can the employee's motivation be imputed to the employer and used to support a claim[.]" *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 275 (2d Cir. 2016). There is no evidence that Dr. Merrens, as the decisionmaker, negligently gave effect to any purported retaliatory animus possessed by Dr. DeMars.

Indeed, other than Dr. Porter's unfounded belief, there is no evidence that Dr. Merrens closed the program on Dr. DeMars' recommendation or "merely effectuat[ed] or rubber-stamp[ed her] unlawful design"—to the contrary, this argument flies in the face of undisputed evidence that Dr. DeMars vehemently *disagreed* with Dr. Merrens' decision. *See* Pl. Br. at 38 (citing *Vasquez*, 835 F.3d at 271-73; *Summa v. Hofstra Univ.*, 708 F.3d 115, 122, 130-31 (2d Cir. 2013)); (JA-87) (Dr. DeMars felt she had "absolutely no say" in the decision to close the REI Division). Dr. Porter's argument also disregards the record evidence that Mr. Herrick made the initial recommendation to close the Division, for purely business reasons. *See* (JA-227 to JA-228 at 12:20-13:8, 13:16-23) ("Q: Why was the decision made to close the division? A: I think that was pretty straightforward. It was marginally

profitable. It was at that time totally dysfunctional. We were unable to sustain staff to run the operation. Patients were not getting the care that they deserved, and we were not able to provide care that was to the reputation of Dartmouth-Hitchcock.").

Moreover, Plaintiff's attribution of any retaliatory animus to Dr. DeMars is based wholly on speculation, conjecture, and isolated statements made after the REI Division closure and resulting termination of all three physicians had been internally announced at D-H.[4]  This is insufficient to support her claims. *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) (explaining that speculation alone is insufficient to defeat a motion for summary judgment).  Dr. Porter's latest theory is that Dr. DeMars was angered by Dr. Porter's complaints about Dr. Seifer (whose

_____

[4] Dr. Porter has taken a sharp about-face in her portrayal of Dr. DeMars; in her First Amended Complaint, Dr. Porter claimed Dr. DeMars was "a vocal supporter of Dr. Blanchette Porter, and she supported the idea of maintaining or re-opening the REI Division. . . [and that h]er stepping down as Chair [of the OB/GYN Department] was likely related in some way to the closure of the REI Division." (JA-44).  Now, however, in the face of undisputed evidence that Dr. Merrens decided to close the REI Division due to nurse staffing issues, Dr. Porter has tried to cast Dr. DeMars as the villain.

hiring at D-H Dr. DeMars championed) and thus wanted to retaliate against her. In a desperate move, she harps on a single email from Dr. DeMars to Dr. Merrens in May 2017 (after the REI Division closure had already been announced), in which Dr. DeMars muses about the closure of the Division and the reaction following Dr. Porter's termination. (JA-644 to JA-646).

Dr. Porter asserts that this post-mortem email evidences Dr. DeMars' retaliatory animus toward Dr. Porter because in the email, "Dr. DeMars argued against retaining Dr. Porter to work in OB/GYN or in a future REI Division because of Dr. Porter's 'past behavior and her inability to just be a worker bee,' and because she 'would undermine any efforts to have someone new come in and restart a program." Pl. Br. at 38 (citing JA-644 to JA-646). But this is not what the email states. Dr. DeMars does not say that she argued against retaining Dr. Porter (to the contrary, the evidence shows she repeatedly tried to find a way to do so). (JA-645). Instead, she says that "Daniel (Herrick), Heather (Gunnell)[5], and [she had] thought about the consequences" of having Dr. Porter "continue to do ultrasound, and be a

---

[5] Ms. Gunnell was the OB/GYN Practice Manager.

'worker bee' in a new REI division[6]" . . . "knowing [Dr. Porter's] past behavior and her inability to just be a worker bee.[7]" *Id.* Dr. DeMars tried to find a way to have Dr. Porter stay at D-H and continue to read gynecologic ultrasounds, but there was no business need to support the creation of a limited part-time role for that function in either the Radiology or OB/GYN Departments. (JA-88 at ¶ 15; JA-545 at 158:5-16) (Dr. DeMars states, "what I wanted to try to do was to keep Misty employed."). Dr. Porter argues that a jury could view references to Dr. Porter's "past behavior" and her "inability to be a worker bee" to refer to her whistleblowing complaints. Pl. Br. at 22. But this is mere speculation, and is insufficient to carry Dr. Porter's claim. *Cameron v. Cmty. Aid For Retarded Children, Inc.*, 335 F.3d 60, 65 (2d Cir. 2003) (explaining that choosing plaintiff's interpretation of factual allegations over

---

[6] Over four years later, there is no "new" REI Division, as the Division never reopened.

