# 20-3894-CV

# United States Court of Appeals

*for the*

# Second Circuit

MISTY BLANCHETTE PORTER, M.D.,

*Plaintiff-Appellant,*

— v. —

DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-
HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL,
DARTMOUTH-HITCHCOCK HEALTH,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

GEOFFREY J. VITT
VITT & ASSOCIATES
Eight Beaver Meadow Road
P.O. Box 1229
Norwich, Vermont 05055
(802) 649-5700

KATHERINE B. KRAMER
DGW KRAMER LLP
One Rockefeller Plaza, Suite 1060
New York, New York 10020
(917) 688-2585

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

SUMMARY OF ARGUMENT ...........................................................1

ARGUMENT ....................................................................................1

    I.    An Employer Rarely Admits to Discrimination and
          Retaliation ............................................................................1

    II.   Properly Viewed in Context, Plaintiff's Evidence Indicates
          Pretext and Animus Rather than Mere Stray Remarks ..........3

    III.  The Court Can Consider the Rationality of D-H's Decision to
          Terminate Dr. Porter Because it is Probative of Whether
          D-H's Purported Bad Business Decision was Pretext for an
          Underlying Improper Motive ..................................................6

          A.   Dartmouth-Hitckcock's Inconsistent Explanations for
               Closing the REI Division are Pretextual ....................8

          B.   Termination of Dr. Porter's Employment was Not
               Inevitable ...................................................................13

    IV.  Dr. DeMars Did Not Act as Dr. Porter's Friend and Advocate ..........17

    V.   Dr. Porter's Interpretation of Pretextual Evidence is
          Objectively Reasonable .........................................................19

          A.   Dr. Porter's Evidence Meets the *Weinstock*
               "Objectively Reasonable" Standard..........................19

          B.   Dr. Merrens' Disability-Related Comments Should be
               Taken at Face Value..................................................22

          C.   Dr. Porter Adequately Alleged Temporal Proximity as
               a Factor Indicating Causation ...................................25

    VI.  Anti-Retaliation Protections Should Be Interpreted Broadly to
          Achieve Their Intended Purpose .......................................26

CONCLUSION ................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*,
    696 F.3d 128 (1st Cir. 2012) ................................................................. 1-2, 6

*Bryant v. Jones*,
    696 F. Supp. 2d 1313 (N.D. Ga. 2010) .......................................................8

*In re U.S.*,
    565 F.2d 19 (2d Cir. 1977) ........................................................................26

*Kaytor v. Elec. Boat Corp.*,
    609 F.3d 537 (2d Cir. 2010) ........................................................................4

*Kwan v. Andalex Grp. LLC*,
    737 F.3d 834 (2d Cir. 2013) ...................................................................7, 25

*Lavender v. Kurn*,
    327 U.S. 645 (1946)....................................................................................19

*Lewis v. Philip Morris Inc.*,
    355 F.3d 515 (6th Cir. 2004) .....................................................................21

*McMenemy v. City of Rochester*,
    241 F.3d 279 (2d Cir. 2001) .......................................................................27

*Miles v. N. Gen. Hosp.*,
    998 F. Supp. 377 (S.D.N.Y. 1998) ............................................. 5, 7, 13, 21

*Nguedi v. Fed. Rsrv. Bank of New York*,
    813 F. App'x 616 (2d Cir.), *cert. denied*, 141 S. Ct. 825 (2020) .................21

*Ramseur v. Chase Manhattan Bank*,
    865 F.2d 460 (2d Cir. 1989) ............................................................ 2, 5, 12

*Rasmy v. Marriott Int'l, Inc.*,
    952 F.3d 379 (2d Cir. 2020) ........................................................................4

*Robinson v. 12 Lofts Realty, Inc.*,
    610 F.2d 1032 (2d Cir. 1979) .................................................................2, 11

*Schultz v. Univ. of Wisconsin Hosps. & Clinics Auth.*,
    513 F. Supp. 2d 1023 (W.D. Wis. 2007).....................................................24

*Shafrir v. Ass'n of Reform Zionists of Am.*,
   998 F. Supp. 355 (S.D.N.Y. 1998) ...................................................... 2, 7, 24

*Silver v. N. Shore Univ. Hosp.*,
   490 F. Supp. 2d 354 (S.D.N.Y. 2007) ......................................................4, 23

*Stewart v. Sanmina Texas L.P.*,
   156 S.W.3d 198 (Tex. App. 2005) ...............................................................7

*Taite v. Bridgewater State Univ., Bd. of Trustees*,
   No. 18-1229, 2021 WL 2217457 (1st Cir. June 2, 2021)...............................3

*Weinstock v. Columbia University*,
   224 F.3d 33 (2d Cir. 2000) ................................................................. 19, 20

*Weiss v. JPMorgan Chase & Co.*,
   332 F. App'x 659 (2d Cir. 2009) ......................................................... 6, 7, 8

**Statutes & Other Authorities:**

Hon. Denny Chin, *Summary Judgment in Employment Discrimination
   Cases: A Judge's Perspective*,
   57 N.Y.L. Sch. L. Rev. 671 (2012–2013) .......................................... 2, 4, 28

John A. Berg, *A Catch-22 in Workplace Retaliation Claims*, CBA Rec.,
   (October 2009)...............................................................................................26

Leora F. Eisenstadt & Jennifer M. Pacella, *Whistleblowers Need Not
   Apply*, 55 Am. Bus. L.J. 665 (2018)......................................................26-27

Molly J. Walker Wilson, *Retribution as Ancient Artifact and Modern
   Malady*, 24 Lewis & Clark L. Rev. 1339 (2020) .........................................26

## SUMMARY OF ARGUMENT

The standard for granting an employer summary judgment in a discrimination or retaliation case is not whether the employee can prove a likelihood of winning at trial, but whether the employee can prove the *possibility* of winning. This Court need not—and indeed should not—decide whether a jury will ultimately support D-H's[1] alleged "legitimate" reasons for terminating Dr. Porter's employment or Dr. Porter's allegations of pretext. Such credibility decisions are for the jury. This Court's role is to decide whether Dr. Porter has presented evidence sufficient to place material facts in dispute such that if the jury found her evidence credible, it could find that D-H discriminated and retaliated against Dr. Porter because of her disability and her whistleblowing activities. And the answer to that question is yes.