[7] Dr. Porter also mischaracterizes Dr. DeMars's email as "advis[ing] Dr. Merrens that Dr. Porter's 'past behavior and her inability to be just a worker bee' were reasons to terminate her." Pl. Br. at 22. This is obviously not the case, given the plain language of the email itself when these statements are not taken out of context, as well as the fact that the email post-dates the announcement of the Division closure and Dr. Porter's termination.

defendant's interpretation, without more evidence, is a matter of speculation).

As the District Court reasoned, Dr. DeMars' email "provide[s] little or no evidence relevant to the claims of discrimination and retaliation. . . . Dr. DeMars's consideration of the benefits and costs of retaining Dr. Porter, including her own assessment of what might be best for her colleague, at most indicates that she was very aware of Dr. Porter's disability and limited return to work." (SPA-7 to SPA-8).[8]

The same holds true even if the REI Division closure and D-H's failure to retain Dr. Porter are viewed as separate events, and the District Court also arrived at this conclusion. In the face of all of the other evidence demonstrating Dr. DeMars wanted to retain Dr. Porter, no reasonable jury could infer that Dr. DeMars decided not to arrange for a new position because of her purported anger at Dr. Porter for criticizing Dr. Seifer. "Nothing in Dr. DeMars' emails reasonably supports an inference that she

---

[8] Dr. DeMars was merely concerned for Dr. Porter—indeed, Dr. Porter herself concedes that she and Dr. DeMars had a close friendship. (JA-197 at 83:1-11).

sought to retaliate against Dr. Porter." (SPA-8). It also flies in the face of reality since both Drs. Porter and Seifer were terminated at the same time for the very same reasons.

## 2. Questions Regarding D-H's Business Judgment Are Irrelevant.

While Dr. Porter spills much ink reiterating the reasons she herself believes that the closure was not a good business decision—her level of skill as a physician, that D-H could have tried harder to find nurses, or the negative impact on the community—all of this is immaterial. *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170-71 (2d. Cir. 1993) (whether defendant's stated purpose for employment-related action is unwise or unreasonable is irrelevant); *Dister v. Continental Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) (non-discriminatory reason "need not be well-advised, but merely truthful"); *Borzon v. Green*, 778 F. App'x 16, 19 (2d Cir. 2019) (summary order) ("Ultimately, we do not sit as a super-personnel department that reexamines an entity's business decisions.") (quotations and citation omitted).

Moreover, Dr. Merrens' email discussion with other members of D-H leadership discussing the public relations aspect of the closure does not

demonstrate that the nursing shortage explanation was merely pretext for any retaliatory or discriminatory motive. (JA-653). In this email, Dr. Merrens says that "[w]hile on the surface we are pinning the dissolution of our [REI program] on our failure to maintain and recruit nurses for this work, it is ultimately the dysfunction of the physicians who worked in this area for years (as well as recent hires)[.]" *Id.* Dr. Merrens goes on to say that "[t]he fact that failures of such programs due to nursing shortages are not common" and that D-H would be "referring patients to a similar, rural academic REI center" in Vermont would "make [D-H's] explanation to the public, patients, and the media, well, rather thin." *Id.* Dr. Porter contorts Dr. Merrens' words to claim that "he acknowledged that the nursing shortage story was a 'thin' pretext." Pl. Br. at 22.[9] Not only does this take Dr. Merrens' statements out of context, but even if the email in question *did* show that the nursing shortage was not the primary reason behind closing

_____

[9] Dr. Porter also baselessly cites this email in support of her assertion that the lower court "acknowledged" that D-H's nursing shortage was a "demonstrably pretextual" reason for closing the REI Division. Pl. Br. at 21-22. The District Court made no such finding.

the REI Division, this would be insufficient on its own to evidence pretext for any discrimination or retaliation against Dr. Porter. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.").