## ARGUMENT

### I. An Employer Rarely Admits to Discrimination and Retaliation

Employees are at a significant disadvantage in discrimination and retaliation claims because their burden is essentially to prove what was in the employer's mind. *See Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F. 3d 128, 142 (1st Cir.

---

[1] Defendants-Appellees are referred to collectively as "Defendants" or "D-H" and Plaintiff-Appellant as "Dr. Porter" or "Plaintiff."

2012) (explaining that the heart of the pretext analysis is whether the employer believes its own reasons); *Shafrir v. Ass'n of Reform Zionists of Am.*, 998 F. Supp. 355, 361 (S.D.N.Y. 1998) (collecting cases and noting that "proof of intentional discrimination is often elusive" because "an employer's intent and state of mind are implicated") (quotations omitted). The employer has an obvious interest in keeping discriminatory or retaliatory intentions hidden. "[E]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464–65 (2d Cir. 1989) (quotations omitted). *See also Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1043 (2d Cir. 1979) ("[C]lever men may easily conceal their motivations.") (quotations omitted). Employees are thus left with circumstantial evidence to prove that an adverse employment action was motivated by discriminatory or retaliatory animus.

On top of this, as noted in the *amicus* brief submitted by the Vermont Employment Lawyers Association, Inc., there is an "alarming" trend by the courts to deprive the jury of its fact-finding role by interpreting the law narrowly and deciding employment cases on summary judgment. (Br. of Amicus Curiae in Supp. of Reversal 2.) *See also* Hon. Denny Chin, *Summary Judgment in Employment Discrimination Cases: A Judge's Perspective*, 57 N.Y.L. Sch. L. Rev. 671, 673 (2012–2013) (noting summary judgment is granted in approximately

75% of employment discrimination cases).  It is imperative that courts "proceed with caution and restraint when considering summary judgment motions where, as here, issues of pretext, motive, and intent are in play."  *Taite v. Bridgewater State Univ., Bd. of Trustees*, No. 18-1229, 2021 WL 2217457, at *4 (1st Cir. June 2, 2021).

II.  <u>Properly Viewed in Context, Plaintiff's Evidence Indicates Pretext and Animus Rather than Mere Stray Remarks</u>

Defendants and the District Court examined each piece of evidence in isolation under a microscope and dismissed any item that was not, by itself, sufficient to prove discriminatory or retaliatory animus.  (*See, e.g.,* SPA-7 to SPA-9, SPA-21 to SPA-22, SPA-23 to SPA-25, SPA-29 to SPA-30.)  This was in error because, viewed at that level of detail, they missed the big picture.  *See Taite*, 2021 WL 2217457 at *5 (noting that "courts will look at evidence of discrimination not in splendid isolation, but as part of an aggregate package of proof").  The error evokes the image of George Seurat's *Sunday Afternoon on the Island of La Grande Jatte*.  Up close, this famous painting is a meaningless jumble of colored dots—the viewer must step back to enjoy the scene.  By looking at each "dot" in isolation and ignoring the pattern visible when viewed in context, Defendants and the District Court saw only a jumble of "stray remarks," misinterpretations, and conjecture.  Plaintiff asks this Court instead to step back and examine the whole

picture.  *See* Chin, *supra*, at 680 (noting that "[t]he evidence has to be considered as a whole—seemingly innocuous or innocent pieces of evidence may take on a different meaning when placed in context").  *See also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (concluding that evidence "must be viewed in context"); *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 386 (2d Cir. 2020) (warning against analyzing evidence "piecemeal").

The factors to consider in "determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative 'stray remark,'" include: (1) who; (2) when; (3) what; and (4) the context in which the remark was made.  *See Silver v. N. Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 363, 365 (S.D.N.Y. 2007) (concluding that decisionmaker's age-related remarks, including one relating to decision to terminate plaintiff, made during the same meeting in which plaintiff was notified of his termination, were more than "mere 'stray remarks'").  In the present case, we have a series of comments (1) made by a supervisor who influenced the decision, (JA-318 [167:16–167:19]), and the decisionmaker; (2) in the weeks immediately preceding and following the adverse employment action; (3) about the challenged decisions and in reference to Dr. Porter's protected whistleblower and disability status.  These factors each point to a conclusion that comments by Dr. Merrens and Dr. DeMars about Dr. Porter's whistleblowing activities and disability are more likely to constitute "a probative

4

statement that evidences an intent to discriminate" than a "stray remark." Context is the fourth factor. Looking at the numerous disability-related comments made by Dr. Merrens and Dr. DeMars, for example, the District Court ignored its own advice that an individual comment or stray remark "would play a role if it formed part of a pattern of discriminatory comments by Dr. Merrens or others within the hospital," (SPA-25). (*See also, infra*, Section V.B, discussing in detail two of Dr. Merrens' disability-related comments.)