In short, there is still no evidence that anything other than the decision to close the REI Division, following months of discussion amongst hospital leadership about nurse staffing and dysfunction-related issues amongst the providers, led to Dr. Merrens' decision to terminate Dr. Porter and the other two physicians in the Division.[10]  "No reasonable jury could find that the concerns of hospital leadership about staffing levels or physician conflict

---

[10] Notably Beth Todd, an REI nurse practitioner who also complained about Dr. Seifer and/or Dr. Hsu, was kept on and redeployed in the OB/GYN Department in a more generalist role following the REI Division closure, as there was a business need for a nurse practitioner.  If, as Dr. Porter claims, Dr. DeMars resented Dr. Porter for her complaints and ultimately retaliated against her, it does not follow that Ms. Todd, who made similar complaints, would be allowed to continue employment at D-H even after the Division closed.  Indeed, Dr. DeMars was part of the conversations during which the decision was made to retain Ms. Todd.  (JA-315 at 155:1-156:10).

were excuses they concocted to deflect attention from their true motive of retaliating against Dr. Porter." (SPA-19).

For the reasons set forth above, this Court should affirm the District Court's ruling in favor of D-H on Dr. Porter's whistleblower claim.

## III. Summary Judgment on Dr. Porter's Disability Claims Was Also Appropriate.

Dr. Porter alleged claims for failure to accommodate, disability discrimination and retaliation under various federal, New Hampshire, and Vermont laws. Under both federal and state law, her claims fail.

### A. Dr. Porter Failed To Establish Even A Prima Facie Case Of Failure To Accommodate.

To establish a prima facie case for failure to accommodate under the ADA, Section 504, and New Hampshire and Vermont state law, Dr. Porter bears the burden of demonstrating that: (1) she suffered from a disability within the meaning of the statute; (2) D-H was aware of her disability; (3) she could perform the essential functions of the job with reasonable accommodation; and (4) D-H refused to make such accommodation. *Best v. Duane Reade, Inc.*, 715 Fed. Appx. 95, 96 (2d Cir. 2018) (summary order)

(citation omitted); *Sharma v. Potter*, 06 Civ. 4448 (GAY), 2 2008 WL 461377, at

*3 (S.D.N.Y. Feb. 14, 2008) (citation omitted); *Gage v. Rymes Heating Oils, Inc.*,

Case No. 14-cv-480-PB, 2016 WL 843262, at *5 (D.N.H. Mar. 1, 2016); *Connors*

*v. Dartmouth Hitchcock Med. Ctr.*, 12 F. Supp. 3d 688, 699-700 (D. Vt. 2014)

(citations omitted); *see also* (SPA-26).

Even construing Dr. Porter's evidence in the light most favorable to

her, she failed to establish her prima facie case. (SPA-28). The parties do not

dispute that Dr. Porter suffered from an injury that caused her to take

multiple, extended leaves of absence and subsequently request

accommodations upon returning to work. Nor is there any dispute that D-

H approved her requested accommodations. Dr. Porter's failure to

accommodate claim instead centers on her belief that while Dr. DeMars

approved and authorized every one of her requested accommodations, Dr.

Seifer and Dr. Hsu did not sufficiently comply with each one of them one

hundred percent (100%) of the time (such as by interrupting her protected

workspace), and that Dr. DeMars and Heather Gunnell, OB/GYN Practice

Manager, did not adequately enforce Dr. Seifer's compliance.  Pl. Br. at 45-46.

Under Second Circuit precedent, a "[r]easonable accommodation may take many forms. . . . [E]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee.  All that is required is effectiveness."  (SPA-28) (quoting *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 95 (2d Cir. 2015)); *see also Fink v. New York City Dep't of Pers.*, 53 F.3d 565, 567 (2d Cir. 1995) (stating Section 504 "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation is reasonable") (citation omitted).[11]

Moreover, Dr. Porter has never argued, nor does the evidence demonstrate, that the accommodations provided to her—even if not perfectly complied with to the letter—did not enable her to perform the essential functions of her position.  Rather, Dr. Porter continued to work the

---

[11] Dr. Porter provides no authority for her contention that "[i]t is not sufficient to promise an accommodation—to be effective, it must actually be delivered."  Pl. Br. at 46.

hours of her choosing and slowly ramp up her time, all the while receiving disability benefits (short and long-term). (JA-84 to JA-85 at ¶¶ 3-6). Indeed, as the District Court stressed, Dr. Porter asserted in her own First Amended Complaint that "[w]hen Dartmouth-Hitchcock terminated her employment, Dr. [] Porter was on long-term disability, although she had been able to return to work half-time. With this accommodation, Dr. [] Porter was performing at her usual high standards *and she was able to meet all the essential job requirements*." (JA-18 at ¶ 6) (emphasis added); (SPA-28). As such, the District Court correctly concluded that D-H was entitled to summary judgment on Dr. Porter's failure to accommodate claim. *See Noll*, 787 F.3d 89 (granting summary judgment to employer where accommodation provided to plaintiff allowed him to perform essential functions of his position).