D-H is free to argue at trial that Dr. Porter's interpretation does not reflect Dr. Merrens' true intent, and the string of "disability" comments are stray remarks rather than a pattern revealing that Dr. Porter's disability influenced Dr. Merrens' decision, but it was not the court's role to select the "better" interpretation. *See Miles v. N. Gen. Hosp.*, 998 F. Supp. 377, 387–88 (S.D.N.Y. 1998) (refusing to conclude, after considering the evidence as a whole, that age-related comments were "stray remarks" and stating that it would be "more appropriate to let the jury decide what, if any weight, to give to the comments"). The jury must be afforded the opportunity to listen to both sides and decide for itself which version to believe. *See Ramseur*, 865 F.2d at 467 ("The question of which inference to draw … is a matter exclusively within the province of the jury.").

III.  The Court Can Consider the Rationality of D-H's Decision to Terminate
Dr. Porter Because it is Probative of Whether D-H's Purported Bad
Business Decision was Pretext for an Underlying Improper Motive

To show pretext, Dr. Porter must establish that D-H's "legitimate" reason is false or not the motivation behind her termination and that discrimination or retaliation was the true motivation. The reasonableness of an employer's decision is relevant to a determination of whether the employer's stated reasons are the true reasons. *See, e.g., Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 663 (2d Cir. 2009) (Where the employer's policy was to provide "true" reasons for termination decisions, and where employer failed to provide plaintiff with any reason initially, employer's later "vaguely formulated and technically inaccurate explanations" would permit a jury to infer pretext.).

Dr. Porter does not ask this Court to act as a super-personnel department, nitpicking D-H's bad business decisions. Rather, Dr. Porter asks this Court to look at the totality of circumstances surrounding the decision to terminate Dr. Porter's employment and to recognize that if D-H's purported rationale for its decision to terminate Dr. Porter makes no sense, it may be because it is not the real reason for her termination. *See id.* at 663 (noting that an employer's "invocation of the business judgment rule does not insulate its decisions from all scrutiny in a discrimination case"); *Acevedo-Parrilla*, 696 F. 3d at 141 (finding plaintiff

"presented more than a simple disagreement with the correctness of [employer's] decisions" where he argued that employer's stated reasons for dismissal are inconsistent with his performance record, raising the question of whether employer "truly believed" plaintiff's performance was unsatisfactory); *Stewart v. Sanmina Texas L.P.*, 156 S.W.3d 198, 210-213 (Tex. App. 2005) (noting that where a "mistake of judgment" is sufficiently large, "one may wonder whether it was a mistake at all").

Evidence tending to show that the alleged "legitimate" reason is false, including inconsistent or evolving explanations for plaintiff's termination, is probative of pretext. *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845, 847 (2d Cir. 2013); *Weiss*, 332 F. App'x at 663 (stating "[i]nconsistent or even post-hoc explanations for a termination decision may suggest discriminatory motive");[2] *Shafrir*, 998 F. Supp. at 362 (concluding that "a jury could find pretext based on [defendants'] 'moving target' explanations"); *Miles*, 998 F. Supp. at 385 (finding that warnings in plaintiff's personnel file leading up to plaintiff's discharge "lose much of their impact" when paired with an alleged threat by supervisor to "fill her

---

[2] D-H attempts to discount the relevance of conversations and correspondence that occurred after announcing the decision to close the REI Division and terminate the three REI physicians. (Opp. at 30.) Where the communications directly concern and clarify the motivation for a past decision, however, they are every bit as relevant as communications leading up to the decision.

personnel file with adverse documentation" and likewise provide evidence of animus).  Dr. Porter's allegation that D-H essentially had a "scheme" to rid itself of two incompetent physicians and one disabled whistleblower, (*see, e.g.,* JA-644 to JA-645; JA-656 to JA-657), is probative of pretext.  *See Bryant v. Jones*, 696 F. Supp. 2d 1313, 1327 (N.D. Ga. 2010) (stating that plaintiffs' allegations "amount to more than second-guessing of allegedly legitimate business decisions" where testimony alleged that employer had a "scheme" to transfer and reassign certain employees to force them to resign their positions).

An employer's "legitimate" reason is not legitimate if it is not believed by the employer.  *See Weiss*, 332 F. App'x at 662 (noting that "the evidence presented by Weiss goes to whether his supervisors could have credibly believed that Weiss was at fault for the complaints of his sales team, and whether Weiss's supervisors thought that they could resolve the problem by replacing Weiss.").  If the employer's stated reason behind the termination is false or not the true motivation, then the employer has not produced a legitimate, non-discriminatory reason for the termination.

A. *Dartmouth-Hitckcock's Inconsistent Explanations for Closing the REI Division are Pretextual*

At various times, D-H has argued that it had no choice but to close the REI Division and terminate Dr. Porter and the other REI physicians because (a) there

was a nursing shortage, (b) there was "dysfunction" within the REI division, or (c) both.[3]

Laying the blame for the REI Division closure on a lack of qualified nurses, (Opp. at 10),[4] sounds plausible on the surface. Whether Dr. Merrens believed and was motivated by this reason is, on closer inspection, a disputed fact because the evidence shows that Dr. Merrens and Dr. DeMars viewed the nursing shortage as a convenient, and perhaps manufactured, "cover story."[5] Dr. DeMars admitted that the nursing shortage would be an "ideal message." (JA-657.) Dr. Merrens agreed, although he acknowledged that the excuse would seem "thin" to others. (JA-653.)[6]

---

[3] Although D-H half-heartedly attempts to muddy the waters by asserting that there were unspecified "complaints" against Dr. Porter in addition to well-documented and serious complaints about Drs. Seifer and Hsu, it does not seriously allege that it was justified in terminating Dr. Porter because of her performance or skills or the violation of any internal policies.