**B.    Dr. Porter Could Not Show That She Was Terminated Because Of Her Disability.**

To establish a prima facie case for discriminatory discharge under the ADA, Dr. Porter must show that: (1) D-H is subject to the ADA; (2) Dr. Porter suffers from a disability within the meaning of the statute; (3) she could

perform the essential functions of her job with or without reasonable accommodation; and (4) she was discharged because of her disability. *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998) (citations omitted); *see also* (SPA-22). The parties agree with the District Court that for Dr. Porter's federal claims under the ADA and Section 504, she must prove that "but-for" her disability, she would not have been terminated. (SPA-22); *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2668 (2020); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 337 (2d Cir. 2000).

Dr. Porter argues that her Vermont and New Hampshire claims should be subject to the less stringent "motivating factor" standard, and criticizes the District Court for applying the *Natofsky* "but-for" causation standard to Dr. Porter's VFEPA and New Hampshire disability claims. Pl. Br. at 48-51. Dr. Porter's assertion has no merit. As the District Court acknowledged, *Natofsky* modified the causation standard for the ADA to a "but-for" standard. (SPA-22). This was because the ADA lacked the explicit language of Title VII stating that "an unlawful employment practice is established

when the complaining party demonstrates that race, color, religion, sex, or national origin *was a motivating factor* for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added); *Natofsky*, 921 F.3d at 347.

But Vermont and New Hampshire courts have both consistently held that state law disability discrimination claims follow the standards and burdens of proof articulated for the equivalent federal claims. *See, e.g.*, *Mueller v. Rutland Mental Health Servs.*, File No. 1:05-cv-38, 2006 WL 2585101, at *2 (D. Vt. Aug. 17, 2006) ("The standards and burdens of proof under the VFEPA are identical to those under the ADA.") (citation omitted); *Gage*, 2016 WL 843262 at *5 n.5 ("As both this court and the New Hampshire Supreme Court have recognized, claims under Section 354-A are construed in conformity with the ADA.") (citation omitted). While, as Dr. Porter states, federal decisions are not automatically binding upon state courts, it is nonsensical to assume that Vermont and New Hampshire disability discrimination claims would continue to follow the standard for Title VII, which does not relate to disability, rather than the ADA. This is particularly

true given that the Vermont and New Hampshire statutes do not contain the "motivating factor" language of Title VII.  Unsurprisingly, *Witherbee v. Town of Brattleboro* and *Merrill v. Fall Mountain Reg'l Sch. Dist. – SAU 60*, which Dr. Porter cites for the proposition that VFEPA and § 354-A:7 claims must follow Title VII's burdens of review and standards of proof, also are not disability cases.  Pl. Br. at 48, 50 (citing *Witherbee*, No. 2:18-cv-00113, 2019 WL 2476722 (D. Vt. June 13, 2019) (sex discrimination); *Merrill*, EA 0313-06, 16D-2006-10091 (Sept. 2010), https://www.nh.gov/hrc/decisions/documents/merrill-v-sau60-gross.pdf (age discrimination)).  When construing disability claims, Vermont and New Hampshire law follows federal law.  Accordingly, the District Court correctly applied the "but-for" standard to Dr. Porter's VFEPA (VT) and § 354-A:7 claims (NH).

The parties agree that the *McDonnell-Douglas* burden-shifting analysis applies to Dr. Porter's federal and state disability discrimination and retaliation claims.  (SPA-23); *see also Jackson v. New York City Dep't of Educ.*, 768 Fed. Appx. 16, 17 (2d Cir. 2019) (summary order) (applying *McDonnell-Douglas* framework to both ADA and Rehabilitation Act claims and noting

prima facie case is the same) (citations omitted); *Gage*, 2016 WL 843262 at *5 n.5 (citations omitted) (applying *McDonnell-Douglas* framework to both ADA and § 354-A discrimination claim and noting § 354-A claims are construed in conformity with the ADA); *Connors*, 12 F. Supp. 3d at 699 (applying *McDonnell-Douglas* to VFEPA claim).

The overarching theme of Dr. Porter's criticism of the District Court's decision is that it failed to comport with her version of the events that unfolded surrounding her termination. She couches this as the District Court's failure to construe the evidence in her favor, but in reality, the District Court merely declined to accept Dr. Porter's speculation and conjecture as a valid basis for establishing her claims. Pl. Br. at 42; *Weinstock*, 224 F.3d at 42, 44-45 (rejecting an employee's assertion that certain statements evidenced pretext because employee's interpretation of the statements was "simply not objectively reasonable" and stating "[t]o get to the jury, it is not enough … to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination.") (quotations and citation omitted).