[4] Citations to "Opp." refer to the Brief of Defendants-Appellees.

[5] "Plaintiff's counsel has produced evidence that hospital administrators created a 'cover story' for the closure of the REI Division which was not entirely true." (SPA-5.)

[6] D-H claims that Dr. Porter "acknowledges that the nursing situation within the REI Division was dire." (*See* Opp. at 8 (citing as proof a statement from Dr. Porter's deposition).) In her deposition, Dr. Porter was shown an email sent by Heather Gunnell discussing the "critical staffing issue in REI." (JA-487.) When asked what she understood the email to mean, Dr. Porter replied, "I understood there was a critical shortage of nurses, yes. *I also understood there were solutions*

In reality, any lack of REI nurses was due to D-H's own, arguably intentional, recruiting and staffing failures. D-H fails to mention, for example, that Sharon Parent gave D-H a year's notice before she retired. (Opp. at 8; JA-594.) Ms. Parent—with 17 years of experience as an REI nurse—believed this was more than sufficient for D-H to locate and train a replacement. (JA-594.) In case it was not, Ms. Parent also offered to continue to fill in when needed, but was inexplicably given the runaround. (JA-594 to JA-595.) Later, Dr. DeMars admitted to Ms. Parent that she had instructed HR and the REI Division not to hire her. (*Id.*) On top of this, the evidence suggests that recruitment efforts were discontinued around February 2017. (JA-271 [144:6–144:23.) A reasonable jury could infer that D-H began manufacturing a nursing shortage shortly before announcing the decision to close the REI Division. A reasonable jury could likewise infer that D-H's alleged "legitimate" reason was either false or was not the motivation for deciding to terminate Dr. Porter's employment.

At other times, D-H blames the REI closure solely on "dysfunction," (Opp. at 9), thus shifting away from its prior rationale of a nursing shortage. (*See also id.*

_____

*to that shortage*." (JA-488 (emphasis added).) D-H attempts to manipulate the Court's understanding of Dr. Porter's testimony by omitting the key second sentence.

(blaming closure on the "multiple complaints about all of the physicians within the REI Division, including Dr. Porter herself.")[7] This term "dysfunction" goes to the very heart of Dr. Porter's allegation that she was terminated in retaliation for whistleblowing.

It is not speculation to say that when D-H refers to "dysfunction"[8] in the REI Division, it means Dr. Porter's whistleblowing complaints about Drs. Seifer and Hsu and the risk these providers posed to safe patient care and about conduct that she perceived as unlawful, as well as Dr. DeMars' refusal or inability to correct these issues. (*See, e.g.,* JA-254, [120:6–120:9].) Dr. DeMars, Heather Gunnell, and Mr. Herrick—the three individuals who supplied Dr. Merrens with the data used to make decisions about the Division and Dr. Porter's employment[9]—blamed

_____

[7] As noted above, this statement is very misleading. Everyone has a few disgruntled patients, but a quick look at the nature of the complaints involved would suffice to show that Dr. Porter and Drs. Seifer and Hsu were not in the same league with respect to "complaints." (*See, e.g.,* JA-635 to JA-637 (internal review).)

[8] In 1979, this Court warned that decisions made on the basis of subjective observations such as plaintiff did not "fit in," was "argumentative," was "irritable and belligerent," or was a 'troublemaker' require careful analysis, particularly where the decisionmaker's conduct may have intentionally provoked the negative reaction. *Robinson*, 610 F.2d at 1040–42.

[9] Dr. Merrens admits to having limited first-hand knowledge and instead receiving summaries from Dr. DeMars, Mr. Herrick, and Ms. Gunnell. (*See, e.g.,* JA-305 [114:3–116:9]; JA-311 [137:14–138:17]; Opp. at 11.)

Dr. Porter for causing this "dysfunction," (*see, e.g.,* JA-273 to JA-274 [189:23–190:6] (Ms. Gunnell replied that she was "not convinced that the team, any team would be able to have a healthy dynamic if [Dr. Porter] was at the center of it"); JA-644 to JA-645 (Dr. DeMars identified Dr. Porter's "past behavior and her inability to be just a worker bee" as reasons to terminate her); JA-656 to JA-657 (Dr. DeMars accused Dr. Porter of a "masterful takedown" of Dr. Seifer and shared thoughts on how to rebuild the Division without Dr. Porter).)

Closing the Division presented a neat "solution" to the dual problems of the professional incompetence of Drs. Seifer and Hsu and the vocal troublemaker (aka whistleblower) Dr. Porter. Terminating a physician for administrative reasons is easier than justifying termination based on the physician's clinical skills or performance, because in the second case, the physician is entitled to a hearing and other procedural safeguards. Not to mention the potential risk management nightmare if the hospital acknowledges significant professional competence concerns in two of its physicians. (*See* JA-635 to JA-637 (internal review).) Dr. DeMars understood this challenge and stated that "[w]e would not have been able to terminate the other two without cause") (JA-644.) *See also Ramseur*, 865 F.2d at 463–64 (plaintiff obtained a copy of a memo between her supervisors, an HR

---

executive, and legal counsel which stated "it became clear to [counsel] that there might be similar cases involved. … In [counsel's] opinion, if all were treated in the same fashion at the same time the Bank's case would be strengthened in the event of a suit").