As the District Court noted, "there is a great difference between knowing about a disability and taking an adverse employment action because of it." (SPA-23). Simply because Dr. DeMars or Dr. Merrens made comments acknowledging or lamenting Dr. Porter's disability does not indicate any discriminatory bias. And while the parties do not dispute that D-H was well aware of Dr. Porter's disability, there is no evidence that it had any bearing on her termination. The District Court correctly determined that Dr. Porter failed to satisfy the third step of the *McDonnell Douglas* analysis— she did not produce evidence sufficient for a reasonable jury to find that D-H's proffered business reasons for terminating her were pretext for discrimination. (SPA-26).

Dr. Porter does not claim that the REI Division was closed because she was on disability and working part time. Rather, she asserts that D-H's failure to retain her as part of OB/GYN was based on her disability. Pl. Br. at 42. She points again to the same email from Dr. DeMars to Dr. Merrens, dated more than a week after the Division closure and terminations had been announced, asserting that in it "Dr. Merrens and Dr. DeMars . . . stated that

decisions about Dr. Porter's continued employment have been made based on her disability or their perception of Dr. Porter as someone who is disabled." *Id.* at 43 (citing (JA-644 to JA-646)). Dr. Porter evidently interprets the fact that Dr. DeMars makes a post-termination reference to Dr. Porter's disability and the subsequent potential impact on her skill as an indication that her disability was the reason she was not kept on at D-H. But, as the District Court agreed, this is not at all a reasonable reading of that email.

Nothing in the discussion between Dr. DeMars and Dr. Merrens implies that Dr. Porter's termination resulted from her disability. Indeed, Dr. DeMars merely states that the "*best outcome of this termination* is the chance for Misty to actually be out on leave with no intervening responsibilities, so that she can assess how much improvement she might gain." (JA-645) (emphasis added). Dr. DeMars' words (and the timing of the email itself) clearly indicate the decision was already made. "[D]escribing the potential benefit of time off for someone recovering from serious surgery is hardly the basis for inferring that the disability motivated her termination." (SPA-24).

Dr. Russell's affidavit recounting a single alleged remark by Dr. Merrens to the OB/GYN Department in a meeting following Dr. Porter's termination also does not save the day for Dr. Porter. Dr. Russell claims that she said "something like, 'I can understand why the other two needed to leave, but why Misty?'" and that "Dr. Merrens responded by saying that Misty was 'on disability.'" (JA-586 to JA-587 ¶ 10). As the District Court stated, "[i]t would not be reasonable to interpret the exchange as a confession by Dr. Merrens before the entire OB/GYN Department that he had terminated a long-time employee and colleague because she was partially disabled. That is the only interpretation which would directly support plaintiff's claim." (SPA-25).

Dr. Porter also makes much of an email between Dr. Merrens and a nursing coordinator in which Dr. Merrens referred to Dr. Porter's part-time status in responding to the nursing coordinator's inquiries about the REI Division closure and Dr. Porter's termination. Pl. Br. at 24; (JA-648) (Dr. Merrens states that "Dr. Porter currently works at 20% of her time currently and I'm not sure of her interest in staying on if the infertility part were to

cease.").  The District Court also considered this email and correctly concluded that "it is not reasonably possible to read it as evidence of animus or discriminatory intent." (SPA-25).  At worst, Dr. Merrens' reference to the percentage of time Dr. Porter was working was inaccurate and "probably unwise[.]" *Id.*

To be sure, "Dr. Merrens' remark that Dr. Porter was on disability was true." (SPA-26).  While mentioning Dr. Porter's disability at an OB/GYN meeting or discussing it with the nursing coordinator "may have been insensitive, [] standing alone without the context of more explicit statements of discrimination, these [incidents] provide no basis on which a reasonable jury could infer that the hospital administration decided to terminate Dr. Porter because she was disabled." *Id.; see also Naumovski v. Norris*, 934 F.3d 200, 215-16 (2d Cir. 2019) (reversing partial denial of summary judgment because "stray remarks" are insufficient to show employment discrimination); *Langlois v. Hartford Board of Educ.*, 831 F. App'x 548, 551 (2d Cir. 2020) (summary order) ("These stray remarks, troubling as they may be, are nonetheless insufficient to establish discrimination in the absence of

other indicia of discrimination.").  Dr. Porter offers nothing to rebut this logical conclusion.