B. *Termination of Dr. Porter's Employment was Not Inevitable*

D-H argues that Dr. Porter couldn't accept that her termination was an "inevitable" consequence of closing the REI Division. That not everyone lost their job proves that D-H made conscious decisions about whether to re-deploy or terminate particular REI Division staff.[10] At that point, Dr. Porter had been an employee of D-H for more than twenty years. *Cf. Miles*, 998 F. Supp. at 388 ("A reasonable jury could also conclude that termination of a 25-year career was unreasonably and inexplicably harsh."). Once the decision was made to close the REI Division, Dr. Porter could have been offered another position at D-H. Initially, it looked like this is what D-H would do. (*See* JA-195 [81:15-81:19]; JA-

---

[10] Despite D-H's assertion that "[b]oth Drs. Porter and Seifer were terminated at the same time for the very same reasons," (Opp. at 33), Dr. Porter and Dr. Seifer had vastly different skill sets and reputations which warranted separate consideration. While it may indeed have been difficult for D-H to find sufficient non-REI work for Dr. Seifer, Dr. Porter had numerous skills that she could put to use outside a dedicated REI Division.

659 to JA-664.)  But although D-H claims that it tried to find a way to reassign Dr. Porter, this remains a *disputed* factual issue.

The doctors and nurses in the OB/GYN Department were unanimous in their opinion that Dr. Porter had unique skills—beyond her recognized expertise in ultrasound—that were badly needed.  (*See, e.g.,* JA-586 ("Many general GYN surgery cases went to Dr. Porter" and she was the "go-to person for complex benign GYN surgeries, such as myomectomies."); *id.* ("Dr. Porter did a lot of work that was related to fertility preservation … an important area of medical care for OB/GYN patients, regardless of whether DH scaled back its IVF program or temporarily paused the IVF services."); JA-583 (Dr. Porter performed "ultrasound-guided procedures that no other physicians in the department performed"); *id.* ("[N]o one … could replace Dr. Porter's surgical skills."); JA-648 ("[Dr. Porter's] expertise in gynecologic ultrasound, myomectomies, hysteroscopy, and gyn surgeries provide a level of care to women that is not available from other members of Gynecology staff."); JA-592 ("It was well-known that Dr. Porter was a resource for doctors in the OB/GYN Department, not only doctors in the REI Division.").  *See also* JA-345 (Dr. Porter was "more valuable" covering the ultrasound clinic than taking call because "the resident house staff needed to have regular and quality teaching in gynecologic ultrasound."); JA-347 to JA-349

(listing the range of work Dr. Porter was performing at the time of her termination).)

Viewing the evidence in Dr. Porter's favor, as required for summary judgment, the Court should conclude that D-H did not make a reasonable effort to retain or reassign Dr. Porter. At best, Dr. DeMars made a half-hearted effort to explore a part-time ultrasound-only role for Dr. Porter, likely just to be able to say that she tried. The OB/GYN Department was understaffed and, as a trained OB/GYN physician, Dr. Porter could have been fully occupied with that work. (*See* JA-648; JA-666 (immediately following closure of the REI Division, D-H issued an urgent hiring request for a generalist OB/GYN physician); JA-710 (D-H reallocated an REI nurse practitioner to a general OB/GYN role following REI closure).) Nonetheless, the evidence shows that D-H chose instead to terminate Dr. Porter for unlawful reasons.

It is telling that when Dr. Merrens was asked directly by an OB/GYN physician in a Department-wide meeting why Dr. Porter couldn't stay, he did not cite staffing issues or the "inevitability" of her termination following closure of the REI Division. He said it was because Dr. Porter was "on disability." (JA-586 to JA-587.) Within days of this meeting, Dr. Merrens received an email from an experienced OB/GYN nurse who had worked extensively with Dr. Porter asking why Dr. Porter could not be kept on, since OB/GYN was "short staffed already"

and Dr. Porter provided critical OB/GYN services.  (JA-648.)  Dr. Merrens' reply included nothing about the need to make a hard business decision.  Instead, he explained that Dr. Porter "currently works at 20% of her time currently [*sic*],"[11] adding, as an afterthought: "I'm not sure of her interest in staying on if the infertility part were to cease."  (*Id.*)  After over twenty years of exceptional service, that D-H did not even ask Dr. Porter what she wanted to do under the circumstances, supports an inference that D-H's motives in terminating Dr. Porter were unlawful.

D-H is entitled to argue to a jury that it did its best to find Dr. Porter a position but was sadly unsuccessful.  Dr. Porter is entitled to call the doctors and nurses who would testify that she was already performing work for OB/GYN and that they relied upon her unique skills to provide essential services.  And the jury is entitled to decide which to believe, because Dr. Porter has presented enough evidence to clear the hurdle of summary judgment.  By resolving disputes of fact and granting summary judgment, the District Court usurped the jury's role.

---

[11] An inaccurate statement, because Dr. Porter was working a 50% schedule at that time.  (JA-85; JA-340 to JA-342.)

## IV.    Dr. DeMars Did Not Act as Dr. Porter's Friend and Advocate

Dr. DeMars' loyalties are a matter of perspective and a core disputed fact.  Dr.