Moreover, other undisputed evidence expressly corroborates that Dr. Porter's disability was unrelated to Dr. Merrens' decision to terminate her when the REI Division closed.  (JA-88 at ¶ 14) (Dr. Merrens states that "there was nothing about [Dr. Porter's] disability that led to my decision about her termination[.] . . . [Nothing] about her disability or her needing time off had any component to the decision that was made, and we were pretty clear about that.").  Similarly, Mr. Herrick and Dr. DeMars both attempted to determine whether there was a way for Dr. Porter to stay on in the OB/GYN or Radiology Departments reading gynecologic ultrasounds.  Though their search revealed no business need for such a position, this evidence contradicts any notion that Dr. Porter's disability was a factor.  *Id.*  That Dr. Porter may disagree with the merits of D-H's decision not to retain her and opine that there was a business need for her to stay on does not refute the uncontroverted evidence that shows otherwise.

The lower court correctly determined that Dr. Porter has not adduced evidence sufficient to show that her termination (as a result of the closure of the REI Division, or due to D-H's failure to keep her on in another capacity) was because of her disability. A reasonable jury could not conclude that D-H's stated business reasons were pretextual. Accordingly, this Court should affirm the District Court's grant of summary judgment on Dr. Porter's disability discrimination and retaliation claims.

## IV. The District Court Correctly Awarded Summary Judgment To D-H On Dr. Porter's Wrongful Discharge Claim.

Under New Hampshire common law, Dr. Porter is required to establish two elements to succeed on her cause of action for wrongful discharge: (1) D-H was motivated by bad faith, malice, or retaliation in terminating her employment and (2) that her employment was terminated because she performed acts which public policy would encourage or refused to perform acts which public policy would condemn. (SPA-29) (citing *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 44 (1st Cir. 2001); *Cloutier v. Great Atl. & Pac. Tea Co.*, 121 N.H. 915, 922, 436 A.2d 1140 (1981)).

The District Court found that Dr. Porter's wrongful discharge claim failed for the same reason as her whistleblower retaliation claim – "[t]he record evidence does not support a conclusion by a jury that Dr. DeMars's anger towards Dr. Porter for criticizing Dr. Hsu and Dr. Seifer led to either the closure of the REI Division or the decision not to retain Dr. Porter in an alternative capacity at DHMC." (SPA-29). Once again, on appeal, Dr. Porter regurgitates the same unsupported assertions—her speculation that Dr. DeMars wanted to oust her and blame her for being the cause of any dysfunction in the REI Division, to shift blame from Dr. Seifer (and Dr. DeMars herself). Pl. Br. at 40-41.

Dr. Porter simply has not provided a shred of evidence, other than her own speculation, that Dr. DeMars harbored any malice or retaliatory animosity toward her. Moreover, the record evidence overwhelmingly indicates that the contrary was true—Dr. DeMars tried her best to keep Dr. Porter on at D-H. Further, none of the evidence would allow a reasonable jury to conclude that any underlying anger Dr. DeMars might have harbored toward Dr. Porter actually led to the closure of the REI Division or the

decision not to retain Dr. Porter. (SPA-29). These decisions were made by individuals other than Dr. DeMars, and there is no evidence that Dr. DeMars caused either outcome.

Accordingly, the District Court's award of summary judgment to D-H on Dr. Porter's wrongful discharge claim should be affirmed.

## <u>CONCLUSION</u>

For the reasons described above, the judgment of the District Court should be affirmed in its entirety on the merits.

Dated: June 1, 2021        Respectfully submitted,

*/s/ Donald W. Schroeder*
Donald W. Schroeder
Jessica E. Joseph
Morgan McDonald
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
Fax: (617) 342-4001

*Attorneys for Defendants-Appellees*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Local Rule 32.1(a)(4)(A).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 9,474 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Palatino Linotype and complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A).

3. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of Microsoft Word 2010 in preparing this certificate.

Dated: June 1, 2021

*/s/ Donald W. Schroeder*
Donald W. Schroeder
Jessica E. Joseph
Morgan McDonald

FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
Fax: (617) 342-4001

*Attorneys for Defendants-Appellees*

# CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of June, 2021, I filed the foregoing Opposing Brief of Defendant-Appellees Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health, with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Donald W. Schroeder*
Donald W. Schroeder
Jessica E. Joseph
Morgan McDonald
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 342-4000
Fax: (617) 342-4001

*Attorneys for Defendants-Appellees*