DeMars occupied a key role in the decision to close the REI Division and the later

decision to terminate Dr. Porter's employment.  She was Dr. Porter's supervisor

and therefore intimately familiar with Dr. Porter's whistleblowing complaints as

well as her disability and accommodations.  She provided Dr. Merrens with

information about the REI Division and its personnel, (JA-282 [22:9–22:14]),

including framing Dr. Porter's whistleblowing activities as "disruptive" behavior,

(JA-644), and implying that Dr. Porter would never again be as useful as she was

before her disability, (JA-644 to JA-645 ("Everyone also is remembering Misty as

a full time employee wearing 3 hats … I'm not sure that she should or will really

every [*sic*] be able to do the complex hysteroscopy or laparoscopy that she once

did")).  Whatever friendship Dr. DeMars and Dr. Porter may have had in the past,

by the time decisions were being made in 2017 about closing the REI Division and

terminating the staff, and despite what she was saying to Dr. Porter's face, Dr.

DeMars' was no longer acting as Dr. Porter's friend.[12]  (JA-197 [83:1–83:7].)

---

[12] Dr. Porter initially believed that Dr. DeMars had her back, because that is what
Dr. DeMars was telling her.  (JA-195 [81:1–81:19].)  Thus, Dr. Porter's initial
complaint is written to incorporate this understanding.  But subsequent events,
including discovery received from DH and others, showed she was wrong.  (*See*
JA-495 to JA-496 (indicating that Dr. Porter initially believed that Dr. DeMars was

The May 2017 "single email" that D-H references, (Opp. at 30), is not the only evidence of Dr. DeMars' animus in the record, but it is some of the strongest. In the email, which was sent while Dr. Porter was still working at D-H, Dr. DeMars is not begging Dr. Merrens to keep Dr. Porter on at D-H. (JA-645 ("[I]t was the right decision to include her in the terminations, and I don't want to change that decision.").) She is not even quietly acquiescing to a superior's decision that she nevertheless disagrees with. Rather, she explains how she considered moving Dr. Porter to OB/GYN in an ultrasound-heavy role but recommends against it because of Dr. Porter's "past behavior," her "inability to just be a worker bee," and because it would undermine the effort to terminate Drs. Hsu and Seifer "without cause." (*Id.*) These are not the words of someone advocating for the best outcome for her friend. Likewise, a close friend does not say that her "life and the messaging would be much easier" if her friend was "facing loss of license." (JA-657.)

Dr. DeMars was working to save her own career and the evidence shows that she was willing to throw Dr. Porter under the bus to do it. (*See* JA-198 [84:13–84:20]; JA-544 [151:6-152:25].) In any event, it is not for the court to decide between allegedly contradictory interpretations. The ultimate dispute over

---

genuine in her efforts to keep the REI open and Dr. Porter employed, but that her view changed after she saw the emails produced in discovery).)

Dr. DeMars' true feelings towards Dr. Porter or her motivation in portraying Dr. Porter as a disabled troublemaker to Dr. Merrens is best left to the jury, because Dr. Porter has provided sufficient evidence to bring the matter to trial.

V.   Dr. Porter's Interpretation of Pretextual Evidence is Objectively Reasonable

A. *Dr. Porter's Evidence Meets the Weinstock "Objectively Reasonable" Standard*

D-H characterizes Dr. Porter's interpretation of the facts as unreasonable "speculation"[13] and insists that Dr. Merrens decided to close the REI Division and terminate Dr. Porter's employment for complex business reasons having nothing to do with Dr. Porter's disability, her whistleblowing activities, or because Dr. DeMars had poisoned his mind against Dr. Porter.  D-H's primary source of legal authority is *Weinstock v. Columbia University*, a sex-discrimination tenure denial case decided by this Court.  224 F.3d 33 (2d Cir. 2000).  According to D-H, *Weinstock* requires a plaintiff's interpretation to be "objectively reasonable." Given the significant qualitative and quantitative differences in evidence, *Weinstock* is easily distinguished, and D-H overstates its importance.

---

[13] Speculation is not an inherently dirty word.  "Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference."  *Lavender v. Kurn*, 327 U.S. 645, 653 (1946).

The *Weinstock* plaintiff brought her claims after the University denied her bid for tenure. Colleges and Universities are afforded a great deal of deference in their tenure decisions, and the University presented evidence from multiple sources indicating that plaintiff's scholarly pursuits were not of sufficient caliber to warrant tenure. Plaintiff disagreed and argued that comments by the tenure committee that she was "nice" and "nurturing" were evidence of sex-based discriminatory animus. This Court concluded that plaintiff failed to provide admissible evidence that anyone on the committee had actually used the term "nurturing" and that "nice" was not evidence of pretext. In any event, neither term was exclusively stereotypically female nor used in a derogatory fashion. It was, therefore, "not objectively reasonable to label these innocuous words as semaphores for discrimination." *Weinstock*, 224 F.3d at 45.

In contrast, Dr. Porter presented evidence that Dr. DeMars intentionally curated the information she presented to Dr. Merrens, downplaying the problems with Dr. Seifer and Hsu, (*see, e.g.,* JA-298 to JA-299 [88:5–89:16]; JA-306 [120:2–120:20; JA-307 [121:4–122:14]), and portraying Dr. Porter as a troublemaker and the source of irreparable "dysfunction" in the REI Division, (JA-644 to JA-646); that Dr. DeMars recommended termination, (JA-644 to JA-645); and that Dr. Merrens agreed with her (whether because he shared Dr. DeMars' animus or because he simply "rubber-stamped" Dr. DeMars' recommendation),

(JA-653).  It is not objectively unreasonable to conclude that a jury could infer that a supervisor's negative opinion of an employee influenced the decisionmaker.

Similarly, Dr. Porter's interpretation of the role that her disability played in the decision to terminate her employment is not mere speculation, no matter how often or how loudly D-H proclaims it so.  Dr. Porter submitted affidavits, emails, and deposition testimony indicating that on multiple occasions Dr. Merrens and Dr. DeMars explicitly identified Dr. Porter's disability as a primary reason and justification for her termination.  *Compare, e.g., Nguedi v. Fed. Rsrv. Bank of New York*, 813 F. App'x 616, 618 (2d Cir.), *cert. denied*, 141 S. Ct. 825 (2020) (plaintiff failed to respond to the Fed's summary judgment motion with affidavits or other documents to counter the facts asserted by the Fed and "his speculation about what those witnesses might have said was insufficient to defeat summary judgment") *with Lewis v. Philip Morris Inc.,* 355 F.3d 515, 533 (6th Cir. 2004) (vendors presented "more than a mere basis for speculation or conjecture" and raised a question of material fact about whether competition existed in an antitrust case where they provided vendor testimony and evidence of a study).  *See also Miles*, 998 F. Supp. at 388 (concluding that a reasonable jury could find age-based discrimination where plaintiff's evidence included discriminatory remarks, supporting affidavits of three former employees, supervisor's effort to pad plaintiff's file with negative performance reviews, and where employer's decision

to fire an employee with more than twenty years of good service rather than impose lesser discipline seemed excessively severe).

B. *Dr. Merrens' Disability-Related Comments Should be Taken at Face Value*

D-H insists, on repeat, that Dr. Merrens knew virtually nothing about Dr. Porter's health situation.  (Opp. at 11.)  Yet, by D-H's own admissions, Dr. Merrens knew that Dr. Porter was on disability and working part-time and took the initiative to ask if she would continue to receive long-term disability benefits after termination.  (Opp. at 11–12.)  He had also heard Dr. DeMars' own biased opinion and had affirmed Dr. DeMars' view that termination would be the "best outcome" for Dr. Porter, (JA-644 ("[O]nce the dust settles, will [*sic*] be in a better position with all this, including Misty."); JA-645 ("[T]he best outcome of this termination is the chance for Misty to actually be out on leave with no intervening responsibilities, so that she can assess how much improvement she might gain.")).  D-H further insists that Dr. Porter's disability had "no bearing" on Dr. Merrens' decisions.  (Opp. at 12, 44.)  But Dr. Merrens explicitly identified Dr. Porter's disability as the reason for her termination on multiple occasions and to multiple people.

Context matters.  The decision to close the REI Division was a big deal to the OB/GYN Department, so much so that a Department-wide meeting was held to

discuss the decisions that had been made and what to expect going forward. (JA-586 to JA-587.) By this time, Dr. Merrens had been "inundated" with questions from staff asking why Dr. Porter was being terminated and had asked for and received Dr. DeMars' thoughts about how to respond. (JA-644 to JA-646.) It is reasonable to assume that Dr. Merrens had spent time preparing for this meeting and thinking about the questions that were likely to arise. This is the context in which Dr. Michelle Russell asked Dr. Merrens why Dr. Porter couldn't stay on in another role. And Dr. Merrens answered that it was because of her "disability." (JA-586 to JA-587.)

Despite the plain language of Dr. Merrens' response, the District Court concluded that there must be another explanation for the comment because it would not be "reasonable" for Dr. Merrens to admit before the entire OB/GYN Department that Dr. Porter was terminated because of her disability. The District Court erroneously usurped the role of the jury. It then compounded its error by proceeding to list a series of additional comments identifying Dr. Porter's disability as the reason for her termination, but then ignore the "pattern" formed by those comments, (SPA-25). *See Silver*, 490 F. Supp. 2d at 363 ("Although evidence of one stray comment by itself is usually not sufficient proof to show age discrimination, that stray comment may bear a more ominous significance when considered within the totality of the evidence.") (quotations omitted).

D-H is free to argue at trial that Dr. Porter's interpretation does not reflect

Dr. Merrens' true intent, but determinations of witness credibility—including the

credibility of Dr. Russell in recalling Dr. Merrens' statements, although there is no

basis to discount her credibility—are left to the jury.  *See, e.g., Schultz v. Univ. of*

*Wisconsin Hosps. & Clinics Auth.*, 513 F. Supp. 2d 1023, 1036–37 (W.D. Wis.

2007) (noting that a reasonable jury might view discrepancies between the

interview answers as alleged by plaintiff and the notes taken by the interviewers as

evidence of pretext, or it could find plaintiff's "recollection of the precise wording

of her answers [] not credible several years after the fact" but it is for the jury to

make the credibility assessment).

That Dr. Merrens and Dr. DeMars sometimes couched their discriminatory

remarks in terms of what would be "best" for Dr. Porter, (*see, e.g.,* JA-644 to JA-

646 (suggesting that Dr. Porter's termination would be for the best, so that she

could find a part-time REI position somewhere else)), their patronizing attitude is

simply another facet of disability discrimination.  By regarding Dr. Porter as

disabled and less capable both of performing her job and of making her own

decisions about her future, Dr. DeMars and Dr. Merrens allowed Dr. Porter's

disability to unlawfully influence their decisions.  *Cf. Shafrir*, 998 F. Supp. at 362

("A reasonable jury could find on the basis of these statements [purporting to

understand the challenges of balancing family and work and her desire to spend

more time with her daughter], coupled with Hirsch's other comments to plaintiff, that he dismissed her not because she chose to take a vacation but because of his doubts as to her desire and ability to continue working after having a child.").

C. *Dr. Porter Adequately Alleged Temporal Proximity as a Factor Indicating Causation*

Plaintiff's position regarding temporal proximity is adequately covered in the opening brief and only briefly mentioned here to address D-H's statement that the applicable of temporal proximity is limited to the *prima facie* stage. The District Court focused its analysis only on the February 2017 "Zika incident," giving short shrift to the other examples of whistleblowing activity. Essentially, the District Court treated the other whistleblower incidents as though they had occurred prior to February 2017, despite Dr. Porter's allegations that she continued to report unsafe and unlawful conduct well beyond that date. (SPA-14 to SPA-15.) It then placed excessive weight on its determination that temporal proximity was lacking. Temporal proximity is a factor relevant to causation. (*Id.* at 9.) Plaintiff's opening brief devoted much space to the issue of temporal proximity because it continues to play a role at the pretext stage. *See Kwan*, 737 F.3d at 847 ("[A] plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage.").

VI.    Anti-Retaliation Protections Should Be Interpreted Broadly to Achieve Their Intended Purpose

Human behavior is still influenced to a significant degree by ancient evolutionary instincts, which include, for example, the "fight or flight" response and retaliation.  Molly J. Walker Wilson, *Retribution as Ancient Artifact and Modern Malady*, 24 Lewis & Clark L. Rev. 1339, 1344–45 (2020).  When confronted with a whistleblower's allegations of improper conduct, retaliation is an instinctive reaction.  "Only the rare person can slough off being accused of discrimination without experiencing a negative reaction.  More often, the accused experiences defensiveness, frustration, betrayal, anger, or some combination of these feelings."  John A. Berg, *A Catch-22 in Workplace Retaliation Claims*, CBA Rec., October 2009, at 50 (available on Westlaw).  Laws prohibiting workplace retaliation encourage employers to curb these ancient instincts.  Without such protections, employees fear reprisal for reporting unlawful conduct.  *Cf. In re U. S.*, 565 F.2d 19, 22 (2d Cir. 1977) (noting that fear of retaliation, be it physical or more subtle retaliation "such as economic duress, blacklisting or social ostracism," acts as a deterrent to reporting).  And their fear is justified.  Whistleblowers are regularly viewed as "troublemakers" and subjected to retaliation (one study put the frequency at 82%), the effects of which can last a lifetime.  Leora F. Eisenstadt &

Jennifer M. Pacella, *Whistleblowers Need Not Apply*, 55 Am. Bus. L.J. 665, 666, 671 (2018).

There are obvious societal benefits to bringing discrimination and other unlawful or undesirable behavior into the light where it can be eradicated, and government agencies rely heavily on whistleblowers to report incidents of discrimination, worker safety violations, fraud, and other corporate malfeasance. *Id.* at 671. It is vital that existing legal protections against retaliation are interpreted in a manner that recognizes the risks taken by an employee whistleblower and promotes disclosures. *See McMenemy v. City of Rochester*, 241 F.3d 279, 284–85 (2d Cir. 2001) (finding that the interpretation applied by employer and the district court would "significantly deter an employee's use of Title VII remedial mechanisms").

## <u>CONCLUSION</u>

Dr. Porter brought concerns to her supervisor about co-worker conduct that she reasonably believed was both unsafe and unlawful, causing Dr. DeMars to label her as a troublemaker and blame her for the "dysfunction" in the REI Division. The evidence also shows that Dr. DeMars and Dr. Merrens regarded Dr. Porter as damaged goods because of her disability and that this further motivated their decisions (whether because they saw her as less valuable to the hospital or out

of a misguided sense that they knew what was "best" for her).  The "solution" ultimately selected by D-H to rid itself of the two doctors about whom Dr. Porter made reports coincidently also included termination of Dr. Porter's employment.  D-H argues that it had to make a hard business decision and that it is simply too bad that Dr. Porter lost her job after more than twenty years of employment.  Yet, every time Dr. Merrens was asked, this is not the answer he provided.  The Court must remember that "clever men discriminate in clever ways, and where is smoke there is fire."  Chin, *supra,* at 680.  This is classic discrimination and retaliation, and this Court should interpret the protective laws broadly in keeping with their purpose and not in a manner that will discourage Dr. Porter and future potential whistleblowers from bringing unlawful workplace conduct to light.  The lower court erroneously granted summary judgment for the employer while usurping the role of the jury.  Dr. Porter therefore respectfully requests that this Court reverse and remand the matter for further proceedings and trial.

Respectfully submitted,

Dated: June 22, 2021                    /s/ *Geoffrey J. Vitt*
                                        Geoffrey J. Vitt


                                        Geoffrey J. Vitt
                                        Vitt & Associates, PLC
                                        PO Box 1229
                                        8 Beaver Meadow Rd.
                                        Norwich, VT 05055
                                        (802) 649-5700
                                        gvitt@vittandassociates.com


                                        Katherine B. Kramer
                                        DGW Kramer LLP
                                        One Rockefeller Plaza
                                        Suite 1060
                                        New York, NY 10020
                                        (917) 688-2585
                                        kkramer@dgwllp.com


                                        *Attorneys for Appellant*

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(ii) and L.R. 32.1(a)(4)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,875 words. This Brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Word for Microsoft 365 in Times New Roman, 14-point font.

Dated: June 22, 2021                    /s/ *Geoffrey J. Vitt*
                                        Geoffrey J. Vitt


                                        *Attorney for Appellant*